1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **SOUTHERN DISTRICT OF CALIFORNIA**
10
11   SABRINA LAGUNA, an individual; and            CASE NO. 09-CV-2131-JM (BGS)
     ROES 1 through 50 on behalf of
12   themselves and in a representative            **ORDER GRANTING**
     capacity for all others similarly situated,   **PLAINTIFFS' MOTION FOR**
13                                                  **AN ORDER INVALIDATING**
                                        Plaintiffs, **COVERALL'S CHECKLIST**
14                                                  **AND DECLARATIONS**
          vs.                                       **OBTAINED FROM CLASS**
15                                                  **MEMBERS; FOR AN ORDER**
     COVERALL NORTH AMERICA, INC.,                  **DIRECTING CURATIVE**
16   a Delaware corporation; ALLIED                 **NOTICE; AND FOR AN ORDER**
     CAPITAL CORPORATION, a Maryland                **REQUIRING THAT**
17   corporation; DOES 1 through 50,                **COVERALL, ITS AGENTS AND**
     inclusive,                                     **ITS COUNSEL CEASE AND**
18                                                  **DESIST FROM FURTHER**
                                        Defendants. **COMMUNICATIONS WITH**
19                                                  **FORMER AND CURRENT**
                                                    **"FRANCHISEES" REGARDING**
20                                                  **THIS ACTION**
21                                                  Doc. No. 35
22
23          Plaintiffs filed the instant class action lawsuit against Defendants based on a purported
24   franchise agreement between the parties for the provision of janitorial and cleaning services.
25   Plaintiffs' Third Amended Complaint ("TAC") states the following twelve causes of action:
26   (1) breach of contract; (2) misleading advertising in violation of CAL. BUS. & PROF. CODE
27   § 17500 *et seq.*; (3) failure to pay minimum wage in violation of CAL. LAB. CODE §§ 1194,
28   1194.2, 1197; (4) failure to pay overtime compensation in violation of CAL. LAB. CODE §§ 510,

1194 et seq.; (5) failure to provide rest periods or compensation in lieu thereof in violation of CAL. LAB. CODE § 226.7 and relevant California Industrial Wage Commission ("IWC") orders; (6) failure to provide meal periods or compensation in lieu thereof in violation of CAL. LAB. CODE §§ 226.7, 512 and relevant IWC orders; (7) failure to reimburse for reasonable business expenses in violation of CAL. LAB. CODE § 2802; (8) unlawful deductions from wages in violation of CAL. LAB. CODE §§ 221, 223; (9) conversion; (10) unfair business practices under CAL. BUS. & PROF. CODE § 17200 *et seq.*; (11) theft of labor in violation of CAL. LAB. CODE §§ 216, 553, 1199 and CAL. PENAL CODE §§ 484, 532; and (12) injunctive relief. Since this suit was filed, Defendants have held a series of meetings with potential class members at which some of the attendees filled out checklists and signed declarations in support of Defendants' position. Plaintiffs now move for an order from the court that would: (1) invalidate the checklists and declarations that Defendants have obtained from prospective class members to date; (2) direct a neutral curative notice to issue to those prospective class members who have been contacted by Defendants; and (3) prohibit Defendants from contacting potential class members to discuss the case until such curative notice has been sent.

   As neither party has requested oral argument, the court determines this matter is appropriate for resolution based on the papers as submitted pursuant to Local Rule 7.1(d)(1). For the reasons set forth below, the court hereby GRANTS Plaintiffs' motion in its entirety.

## I.   BACKGROUND

   Plaintiffs Sabrina Laguna, Carlos Acevedo, and Teresa Salas (collectively "Plaintiffs") are individuals each of whom independently signed a contract with Defendant Coverall North America, Inc. ("Coverall") for the purchase of a cleaning services franchise. (TAC ¶¶ 71-79.) Under these agreements, Plaintiffs agreed to pay Coverall an initial "franchise fee" and undergo training. (Id.) In exchange, Plaintiffs would be assigned to perform cleaning services for some of Coverall's pre-existing client accounts, which Coverall guaranteed would generate a certain amount of monthly income for Plaintiffs. (Id.) Plaintiffs claim that, despite fulfilling the terms of their agreements, they have not been provided with a sufficient amount of work by Coverall to meet those income guarantees. (Id.)

Plaintiffs also allege that Coverall engages in the same tactics with many of its other workers, pressuring them to sign franchise agreements and making false promises about the amount of income they will receive. (Id. at ¶¶ 25.) These workers are targeted in part because they are immigrants who do not speak English, and who are therefore unable to fully understand the agreements they are signing. (Id. at ¶¶ 30-33.) According to Plaintiffs, after paying for their franchises, workers frequently do not receive the level of income they have been promised because Coverall has an insufficient number of customer accounts to satisfy the guarantees it has made. (Id. at ¶ 35.) In addition, Coverall frequently takes accounts away from workers without justification in order to assign them to new franchisees. (Id. at ¶¶ 38-40.) This process, which Plaintiffs refer to as "churn[ing] the accounts," is designed to generate the appearance that Coverall is fulfilling its agreements with regard to its new workers. (Id. at ¶ 36.) Plaintiffs further allege that, in spite of Coverall's failure to fulfill its end of the franchise agreements, Coverall has not only refused to refund workers' franchise fees, but has also deducted other excessive fees from their payments, further reducing the income the workers actually receive. (Id. at ¶¶ 41-42.)

Moreover, although Coverall classifies its workers as "independent contractors," Plaintiffs claim that the company exercises a degree of control over its workers that creates an employer-employee relationship. (Id. at ¶¶ 46-51.) According to Plaintiffs, Coverall has miscategorized its workers as "franchisees" rather than as employees in order to avoid paying minimum wage and overtime, reimbursing workers for cleaning supplies and transportation costs, and providing rest and meal breaks and workers' compensation. (Id. at ¶¶ 44-45, 52-57.)

In addition to Coverall, Plaintiffs name Allied Capital Corporation ("Allied"), Ares Capital Corporation ("Ares"), CNA Holding Corporation ("CNA"), and Ted Elliott ("Elliott") as defendants in the instant action. Allied previously held an ownership stake in Coverall, which interest was transferred to Ares upon Allied's merger with and into Ares on April 1, 2010. (Id. at ¶ 6.) CNA also holds an ownership interest in Coverall. (Id. at ¶ 8.) Elliott is the CEO of Coverall and the sole director of CNA. (Id. at ¶ 59.) Allied, Ares, CNA, and Elliott are named in the TAC based on an alter ego theory of liability. (Id. at ¶¶ 14-20.)

1    Plaintiffs bring this action on behalf of a class of individuals, identified as "workers

2    who have performed cleaning services for Defendants from August 8, 2004, through the

3    present." (Id. at ¶ 1.) Plaintiff originally filed suit in San Diego Superior Court, and Allied

4    removed the case to this court based on diversity jurisdiction under the Class Action Fairness

5    Act, 28 U.S.C. §§ 1332(d), 1453. (Doc. No. 1 pp. 2-3.) Plaintiffs' motion for class certification

6    is currently set to be heard on January 7, 2011.

7    **A.    Coverall's Meetings with Prospective Class Members**

8    Plaintiffs filed the instant motion in response to a series of ex parte meetings with

9    prospective class members initiated by Coverall. (Doc. No. 35.) In these meetings, Coverall

10   discussed the pending lawsuit and distributed "Franchisee Declaration Checklists" for

11   attendees to fill out. These checklists included statements about whether workers identified

12   themselves as franchisees and whether Coverall exercised control over their day-to-day

13   decisions.[1] Next to each, the workers were asked to check either "Yes" or "No" to indicate

14   their agreement or disagreement with the statement. In addition, Coverall also asked those

15   workers who completed the checklist to sign a declaration attesting to the same information.

16   It is unclear how many completed checklists and signed declarations Coverall has obtained

17   thus far.

18   Plaintiffs now allege that the meetings between Coverall and any prospective class

19   members were inappropriate, as Coverall used the meetings to convey false and misleading

20   information to the attendees and coerce them to sign declarations that would limit their ability

21   _____

22   [1] The following are examples of some of the statements found in the Franchisee Declaration Checklist:

23   - "I do not view myself, and do not believe that I am an employee of Coverall. Rather, I am a franchisee of Coverall and operate my own independent commercial cleaning company."

24   - "I decide when to start and end my workday, as well as whether to take lunch and rest breaks and when those breaks are taken. The length of the breaks I take is entirely up to me."

25   - "During a typical workday, I am not supervised by anyone from Coverall, and am not required to check in or 'touch base' with anyone at Coverall at the beginning, during or at the end of my workday."

26

27

28   (Doc. No. 35, Exh. 4.)

to participate in this action. They have submitted two declarations in support of their motion from Coverall workers who attended meetings with Coverall representatives in June and July of 2010. (Doc. No. 35 Exhs. 2 & 3, hereinafter "Bilbao Decl." and "Mount Decl.," respectively.) Both declarants state that they felt pressured to fill out the checklists and declarations, and that Coverall failed to disclose key facts about the pending litigation.

### 1. Edgar Bilbao

The first declarant, Edgar Bilbao ("Bilbao"), claims that Coverall representatives called him repeatedly to urge him to come to the meetings, and led him to believe that his attendance there was mandatory.[2] (Bilbao Decl. ¶ 3.) In the course of these conversations, Coverall also informed Bilbao that Coverall's attorneys were very good, which Bilbao interpreted as an insinuation that Coverall was likely to prevail in the suit. (Id.) At the meeting, Bilbao met with Coverall representative JoAnn Miya ("Miya"). (Id. at ¶ 4.) According to Bilbao, Miya told him that he was a franchisee of Coverall, and not an employee. (Id.) When Bilbao objected to this characterization and complained that Coverall had taken away several of his accounts and wrongfully withheld others, Miya told him not to worry, and that she would get him more accounts. (Id.) Bilbao felt this was an attempt to bribe him into agreeing to say he was an independent contractor of Coverall, even though he had told Miya that he felt he was an employee. (Id.)

Miya then left Bilbao with the interpreter, who gave him a copy of the franchise checklist in Spanish. (Id. at ¶ 5.) Bilbao claims the interpreter told him that if he disagreed with the statements in the checklist, he would "end up losing because [he] would become an employee of Coverall." (Id.) Bilbao told the interpreter he could not read the questions as he did not have his glasses, and asked to come back a different day with his wife. (Id.) The interpreter denied his request, and instead told Bilbao he would read the questions on the form to him and tell Bilbao which box to check based on his responses. (Id.) Bilbao states that he "felt pressured to stay and complete the form." (Id.) After filling out the checklist, Bilbao was asked to sign a declaration, to which he again objected because he did not have his glasses. (Id.

---

[2] According to Bilbao, his English is not very good, so Coverall relied on Spanish language interpreters when communicating with him both on the phone and in person.

1   at ¶ 6.) The interpreter assured Bilbao that the declaration was accurate, and that it stated that

2   Bilbao was an employee of Coverall. (Id.) Bilbao then signed the declaration and was given

3   a copy to take with him. (Id.) Upon returning home, however, Bilbao claims he reviewed the

4   checklist and declaration and was "shocked to find out that [he] had been tricked." (Id. at ¶ 7.)

5   According to Bilbao, "the form and the declarations say the opposite of what [he] told

6   Ms. Miya and the interpreter." (Id.)

7          Finally, Bilbao states that he was never informed of Coverall's potential conflict of

8   interest with him, or that his presence at the meeting was not required. (Id. at ¶ 8.) Bilbao

9   concludes that, "[h]ad [he] known the truth about what [he] was filling out and signing, [he]

10  would never have signed any of the documents." (Id. at ¶ 10.)

11                      **2.    Claire Mount**

12         Unlike Bilbao, the second declarant, Claire Mount ("Mount"), says she agreed to

13  Coverall's initial request that she attend one of their meetings. (Mount Decl. ¶ 2.) She claims

14  that, upon arriving at the meeting, the Coverall representatives were "very accommodating,"

15  offering the attendees food and "hugging and kissing people." (Id. at ¶ 3.) Mount states that

16  "this was the first time that [she had] ever been treated like this by Coverall." (Id.) The

17  attendees were then addressed by Patrick Joyce ("Joyce"), Coverall's chief operating officer.

18  (Id. at ¶ 4.) Joyce informed the group about the lawsuit being filed against the company by

19  someone "who had[]been with [Coverall] for only two years," but did not mention Plaintiff

20  Sabrina Laguna by name.[3] (Id.) Mount states that she felt Joyce was trying to "make [Laguna]

21  sound bad." (Id. at ¶ 22.) Joyce then told the group that "the lawsuit was a loser because there

22  was not an employer relationship between [Coverall's workers] and Coverall." (Id. at ¶ 4.) The

23  company representatives then began handing out copies of the checklist. (Id.)

24         According to Mount, several of the attendees began to ask questions, and at least two

25  people complained about accounts that had been taken away from them without being

26  replaced. (Id. at ¶ 6.) Mount says that Joyce told the group he would take care of their concerns

27  after they completed the declarations. (Id.) Mount claims that Joyce made it seem as if the

28  _____

[3] At the time of Mount's meeting with Coverall, Laguna was the only named plaintiff in the
suit.

1  attendees would have to sign the declarations before they would be permitted to ask questions

2  about losing work and obtaining new accounts. (Id.)

3        Joyce then went through each of the statements on the checklist with the group, asking

4  them to check whether they were true or false and occasionally offering explanations. (Id.) For

5  example, in reference to the checklist statement, "I do not view myself, and do not believe that

6  I am an employee of Coverall. Rather, I am a franchisee of Coverall and operate my own

7  independent commercial cleaning company," Joyce asked the attendees, "Well, you don't get

8  overtime do you and if you do not get breaks and you would not want to come to us and have

9  to ask us for a break or a vacation, right?" (Id. at ¶ 8.)

10        Mount also claims that Joyce failed to tell the workers at the meeting about Coverall's

11  conflict of interest with them and did not disclose the names of the attorneys representing

12  Plaintiffs in the class action. (Id. at ¶ 22.) Mount did not fill out a checklist, and did not sign

13  a declaration.

14
15        **B.    Plaintiffs' Motion to Invalidate Checklists and Declarations, for Curative
                  Notice, and to Bar Communication with Potential Class Members**

16        Plaintiffs move for three forms of relief: (1) an order invalidating any checklists and

17  declarations Defendants have already obtained from prospective class members; (2) an order

18  directing a curative notice to issue to prospective class members that contains a neutral

19  statement explaining the nature of the lawsuit, the damages sought, and the identity and contact

20  information of class counsel; and (3) an order prohibiting Defendants from contacting

21  prospective class members to discuss the case or solicit waivers of their right to participate in

22  the lawsuit until the curative notice has been issued.

23  **II.    LEGAL STANDARD**

24        The power of federal district courts to regulate contacts between parties to a class action

25  and potential class members arises out of the court's general authority to control class actions

26  under FED. R. CIV. P. 23. In particular, Rule 23(d)(1) states: "In conducting an action under this

27  rule, the court may issue orders that . . . impose conditions on the representative parties or

28  intervenors . . . or deal with similar procedural matters." The U.S. Supreme Court has

interpreted this language to confer upon district courts "both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." (<u>Gulf Oil Co. v. Bernard</u>, 452 U.S. 89, 100 (1981).) Courts are obligated to exercise this authority in order to prevent abuse of the class action mechanism and prohibit parties from acting in a manner that could undermine the fairness of the proceeding. (<u>See</u> <u>id.</u> at 99-100 (citing the "opportunities for abuse" presented by class actions as justification for a broad grant of power); <u>Wang v. Chinese Daily News, Inc.</u>, 2010 WL 3733568, at *8 (9th Cir. 2010) ("Rule 23(d) gives district courts the power to . . . impose limitations when a party engages in behavior that threatens the fairness of the litigation.").)

However, district courts' authority in this regard is not unlimited. The court's discretion "is bounded by the relevant provisions of the Federal Rules." (<u>Gulf Oil</u>, <u>supra</u>, 452 U.S. at 100.) In addition, an order that prohibits future communications between parties and prospective class members may under some circumstances constitute an unconstitutional prior restraint on speech. (<u>See</u> <u>Kleiner v. First Nat'l Bank of Atlanta</u>, 751 F.2d 1193, 1203-07 (11th Cir. 1985).) Any such order passes constitutional muster only if it is "grounded in good cause and issued with a heightened sensitivity for first amendment concerns." (<u>Id.</u> (internal quotation marks omitted).)

### III.   DISCUSSION

Defendants argue that all relief should be denied because Plaintiffs have failed to put forward any evidence of improper conduct on the part of Coverall. (Doc. No. 61.) Defendants have offered their own declarations from workers who attended the meetings with Coverall as well as from the Spanish language interpreter at those meetings in order to rebut the contentions of Bilbao and Mount. In addition, Defendants argue that the declarations offered by Plaintiffs are not credible, and are contradicted by their declarants' own subsequent deposition testimony.

#### A.   Standard of Proof

According to Defendants, the court may grant the requested relief only upon a showing of "a clear record and specific findings . . . of the particular abuses by which [the moving

party] is threatened." (Doc. No. 61 p.7 (emphasis omitted) (quoting <u>Cram v. Elec. Data Sys.</u> <u>Corp.</u>, 2008 WL 178449, at *2 (S.D. Cal. Jan. 17, 2008)).) The standard cited by the <u>Cram</u> court is drawn from the U.S. Supreme Court's <u>Gulf Oil</u> case. <u>Gulf Oil</u> addressed a situation in which the district court had issued an order prohibiting plaintiff's counsel from communicating with potential class members in a pending class action. (<u>Gulf Oil</u>, <u>supra</u>, 452 U.S. at 99.) In ruling that the order exceeded the district court's authority under Rule 23, the Court held that "an order limiting communications between parties and potential class members should be based on a **clear record and specific findings** that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." (<u>Id.</u> at 101 (emphasis added).) The Court clarified this requirement by also citing to the "good cause" standard for issuance of protective orders under FED. R. CIV. P. 26(c). (<u>Gulf Oil</u>, <u>supra</u>, 452 U.S. at 101-02.) Under that standard, the moving party must provide "a **particular and specific demonstration of fact**, as distinguished from stereotyped and conclusory statements." (<u>Id.</u> at 102 n.16 (emphasis added).)

It is unclear whether the Supreme Court intended for the <u>Gulf Oil</u> standard to apply only to orders prohibiting **future** communications between **class counsel** and prospective class members, or whether the standard would also encompass requests to cure or strike **past** communications as well as enjoin future contacts between **defendants** and prospective class members, as Plaintiffs seek to do here. There is some evidence to suggest that the <u>Gulf Oil</u> standard is limited to the specific facts of that case. (<u>See, e.g.</u>, <u>Domingo v. New England Fish Co.</u>, 727 F.2d 1429, 1439 (9th Cir. 1984) (citing <u>Gulf Oil</u> as holding "that a district court may not routinely restrict communications between class members and plaintiffs or their counsel"); <u>Kleiner</u>, <u>supra</u>, 751 F.2d at 1205 (describing the <u>Gulf Oil</u> Court's holding that "orders barring plaintiff contacts with members of the plaintiff class 'should be based on a clear record and specific findings'"); <u>see also</u> <u>Jackson v. Papa John's USA, Inc.</u>, 2009 WL 650181, at *2 (N.D. Ohio Mar. 10, 2009) (applying the <u>Gulf Oil</u> standard to plaintiff's request for an order preventing defendants from communicating with potential class members, but not to the request for authorization of a corrective notice).) However, other district courts have applied

the same standard to many different forms of relief related to pre-certification class communications, including requests analogous to those made by Plaintiffs here. (See, e.g., Li v. A Perfect Day Franchise, Inc., 2010 WL 3835596, at *8-9 (N.D. Cal. Sept. 29, 2010) (citing the Gulf Oil standard in analyzing plaintiffs' motion to invalidate opt-out forms obtained by defendants and to issue a corrective notice); Mevorah v. Wells Fargo Home Mortgage, Inc., 2005 WL 4813532, at *3 (N.D. Cal. Nov. 17, 2005) (quoting Gulf Oil's "clear record and specific findings" language in discussing plaintiff's motion for corrective notice).)

However, even assuming *arguendo* that the Gulf Oil standard applies to all forms of relief sought by Plaintiffs here, Plaintiffs have nevertheless satisfied their burden of producing evidence sufficient to grant that relief. This case is easily distinguishable from the cases cited by Defendants in opposition to Plaintiffs' motion, in which the class action plaintiffs moving for relief failed to provide any evidence beyond mere speculation that the defendants' challenged communications with prospective class members had an improperly coercive or misleading impact. (See, e.g., Cram, supra, 2008 WL 178449, at *2-3; Gerlach v. Wells Fargo & Co., 2006 WL 824652, at *6 (N.D. Cal. Mar. 28, 2006); Jackson, supra, 2009 WL 650181, at *3.) Here, Plaintiffs have provided ample evidence of specific conduct on Coverall's part to support their allegations that Defendants' pre-certification contacts with workers regarding the pending litigation were "coercive, misleading, [and] improper." (Jackson, supra, 2009 WL 650181, at *3.)

Bilbao's and Mount's declarations support a finding that at least two of the workers who attended Coverall's meetings felt pressured to fill out the company's checklist and sign the accompanying declaration, even though they disagreed with the statements contained in those documents, and that they were misled as to the nature of the class action suit. According to Bilbao and Mount, Coverall's representatives indicated to attendees of these meetings, either expressly or impliedly, that Plaintiffs' lawsuit was likely to fail. Coverall also suggested that a ruling in Plaintiffs' favor would be against the interests of the workers, telling attendees that they would "los[e]" if they became employees of Coverall because if Plaintiffs prevailed they would suffer negative consequences, such as having to ask for permission to take breaks or

vacation. In addition, the declarations submitted by Plaintiffs indicate that Coverall's representatives made highly suggestive statements to attendees that signaled how they wanted attendees to answer the questions on their checklists. They explicitly told workers at the start of these meetings that they were franchisees and not employees, asked rhetorical questions implying that certain answers were more favorable to the workers than others, and indicated that attendees should answer "yes" to all the statements if they wanted to avoid a negative outcome. The evidence also suggests that Coverall's representatives used promises to respond to attendees' concerns about their lack of work in order to induce attendees to cooperate. Finally, the declarations support a finding that Coverall failed to inform the attendees that their interests were potentially in conflict with the company's; that they had the option to contact Plaintiffs' or their own independent counsel when deciding whether to participate in the lawsuit; or that by signing the declaration, they were potentially waiving their right to such participation.

Bilbao's completed checklist itself illustrates the confusion that appears to have been engendered by Coverall's attempts to convey the meaning and significance of the statements to which Bilbao was allegedly agreeing. (See Bilbao Decl. Ex. 1.) The form is covered with crossed-out responses and supplementary notations added by Bilbao where he appears to have changed his mind about his answers or attempted to clarify his intentions. Also contributing to the overall sense of uncertainty is the fact that in some of the boxes next to the listed statements, Bilbao put a checkmark indicating his agreement or disagreement, while in others he wrote the words "Si" or "No." It appears that the process by which Coverall obtained Bilbao's responses to its questions was far from clear and straightforward for the person whose name ultimately appears at the bottom of the signed declaration.

## B. Declarations of Other "Franchisees" Submitted by Defendants

Defendants argue that Bilbao's and Mount's allegations are undermined by the declarations of six other Coverall workers who claim that they attended the same or similar meetings with Coverall. (Doc. No. 61-2.) These six workers all state unequivocally that they were not coerced, bribed, or misled by Coverall's representatives at these meetings; that they

were encouraged to be truthful in filling out the checklists; and that they fully understood and acquiesced to the statements contained in their signed declarations. However, these conflicting declarations do not in and of themselves disprove Plaintiffs' allegations. Plaintiffs have provided evidence that at least some participants felt pressured or deceived, which permits the court to reasonably infer that others may have had a similar experience. In addition, if some attendees were indeed unfairly coerced into signing untruthful declarations regarding their relationship with Coverall at these meetings, this is wholly consistent with the same attendees signing additional declarations denying they were coerced in the first place. The formulaic quality of the six declarations submitted by Defendants supports this inference, as the language of all six declarations is nearly identical.

### C.    Credibility of Bilbao and Mount Declarations

Defendants also argue that both Bilbao's and Mount's statements are inherently unreliable. First, Defendants claim that Bilbao's declaration should be disregarded because its "self-serving" nature shows that it lacks credibility. (Doc. No. 61 p.9.) However, none of the authorities cited by Defendants actually support the proposition that self-serving declarations should be automatically discounted. In fact, one Ninth Circuit case cited by Defendants explicitly recognizes that "declarations oftentimes will be 'self-serving'—'[a]nd properly so, because otherwise there would be no point in [a party] submitting [them].'" (SEC v. Phan, 500 F.3d 895, 909 (9th Cir. 2007) (quoting United States v. Shumway, 199 F.3d 1093, 1104 (9th Cir. 1999)) (alterations in original).)

Second, Defendants attack Bilbao's claim that he felt he had been offered a bribe in exchange for his cooperation at the meeting, arguing that this allegation is undermined by the fact that Bilbao has not received any new accounts from Coverall since that meeting took place. However, this argument fails to recognize that the mere fact that Bilbao did not actually receive a bribe does not mean he was not made to feel as if one were being offered at the time he was induced to sign the declaration. Coverall need not actually follow through on an implied promise in order for it to be unfairly coercive.

Finally, Defendants point to Mount's deposition testimony, in which she stated that,

1   although she did not sign a declaration at the meeting, she was permitted to ask the Coverall

2   representative questions about her client accounts afterwards. Defendants argue that this

3   contradicts Mount's earlier claim that the representative made comments at the outset of the

4   meeting that made Mount feel as if she would have to sign the declaration in order to have her

5   problems addressed. This argument suffers from the same flaw as Defendants' attack on

6   Bilbao's bribery allegation. Any unfairly coercive impact of an implication made at the

7   beginning of the meeting would not necessarily be mitigated by Coverall proceeding to answer

8   questions at a later time.

9              **D.    Declaration of Independent Interpreter**

10             Somewhat more troubling is the declaration of Jason Gurvitz, a third-party interpreter

11  hired by Coverall who allegedly provided Spanish translation services for some of the Coverall

12  worker meetings.[4] (Doc. No. 61-3, hereinafter "Gurvitz Decl.") Gurvitz claims that Bilbao's

13  allegations are false characterizations of the Coverall meetings. According to Gurvitz, there

14  was "no coercion by any Coverall representative in any of the discussions [he] witnessed." (Id.

15  at ¶ 11.) "To the contrary," Gurvitz asserts that Coverall's representatives "repeatedly asked

16  [him] to translate to [attendees] that they should answer the questions on the checklist

17  truthfully and however they wanted." (Id.) Gurvitz also claims that he did not witness any

18  Coverall representative state that participation in the meetings was mandatory, and that he was

19  specifically asked to translate to attendees that no one would suffer penalties for failure to sign

20  the declarations and that those who did sign would not be rewarded. (Id.) Moreover, Gurvitz

21  claims that he did not and would not have read a document for someone who was unable to do

22  so himself, as Bilbao claimed his interpreter did, and that he does not recall Bilbao asking to

23  go home and come back another day. (Id. at ¶¶ 5, 7.)

24             Defendants emphasize that Gurvitz is an "unbiased witness" with no ties to Coverall

25  and no interest in the outcome of the litigation. (Doc. No. 61 p.10.) In addition, Gurvitz has

26  ―――――――――――
    [4] Gurvitz states in his declaration that he served as a translator in meetings conducted by
27  Coverall in June 2010. (Gurvitz Decl. ¶ 3.) However, Mount alleges that the meeting she
    attended was held in July 2010. Moreover, neither Defendants nor Gurvitz allege that Gurvitz
28  was the only Spanish language interpreter hired by Coverall, or that he was Coverall's
    interpreter at all of the worker meetings held. Therefore, there appears to be some question as
    to whether Gurvitz's statements apply to the specific meetings that Bilbao and Mount attended.

1   earned several levels of governmental security clearances which Defendants argue "he simply

2   would not risk" by pressuring Bilbao in the manner alleged. (Id. at pp. 9-10.)

3        First, it should be noted that not all of the misconduct alleged by Plaintiffs occurred at

4   the meetings themselves. For example, Bilbao claims that, prior to his meeting with Coverall,

5   representatives had called him repeatedly to urge him to come and implied that his attendance

6   was mandatory. Gurvitz's statements have no relevance to those allegations. Second, it is not

7   clear whether Gurvitz is the same interpreter that Bilbao claims misled him about the content

8   of the declaration he was signing. (See supra note 4.) Bilbao claims he does not remember the

9   name of the interpreter he met with at Coverall's office (Bilbao Decl. ¶ 4), and Gurvitz does

10  not say that he recalls meeting Bilbao in particular and translating the checklist and declaration

11  for him (Gurvitz Decl.). Gurvitz only declares that he would not have committed in his

12  professional capacity the types of acts alleged by Bilbao. Third, Gurvitz does not rebut all of

13  Plaintiffs' allegations of misconduct. For example, he does not mention in his declaration

14  whether Coverall representatives, either independently or through him, disclosed possible

15  conflicts of interest to meeting attendees, advised them of their right to seek outside counsel,

16  or informed them that signing the declaration could potentially waive their right to participate

17  in the class action.

18       Finally, much of the coercive and misleading conduct alleged by Bilbao and Mount was

19  not explicit—for example, an open threat to take workers' client accounts away if they did not

20  sign declarations—but rather was purportedly accomplished through suggestion and innuendo.

21  Moreover, any statements made by Defendants to potential class members may well have been

22  inherently coercive given the arguably disproportionate balance of power between the parties,

23  in which Defendants were dominant. (See Belt, supra, 299 F. Supp. 2d at 668 (noting the

24  "heightened potential for coercion" when the parties are "involved in an ongoing business

25  relationship, such as employer-employee"); see also Kleiner, supra, 751 F.2d at 1202 ("A

26  unilateral communications scheme . . . is rife with potential for coercion.").) Although the

27  question of whether Coverall's workers are more properly classified as franchisees or

28  employees is currently under dispute, it is clear that Coverall wielded significant influence over

its workers' livelihoods, as the workers depended on the client accounts assigned to them by Coverall for income. Furthermore, the fact that Coverall solicited these declarations in the context of live, in-person meetings with its workers contributes to the inference that undue pressure may well have been placed on the attendees to complete the checklists and sign the declarations as Coverall requested. (See Kleiner, supra, 751 F.2d at 1206 (describing in-person, unsupervised solicitation as "inherently conducive to overreaching and duress" because it "may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection" (quoting Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 457 (1978))).)

Thus, even accepting Gurlitz's declaration in its entirety, Plaintiffs' unrebutted allegations, when taken together with the fundamentally coercive environment in which Coverall held its meetings, provide a sufficient basis for the court's finding that Coverall engaged in improper conduct in unilaterally contacting potential class members and soliciting their signed declarations.

### E.   Relief

Plaintiffs seek three separate and distinct forms of relief: (1) an order invalidating the completed checklists and signed declarations of potential class members already obtained by Defendants; (2) an order directing a neutral corrective notice to issue to all potential class members; and (3) an injunction prohibiting Defendants from contacting potential class members regarding the pending litigation until such time as the corrective notice has been issued. Under the circumstances, there is ample precedent justifying the court's authority to grant of all three of Plaintiffs' requests. More importantly, all three may be necessary in order to remedy any harm done to Plaintiffs' case. (See Kleiner, supra, 751 F.2d at 1203 ("Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable.").) Therefore, the court GRANTS all three forms of relief requested by Plaintiff, subject to the modifications described below.

**1.      Order invalidating checklists and declarations already obtained**

Plaintiffs request that the court invalidate any checklists and declarations that have been or will be executed prior to the issuance of a neutral corrective notice to potential class members, and order that these documents may not be used in any manner in this litigation, regardless of whether any such declaration or checklist would be helpful or harmful to Defendants' position. The validity of the declarations is particularly important given the fact that class certification has yet to be briefed and ruled upon. Signed declarations from many of Coverall's workers indicating that they do not view themselves as employees of Coverall and have not experienced problems with their franchise agreements similar to those Plaintiffs allege could seriously undermine Plaintiffs' ability to prove the requirements necessary for class certification under FED. R. CIV. P. 23(a). Moreover, even if the class is certified, Defendants could potentially use these forms to challenge the subsequent participation of any declarants in the suit. This is especially problematic since there is no indication that Coverall told meeting attendees that signing the declarations could be construed as a decision to opt out of the class and relinquish their right to any recovery obtained by Plaintiffs.

Other district courts have issued orders invalidating prior executed documents in similar contexts. In Li v. A Perfect Day Franchise, Inc., the court invalidated thirty-eight signed opt-out forms that the court ruled had been obtained from the defendant's employees through a series of "inherently coercive" meetings. (Li, supra, 2010 WL 3835596 at *9.) Similarly, in Wang v. Chinese Daily News, Inc., the Ninth Circuit upheld a district court's decision to invalidate all the existing opt-out agreements based on evidence that defendant had subjected its employees to "coercive techniques." (Wang, supra, 2010 WL 3733568, at *8-9.)

Although it is unclear how many checklists and declarations Defendants have obtained thus far, they must all be set aside in order to ensure that the subsequent proceedings are fair to all parties potentially affected by this suit. Therefore, any and all checklists or declarations completed or signed by prospective class members prior to the issuance of the corrective notice described infra are declared invalid for purposes of the instant litigation. Neither side may rely

on or refer to the contents of any such documents in filings, briefs, or arguments submitted to the court following the issuance of this order.

**2.      Order requiring issuance of corrective notice**

Plaintiffs also request that the court order the parties to meet and confer to draft a curative notice directed at the prospective class members who have been contacted by Defendants and/or their counsel. The draft notice must then be submitted to this court for approval and, once approval is granted, mailed to the intended recipients at Defendants' expense.

Curative notice of the type requested here is commonly granted by courts in order to mitigate the impact of misleading or deceptive information that has been disseminated about a class action. (See, e.g., In re M.L. Stern Litigation, supra, 250 F.R.D. at 500-01 (ordering the defendant to send an amended letter to its Account Executives incorporating modifications made by the court); Mevorah, supra, 2005 WL 4813532, at *6 (ordering the parties to meet and confer to draft a notice containing "a brief summary of plaintiff's claims, defendant's defenses, and the potential outcome of the suit should plaintiff prevail"); Pollar v. Judson Steel Corp., 33 FEP Cases 1870, at *1 (N.D. Cal. 1984) (ordering the defendants to publish an amended notice in the local newspapers and to send copies to all individuals to whom copies of the original notice had been sent); Belt v. Emcare Inc., 299 F.Supp.2d 664, 669 (E.D. Tex. 2003) (ordering the defendant to send corrective notice "to all potential class members to whom [the defendant] directed its improper communication").) Moreover, curative notice appears to be a relatively inexpensive means of resolving any confusion or misunderstanding created among the prospective class members.

Therefore, the parties are hereby ordered to meet and confer and draft a corrective notice under the supervision and direction of Magistrate Judge Bernard Skomal. The notice is required to comply with the following guidelines: First, the parties should draft a neutrally worded summary of the issues being litigated, the arguments being made by each side, and the potential consequences for class members should the court certify this case as a class action. Second, the notice should include a brief description of the class certification and opt-out

processes, clearly stating that a class has not yet been certified and explaining that each potential class member will have an opportunity to decide for himself or herself whether to participate in the action if it is later so certified. Third, the notice should explicitly advise the recipients that they have the right to consult counsel—either their own or Plaintiffs'—in making their decision, and that Defendants will neither reward a decision to opt out nor retaliate against those who participate. Finally, the notice should include a description of the other remedies ordered herein—that is, the invalidation of the previously obtained checklists and declarations, and the order prohibiting both parties from communicating with prospective class members about the case until the notice has been sent.

In the past, courts have ordered defendants to bear the expense of issuing curative notice where they were found to have acted unfairly and in bad faith. (See, e.g., Mevorah, supra, 2005 WL 4813532, at *6; Belt, supra, 299 F.Supp.2d at 670.) Because Defendants here appear to have conducted these meetings for the purposes of presenting their own one-sided account of the case and discouraging workers from joining the suit, the court orders Defendants to pay the cost of mailing the final versions of the curative notice to any and all prospective class members with whom they have had contact regarding this litigation.

### 3. Order prohibiting Defendants from communicating with prospective class members about the case

Finally, Plaintiffs ask that the court enjoin Defendants from contacting potential class members about the pending litigation until the above curative notice has been issued. Such orders are also routinely issued by district courts in similar situations. (See, e.g., Mevorah, supra, 2005 WL 4813532, at *5; Pollar, supra, 33 FEP Cases 1870, at *1; cf. Li, supra, 2010 WL 3835596, at *10 (finding that a communications ban was unnecessary given the issuance of a corrective notice).)

While such a measure would help ensure that Defendants do not engage in further coercive behavior towards Coverall's workers, it also potentially runs afoul of the First Amendment. Although Defendants have not raised such concerns in their opposition, it is nevertheless prudent for the court to examine them before making its decision.

1    The Eleventh Circuit ruled on this precise issue in <u>Kleiner</u> when it reviewed a district

2    court's order prohibiting the defendant from making unsupervised contacts with class

3    members. (<u>Kleiner</u>, <u>supra</u>, at 751 F.2d at 1196-97.) The court spelled out the First Amendment

4    standard for such orders:

5          In general, an order limiting communications regarding ongoing litigation
           between a class and class opponents will satisfy first amendment concerns if it
6          is grounded in good cause and issued with a "heightened sensitivity" for first
           amendment concerns. In ascertaining the existence of good cause, four criteria
7          are determinative: the severity and the likelihood of the perceived harm; the
           precision with which the order is drawn; the availability of a less onerous
8          alternative; and the duration of the order.

9    (<u>Id.</u> at 1205-06.) The <u>Kleiner</u> court rejected the defendant's argument that the district court's

10   order amounted to an unconstitutional prior restraint on speech. Reasoning that, in litigation,

11   "a fair and just result often presupposes restraints on the speech of the parties," the court found

12   that the district court's order, which affected only those communications related to litigation,

13   was sufficiently narrowly drawn to satisfy First Amendment concerns. (<u>Id.</u> at 1206

14   (emphasizing that the order "did not impinge on the [defendant's] ability to speak with [class

15   members] about routine business matters unrelated to the lawsuit").)

16   Here, Plaintiffs are requesting that Defendants' communications with prospective class

17   members be restricted only to the extent that they seek to discuss the case or solicit waivers

18   of class members' rights to participate in this action, and only until curative notice has been

19   issued. Thus, the order is very narrowly drawn, and likely to be of short duration. Moreover,

20   as discussed above, the likelihood of harm resulting from further unsupervised and potentially

21   coercive contacts between Defendants and potential class members is great. Therefore, such

22   an order is likely to survive any potential First Amendment challenges.

23   In their opposition, Defendants claim that their decision to hold the meetings was in part

24   because some of their workers had "complained of solicitations by Plaintiff's [sic] counsel."

25   (Doc. No. 61 p.1.) Although they do not elaborate on this contention, and Plaintiffs do not

26   address it in their reply brief, there is a possibility that Plaintiffs could take advantage of the

27   period during which Defendants are not permitted to contact potential class members by

28   attempting to solicit workers to join the class while their opponents are compelled to remain

silent. Although statements by Plaintiffs do not threaten to have the same inherently coercive effect on potential class members as Defendants' statements do, unilateral communications from Plaintiffs during this period could nevertheless be unfairly biased and misleading. Therefore, a corresponding restriction on Plaintiffs' contacts with prospective class members regarding the litigation will also be imposed until corrective notice is sent.

## IV.    CONCLUSION

"When confronted with claims pressed by a plaintiff class, it is obviously in defendants' interest to diminish the size of the class and thus the range of potential liability by soliciting exclusion requests." (Kleiner, supra, 751 F.2d at 1202.) The evidence before the court suggests that this is precisely what Defendants have attempted to do here. By holding unilateral meetings with prospective class members to present a one-sided and potentially misleading version of the lawsuit, and then allegedly using their position of authority over meeting attendees to pressure them to sign declarations that may have gone against their own interests, Defendants acted in a manner that created "an obvious potential for confusion" at best, and that "adversely affect[ed] the administration of justice" at worst. (Gulf Oil, supra, 452 U.S. at 100 n.12 (quoting Waldo v. Lakeshore Estates, Inc., 433 F.Supp. 782 (E.D. La. 1977)).) Therefore, the court hereby GRANTS Plaintiffs' motion in its entirety and orders the three forms of relief to issue as described above.

**IT IS SO ORDERED.**

DATED:  November 30, 2010

_____
Hon. Jeffrey T. Miller
United States District Judge

- 20 -

09-CV-2131-JM (BGS)