1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   SABRINA LAGUNA, an individual;              CASE NO. 09-CV-2131-JM (BGS)
     CARLOS ACEVEDO, an individual;
12   TERESA SALAS, an individual; and            **ORDER GRANTING IN PART**
     ROES 3 through 50 on behalf of              **AND DENYING IN PART**
13   themselves and in a representative          **DEFENDANTS' MOTIONS TO**
     capacity for all others similarly situated, **DISMISS**
14
                                    Plaintiffs,  Doc. Nos. 76, 77, 96
15
             v.
16
     COVERALL NORTH AMERICA, INC.,
17   a Delaware corporation; ALLIED
     CAPITAL CORPORATION, a Maryland
18   corporation; ARES CAPITAL
     CORPORATION, a Maryland
19   corporation; CNA HOLDING
     CORPORATION, a Delaware
20   corporation; TED ELLIOTT, an
     individual; and DOES 5 through 50,
21   inclusive,

22                                  Defendants.

23           Plaintiffs filed the instant class action lawsuit against Defendants based on a purported

24   franchise agreement between the parties for the provision of janitorial and cleaning services.

25   Plaintiffs' Third Amended Complaint (Doc. No. 65, hereafter "TAC") states the following

26   twelve causes of action: (1) breach of contract; (2) misleading advertising in violation of CAL.

27   BUS. & PROF. CODE § 17500 *et seq.*; (3) failure to pay minimum wage in violation of CAL.

28   LAB. CODE §§ 1194, 1194.2 & 1197; (4) failure to pay overtime compensation in violation of

CAL. LAB. CODE §§ 510 & 1194 *et seq.*; (5) failure to provide rest periods or compensation in lieu thereof in violation of CAL. LAB. CODE § 226.7 and relevant California Industrial Wage Commission ("IWC") orders; (6) failure to provide meal periods or compensation in lieu thereof in violation of CAL. LAB. CODE §§ 226.7 & 512 and relevant IWC orders; (7) failure to reimburse for reasonable business expenses in violation of CAL. LAB. CODE § 2802; (8) unlawful deductions from wages in violation of CAL. LAB. CODE §§ 221 & 223; (9) conversion; (10) unfair business practices under CAL. BUS. & PROF. CODE § 17200 *et seq.*; (11) theft of labor in violation of CAL. LAB. CODE §§ 216, 553 & 1199 and CAL. PENAL CODE §§ 484 & 532; and (12) injunctive relief. Defendants now bring three separate motions to dismiss Plaintiffs' complaint. For the reasons set forth below, the court hereby GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss.

## I.    BACKGROUND

Plaintiffs Sabrina Laguna, Carlos Acevedo, and Teresa Salas (collectively "Plaintiffs") are individuals each of whom independently signed a contract with Defendant Coverall North America, Inc. ("Coverall") for the purchase of a cleaning services franchise. (TAC ¶¶ 71-79.) Under these agreements, Plaintiffs agreed to pay Coverall an initial "franchise fee" and undergo training. (Id.) In exchange, Plaintiffs would be assigned to perform cleaning services for certain pre-existing client accounts held by Coverall, which Coverall guaranteed would generate a certain amount of monthly income for Plaintiffs. (Id.) Plaintiffs claim that, despite fulfilling the terms of their agreements, they have not been provided with a sufficient amount of work by Coverall to meet those income guarantees. (Id.)

Plaintiffs also allege that Coverall engages in the same tactics with many of its other workers, pressuring them to sign franchise agreements and making false promises about the amount of income they will receive. (Id. ¶ 25.) These workers are targeted in part because they are immigrants who do not speak English, and who are therefore unable to fully understand the agreements they are signing. (Id. ¶¶ 30-33.) According to Plaintiffs, after paying for their franchises, workers frequently do not receive the level of income they have been promised because Coverall has an insufficient number of customer accounts to satisfy the guarantees it

has made. (Id. ¶ 35.) In addition, Coverall frequently takes accounts away from workers without justification in order to assign them to new franchisees. (Id. ¶¶ 38-40.) This process, which Plaintiffs refer to as "churn[ing] the accounts," is designed to generate the appearance that Coverall is fulfilling its agreements with regard to its new workers. (Id. ¶ 36.) Plaintiffs further allege that, in spite of Coverall's failure to fulfill its end of the franchise agreements, Coverall has not only refused to refund workers' franchise fees, but has also deducted other excessive fees from their payments, further reducing the income the workers actually receive. (Id. ¶¶ 41-42.)

Moreover, although Coverall classifies its workers as "independent contractors," Plaintiffs claim that the company exercises a degree of control over its workers that creates an employer-employee relationship. (Id. ¶¶ 46-51.) According to Plaintiffs, Coverall has miscategorized its workers as "franchisees" rather than as employees, thereby avoiding its obligation to pay minimum wage and overtime, reimburse workers for cleaning supplies and transportation costs, and provide rest and meal breaks and workers' compensation. (Id. ¶¶ 44-45, 52-57.)

In addition to Coverall, Plaintiffs name Allied Capital Corporation ("Allied"), Ares Capital Corporation ("Ares"), CNA Holding Corporation ("CNA"), and Ted Elliott ("Elliott") as defendants in the instant action. Allied previously held an ownership stake in Coverall, which interest was transferred to Ares upon Allied's merger with and into Ares on April 1, 2010. (Id. ¶ 6.) CNA also holds an ownership interest in Coverall. (Id. ¶ 8.) Elliott is the CEO of Coverall and the sole director of CNA. (Id. ¶ 59.) Allied, Ares, CNA, and Elliott are named in the TAC based on joint employer, joint enterprise, and alter ego theories of liability. (Id. ¶¶ 14-20, 58-59.)

Plaintiffs bring this action on behalf of a class of individuals, identified as "workers who have performed cleaning services for Defendants from August 8, 2004, through the present." (Id. ¶ 1.) Plaintiff originally filed suit in San Diego Superior Court, and Allied removed the case to this court based on diversity jurisdiction under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d) & 1453. (Doc. No. 1 pp. 2-3.)

Defendants Coverall and CNA, Allied and Ares, and Elliott now bring three separate motions to dismiss Plaintiffs' TAC.[1] (Doc. Nos. 76, 77, 96.) On January 28, 2011, counsel for all parties appeared before the court and presented oral argument on these motions.

## II. LEGAL STANDARD

A motion to dismiss under FED. R. CIV. P. 12(b)(6) challenges the legal sufficiency of the pleadings. (De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978).) In evaluating the motion, the court must construe the pleadings in the light most favorable to the non-moving party, accepting as true all material allegations in the complaint and any reasonable inferences drawn therefrom. (See, e.g., Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003).) While Rule 12(b)(6) dismissal is proper only in "extraordinary" cases (United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981), the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level" (Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). The court should grant 12(b)(6) relief only if the complaint lacks either a "cognizable legal theory" or facts sufficient to support a cognizable legal theory. (Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).)

## III. DISCUSSION

The three sets of parties advance various overlapping arguments in support of dismissal. At the outset, Defendants raise a number of challenges to this court's jurisdiction over some of the parties and to the theories of liability under which Defendants may be held to account for each other's alleged actions. These issues are addressed below first before turning to Defendants' substantive challenges to Plaintiffs' underlying causes of action.

### A. Theories of Liability

#### 1. Alter Ego

Defendants argue that Plaintiffs' alter ego theory is insufficiently pled for several reasons. First, Plaintiffs "do not specify which Corporate Defendant is the alter ego of which other corporate entity." (Doc. No. 77 p.7; see also Doc. No. 76 pp. 6-7; Doc. No. 96 p.9.)

---

[1] In addition to filing their own motion to dismiss, Coverall and CNA have also joined in Allied and Ares's motion.

Second, Plaintiffs fail to plead facts in support of the two requirements for application of the alter ego theory. (Doc. No. 77 p.7; Doc. No. 96 p.9.)

Initially, it should be noted that none of the Defendants have cited to controlling authority for the proposition that an alter ego claim must explicitly set forth which entity is alleged to have acted as which entity's alter ego.[2] More importantly, it appears clear from the nature of the allegations contained in the TAC that Plaintiffs are claiming that Coverall, as the actual alleged wrongdoer in the case, acted as the alter ego of each of the other named Defendants.

Defendants also argue that Plaintiffs have pled only "boilerplate legal conclusions," devoid of factual support, in alleging their alter ego theory of liability. (Doc. No. 77 p.8; see also Doc. No. 76 pp. 7-8; Doc. No. 96 p.9.)

California law sets forth two conditions, both of which must be met in order for the alter ego doctrine to apply:

> First, there must be such a ***unity of interest and ownership*** between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an ***inequitable result*** if the acts in question are treated as those of the corporation alone.

(Sonora Diamond Corp. v. Superior Court of Tuolumne Cty., 83 Cal. App. 4th 523, 538 (Cal. Ct. App. 2000) (emphasis added).) Whether these requirements are met depends upon "a fact-specific examination of numerous elements." (Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc., 99 Cal. App. 4th 228, 244 (Cal. Ct. App. 2002).)

### a)    Unity of Interest and Ownership

With regard to the first condition, the court may consider many different factors, including: whether a corporation is inadequately capitalized; whether the standard corporate formalities have been disregarded; whether two corporate entities have identical directors and

---

[2] All three sets of defendants cite only to Kingsburg Apple Packers, Inc. v. Ballantine Produce Co., No. 1:09-CV-901-AWI-JLT, 2010 WL 2817056, at *4 (E.D. Cal. July 16, 2010) for this contention, which, as an unpublished district court judgment, is not controlling precedent for this court. During oral argument, counsel for Coverall, CNA, and Elliott also referred the court to an unpublished Southern District of California case, Lisa McConnell, Inc. v. Idearc, Inc., 2010 WL 364172, in support of their claim. However, upon further examination, that case does not touch upon this issue.

officers; whether one corporation is used as a shell or conduit for the business of another; whether assets and liabilities are being manipulated between a corporation and another entity; whether two entities use the same office or business location; and whether two entities employ the same employees or attorney. (See id. at 245; Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal. App. 2d 825, 838-40 (Cal. Ct. App. 1962).) However, "[n]o single factor is determinative." (Virtualmagic Asia, Inc., 99 Cal. App. 4th at 245.)

In their TAC, Plaintiffs allege generally that Coverall was organized and operated by the non-Coverall defendants "for the purpose of shielding assets of Defendants from liabilities"; that the non-Coverall defendants "regularly removed cash and other assets" from Coverall in order to minimize the assets that could be used to satisfy debts or judgments against Coverall; that Coverall was "a shell or conduit for the affairs of [non-Coverall] Defendants"; that the non-Coverall defendants failed to adequately capitalize Coverall; and that Coverall "ha[s] not respected normal corporate formalities," including the keeping of corporate minutes. (TAC ¶¶ 16-20.) Defendants correctly point out that some of these alter ego allegations are simply conclusory statements without any apparent factual basis. For instance, merely stating that Coverall was a "shell or conduit" for the non-Coverall defendants is a legal conclusion rather than a factual statement. However, others of these claims do appear to be allegations of fact—for example, that the non-Coverall defendants routinely shifted assets away from Coverall, or that Coverall did not keep corporate minutes. Whether Plaintiffs will actually be able to prove these facts at a later stage is irrelevant to the instant motion. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" (Bell Atl. Corp., 550 U.S. at 556 (2007) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).)

Moreover, Plaintiffs have also made other, more concrete allegations in support of their alter ego theory. Plaintiffs allege that CNA holds an ownership stake in Coverall (TAC ¶¶ 6-8), and that Elliott is both the CEO of Coverall and director of CNA (id. ¶ 59). It should be noted that this shared leadership is all the more significant because Plaintiffs have alleged that Elliott is CNA's *sole* director. It is also undisputed that CNA, Coverall, and Elliott are represented

by the same counsel. These facts appear sufficient to make out a plausible claim that a "unity of interest and ownership" exists between Coverall and CNA under the minimal standard required at this initial pleading stage.

Whether these same facts also support an alter ego claim as to Elliott is less certain. Although Plaintiffs have alleged that Elliott is the primary connection between CNA and Coverall, there are no facts in the TAC to suggest that Elliott is acting individually on his own behalf under the guise of Coverall. A corporation might be said to be acting as the alter ego of an individual where, for example, the individual treats the corporation's assets as his own, holds out that he is personally liable for the debts of the corporation, or is the sole owner of all the stock in the corporation. (See Associated Vendors, Inc., 210 Cal. App. 2d at 839.) There are no such facts here that indicate that Elliott is covertly receiving some personal benefit from his relationship with Coverall. Plaintiffs have alleged that Elliott was "intimately involved in the day-to-day decisions at Coverall" (TAC ¶ 59), including some instances of intentional wrongdoing. However, this does not illustrate a "unity of interest and ownership" between Coverall and Elliott such that "the separate personalities of [Coverall] and [Elliott] do not in reality exist." (Sonora Diamond Corp., 83 Cal. App. 4th at 539.) Therefore, the claim that Elliott is liable for Coverall's actions on an alter ego theory has been inadequately pled as to this first element.

As for Defendants Allied and Ares, Plaintiffs claim that several of Coverall's executive officers "report directly to [Allied]" about Coverall's activities (TAC ¶ 58), which they argue shows that Allied and Ares "use[] the same offices and employees as Coverall" (Doc. No. 98 p.18).[3] Plaintiffs also point to the deposition of Coverall's former CFO, who testified to the extent of Allied's involvement with and control over Coverall's operations. (Id.) Moreover,

---

[3] Upon reviewing the actual deposition testimony relied upon by Plaintiffs in making this allegation, it appears that the evidence does not support Plaintiffs' version of the facts. For example, when asked explicitly whether she reported any of her work "to Allied directly," Laura Bach testified that she did not. (Doc. No. 98 Exh. 4 (hereafter "Bach Decl."), p.27 ll. 4-6.) The portions of Dominique March's testimony provided by Plaintiffs do not even touch upon the subject of whether Ms. March had any interaction with Allied. (Doc. No. 98 Exh. 3.) However, Ms. Bach's testimony does mention regular meetings between Allied and other Coverall executive officers on a quarterly basis. (Bach Decl. p.27 ll. 1-3.)

09-CV-2131-JM (BGS)

although raised by Plaintiffs in support of a different argument, there is evidence in the record that Allied (now Ares) holds a majority of seats on the board of Coverall. (Doc. No. 98 p.13; cf. Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980) (finding the facts insufficient to establish that the parent company was the alter ego of the subsidiary in part because "[t]he record d[id] not show that executives and directors of the [parent company] ever controlled the [subsidiary's] board or formed a board majority").) Whether these facts are sufficient to make out the first element of an alter ego claim against Allied and Ares is a close call. It is true that Allied's and Ares's actions may very well prove to be merely those of an "active parent corporation" participating in the high-level decision-making of its subsidiaries in a manner that does not give rise to an alter ego relationship. (Doe v. Unocal, 248 F.3d 915, 928 (9th Cir. 2001); see also id. at 927 ("A parent corporation may be directly involved in financing and macro-management of its subsidiaries, however, without exposing itself to a charge that each subsidiary is merely its alter ego.").) However, given that this argument appears in the context of a motion to dismiss,[4] the court finds that Plaintiffs have met the requirements for pleading unity of interest and ownership for these defendants at this stage.

**b)      Inequitable Result**

Even if a unity of interest and ownership is found between two entities, the alter ego doctrine may not be applied to extend liability unless it is also shown "that an injustice would result from the recognition of separate corporate identities." (Virtualmagic Asia, Inc., 99 Cal. App. 4th at 245.) "The alter ego doctrine does not guard against every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to *bad faith* makes it inequitable for the corporate owner to hide behind the corporate form." (Sonora Diamond Corp., 83 Cal. App. 4th at 539 (emphasis added); see also Associated Vendors, Inc., 210 Cal.

---

[4]  In one of the cases cited repeatedly by Allied and Ares's counsel at oral argument, Calvert v. Huckins, the district court analyzes the plaintiffs' alter ego theory under a more exacting standard because it is pled as a basis for personal jurisdiction. (875 F. Supp. 674, 678 (E.D. Cal. 1995).) However, because Allied and Ares have not challenged this court's jurisdiction, this "clear evidence" standard is inapposite. More importantly, as a district court case, Calvert is simply not controlling authority.

App. 2d at 838 ("[B]ad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity.").)

Here, Plaintiffs argue that an "inequitable result" would occur from failing to recognize the non-Coverall entities as alter ego defendants because Plaintiffs would be "precluded from pursuing all necessary relief on behalf of themselves and the putative class as against all liable parties." (Doc. No. 97 p.13.) Plaintiffs' counsel made clear at oral argument that this concern was based on Coverall's perceived inability to satisfy a judgment against them. (Transcript, Oral Argument on Motions to Dismiss, Jan. 28, 2011 (hereafter "Transcript"), p.20 ll. 16-24.) However, as Defendants correctly point out, "[d]ifficulty in enforcing a judgment or collecting a debt does not satisfy [the inequitable result] standard." (Sonora Diamond Corp., 83 Cal. App. 4th at 539.)

Nonetheless, the TAC does contain other allegations that indicate that the non-Coverall defendants acted in bad faith in "hid[ing] behind the corporate form" of Coverall. Specifically, Plaintiffs allege that the non-Coverall defendants

> organized and operated [Coverall] . . . for the purpose of shielding the assets of Defendants from liabilities and . . . regularly removed cash and other assets from [Coverall] for the purpose of minimizing the assets . . . which could be executed or levied upon satisfaction of debts or judgments against Defendants.

(TAC ¶ 16.) While the TAC contains no additional factual support for these allegations beyond what is stated above, these statements are by themselves sufficient to satisfy federal pleading standards. A specific allegation that Defendants were regularly shifting assets away from Coverall in order to shield them from collection is more than just "a formulaic recitation of the elements of a cause of action." (Bell Atl. Corp., 550 U.S. at 555.) Plaintiffs need not provide concrete evidence to prove non-Coverall Defendants' bad faith at this stage.

### c) Other considerations

In addition, Allied and Ares now raise the argument that it is impossible for either company to have been the alter ego of Coverall during the period in question because of the companies' April 1, 2010 merger. (Doc. No. 76 p.7.) According to Allied and Ares, Ares

cannot be held liable because it was not involved with any of the acts alleged in the TAC prior to Allied's merger with and into Ares, and Allied cannot be held liable because it no longer exists. (Id.) Under this line of reasoning, a company could commit any number of wrongful acts and simply escape liability by merging itself into another company. Aside from being patently absurd, this argument is clearly contrary to California law, which establishes that, upon merger, "[a]ny action or proceeding pending by or against any disappearing corporation may be prosecuted to judgment, which shall bind the surviving corporation, or the surviving corporation may be proceeded against or substituted in its place." (CAL. CORP. CODE § 1107(d).) This is true even if the pending proceedings are unknown to the surviving corporation at the time of the merger. (Petrini v. Mohasco Corp., 61 Cal. App. 4th 1091, 1098-99 (Cal. Ct. App. 1998).) Thus, Allied and Ares can properly be held liable under an alter ego theory for acts that took place between August 8, 2004 and the present.

***

Because Plaintiffs have failed to plead facts sufficient to demonstrate a unity of interest and ownership between Coverall and Elliott, the court GRANTS Elliott's motion to dismiss as to this particular theory of liability. However, both elements of the alter ego theory have been adequately pled as to Defendants CNA, Allied, and Ares; therefore, the court DENIES all other motions to dismiss on these grounds.

### 2.    Joint Employer

Plaintiffs allege several causes of action premised on the theory that Plaintiffs were in a de facto employer-employee relationship with Coverall.[5] (See TAC ¶¶ 46-51.) The non-Coverall defendants are joined in these allegations based in part on the claim that they are "joint employers" along with Coverall. Defendants now argue that Plaintiffs have failed to plead the necessary requirements in order to prove a joint employment relationship.

//

//

---

[5] Specifically, Plaintiffs' third through eighth causes of action state claims that may be brought by an employee against an employer.

### a)  Applicable test

In determining whether Plaintiffs have met their burden, it is first necessary to define the elements of a joint employer relationship. Plaintiffs and Defendants Coverall, CNA, Allied, and Ares all rely upon multi-factor tests drawn from interpretations of federal laws. (See Doc. No. 77 p.6, Doc. No. 97 p.7, and Doc. No. 99 p.7 (citing to Wynn v. Nat'l Broad. Co., Inc., 234 F. Supp. 2d 1067 (C.D. Cal. 2002) (setting out factors that determine when two or more business entities may be treated as a "single employer" under the federal Age Discrimination in Employment Act ("ADEA"))); Doc. No. 76 p.5, Doc. No. 97 p.7, and Doc. No. 99 p.6 (citing to Maddock v. KB Homes, Inc., 631 F. Supp. 2d 1226 (C.D. Cal. 2007) (describing the "economic reality" test for joint employment under the Fair Labor Standards Act)).)

However, a recent California Supreme Court case articulates a significantly different rule. In Martinez v. Combs, the Court addressed the issue of how an employment relationship is defined in an action under CAL. LAB. CODE § 1194 (providing a cause of action for employees who do not receive minimum wage or overtime compensation). (49 Cal. 4th 35 (2010).)  Section 1194 (under which Plaintiffs' third and fourth causes of action arise) was enacted as part of a larger act that also created the California Industrial Welfare Commission ("IWC"), to which the California Legislature delegated "broad authority to regulate . . . hours, wages and labor conditions," including the power to issue wage orders governing these matters. (Id. at 53-54.) To date, the IWC has issued eighteen separate wage orders, setting forth minimum requirements in areas such as overtime pay, minimum wage, meal periods, and rest periods. (Id. at 57; CAL. CODE REGS. tit. 8, §§ 11000-11170.)

Based on its review of the relevant legislative history, the Martinez Court found that state statutes such as § 1194 that give employees private rights of action against their employers for violations of these requirements are simply an enforcement mechanism for the IWC's wage orders. (Martinez, 49 Cal. 4th  at 56.) Given the Legislature's clear intent to grant the IWC significant discretion in these matters, the Court further found that judicial deference to the wage orders, including their definitional provisions, was necessary. (Id. at 61-62.) The Court consequently held that the IWC's definition of the employment relationship controlled

in actions under § 1194, and that that definition quite clearly did *not* incorporate federal law. (Id. at pp. 64-68.)

The IWC's definition of an "employer" should therefore be applied to determine whether two or more entities have acted as "joint employers" in causes of action controlled by Martinez. (See id. at 59 (noting that the IWC definition "reach[es] situations in which multiple entities control different aspects of the employment relationship").) As noted above, Plaintiffs' third and fourth causes of action for failure to pay minimum wage and failure to pay overtime compensation arise directly under § 1194 and therefore fall within the purview of Martinez. Further, the Martinez Court's reasoning can also be applied directly to Plaintiffs' fifth and sixth causes of action for failure to provide rest or meal periods: both of these claims arise under CAL. LAB. CODE § 226.7, which explicitly references the corresponding IWC wage orders setting forth the required rest and meal periods that must be provided to employees. Therefore, whether the non-Coverall defendants can be held liable as joint employers along with Coverall on these four causes of action depends on whether Defendants constitute "employers" within the meaning of the IWC's wage orders.

On the other hand, Plaintiffs' other claims that are based on private rights of action against "employers" do not appear to state claims for IWC wage order violations. Specifically, Plaintiffs' seventh and eighth causes of action for failure to reimburse for reasonable business expenses and unlawful deductions from wages are not claims to enforce specific IWC wage order provisions. Therefore, the determination of whether Defendants acted as joint employers with regard to those claims is subject to the common law test for an employment relationship.[6] (See Estrada v. FedEx Ground Package Sys., Inc., 154 Cal. App. 4th 1, 10 (Cal. Ct. App. 2007) ("Because the Labor Code does not expressly define 'employee' for purposes of section 2802, the common law test of employment applies.").)

---

[6] Plaintiffs' counsel clarified at oral argument that he believed the Martinez test for the existence of an employer-employee relationship controlled in all of Plaintiffs' claims brought under the California Labor Code, including those claims arising under Labor Code sections that do not specifically incorporate working conditions standards set forth in the IWC's wage orders. (Transcript, p.23 l.12 to p.24 l.8.) However, counsel provided no authority for this assertion, and as such the court finds it is without merit.

**b)** **<u>Martinez</u> test**

The IWC's wage orders define an "employer" as "any person . . . who directly or indirectly, or through an agent or any other person, ***employs or exercises control over the wages, hours, or working conditions*** of any person." (<u>See</u> IWC Order No. 5-2001 sec. 2(H), CAL. CODE REGS. tit. 8, § 11050(2)(H) (emphasis added).) To "employ" is defined as "to ***engage, suffer, or permit to work***." (<u>Id.</u> § 11050(2)(E) (emphasis added).) The <u>Martinez</u> Court thus held that employment according to the IWC has three alternative definitions: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (49 Cal. 4th at 64 (emphasis in original).)

Plaintiffs have generally alleged that "Defendants directly and indirectly exercised control over the wages, hours, and work of [Coverall workers], including Plaintiffs." (TAC ¶ 10.) Such an allegation, if substantiated, would be sufficient to establish an employer-employee relationship between Defendants and Plaintiffs under the first <u>Martinez</u> definition. Defendants argue, however, that a bare conclusory statement of this nature is inadequate to satisfy federal pleading standards. (Doc. No. 76 pp. 5-6; Doc. No. 77 pp. 6-7; Doc. No. 96 p.11.)

In response, Plaintiffs argue that they have pled facts that are sufficient to permit the court to "draw the reasonable inference" that Defendants exercise the requisite degree of control over Plaintiffs' day-to-day working conditions. (Doc. No. 97 pp.7-9; Doc. No. 98 pp. 8-10; Doc. No. 99 pp. 7-8.) With regard to Defendants CNA, Coverall, and Elliott, Plaintiffs argue that this inference is justified by a showing of CNA and Coverall's overlapping management and control structure. (Doc. No. 97 pp. 7-8.) Specifically, because Elliott is both sole director of CNA and CEO of Coverall, and because Plaintiffs have pled that Elliott was "intimately involved in the day-to-day decisions at Coverall," Plaintiffs contend that they have shown that CNA and Elliott were both joint employers of Coverall's workers. As for Defendants Allied and Ares, Plaintiffs point to their claim that several of Coverall's executive officers have testified that they "report directly" to Allied, and are required by Allied to

"prepare data and reports regarding Coverall's cleaning workers." (Doc. No. 98 p.9; TAC ¶ 58.) In addition, Plaintiffs highlight portions of the deposition testimony taken from Coverall's former CFO, Steven Cumbow, in which Cumbow discusses the "[e]xtremely close[]" relationship between Allied and Coverall. (Doc. No. 98 pp. 9-10.) According to Plaintiffs, this is sufficient to "demonstrate[] that [Allied and Ares] control Coverall's employees, hire and fire them, and set their conditions of employment." (Id. at p.10.)

Although Plaintiffs have shown a certain degree of direct involvement by the non-Coverall defendants in Coverall's actions, they have failed to plead facts sufficient to support the contention that the non-Coverall defendants actually "exercise control over the wages, hours, and working conditions" of Coverall's workers. Rather, Plaintiffs appear to have alleged only that the non-Coverall defendants take part in the higher-level decisions at Coverall. For example, Plaintiffs have claimed that Elliott was involved in decisions relating to the improper classification of Coverall's employees as "franchisees" and the company's decision to "churn" the accounts. (Doc. No. 99 pp. 7-8.) Similarly, Plaintiffs have alleged that Allied and Ares were called on to approve "most of the large decisions" made by Coverall, including the "large hiring decisions" for positions such as CFO. (Doc. No. 98 p.10.) However, these allegations lead at most to the conclusion that the non-Coverall defendants controlled many of Coverall's broader strategic choices; such a level of involvement does not amount to control over Coverall workers' "day-to-day" activities.

However, the second definition of employment articulated in Martinez *does* provide a potential basis for Plaintiffs' joint employer theory. The Martinez Court found that the phrases "to suffer" or "to permit" were "terms of art in employment law" which borrowed heavily from early 20th century statutes prohibiting child labor. (49 Cal. 4th at 64, 69.) Under that reading, a business owner or proprietor was liable for an unlawful work condition where he "permit[ted] [the condition] by acquiescence" or "suffer[ed] [the condition] by a failure to hinder." (Id. at 69 (quoting Curtis & Gartside Co. v. Pigg, 134 P. 1125, 1129 (Okla. 1913)).) In other words, "[t]he basis of liability is the defendant's knowledge of and *failure to prevent*

the [unlawful] work from occurring." (Id. (citing People v. Sheffield Farms-Slawson-Decker Co., 167 N.Y.S. 958, 961 (1917)) (emphasis in original).)

Here, Plaintiffs have pled facts sufficient to show that the non-Coverall defendants had actual knowledge of the allegedly unlawful working conditions suffered by Plaintiffs. For example, Plaintiffs allege that Elliott personally participated in the decision to misclassify Coverall's workers as "franchisees," and that Allied requested and regularly received reports about Coverall's workers. Moreover, Plaintiffs have also pled facts sufficient to show that the non-Coverall defendants had the power to prevent Plaintiffs from working under those conditions. (Cf. Martinez, 49 Cal. 4th at 70 (finding that the defendants did not meet the IWC's definition of "employers" under the "suffer or permit" standard because they did not have the power to prevent the plaintiffs from working).) As CEO of Coverall, Elliott certainly had the authority to redefine Plaintiffs' status as employees and remedy their working conditions. The same can be said of CNA, the parent company of Coverall. In addition, Plaintiffs have provided deposition testimony from a former high-level executive at Coverall establishing that Allied had significant control over Coverall's operations. Thus, Plaintiffs have pled facts sufficient to support a claim that the non-Coverall defendants may be held liable as Plaintiffs' "employers" within the meaning of the IWC's wage orders.

Although Defendant Elliott acknowledges that the Martinez definition of employment controls in the current situation, he nevertheless argues that he is not liable under this definition because the same Court also held that the IWC's definition excludes "individual corporate agents acting within the scope of their agency." (Doc. No. 96 p.11 (quoting Martinez, 49 Cal. 4th at 66).) This holding is an affirmation of a portion of the Court's earlier decision in Reynolds v. Bement, 36 Cal. 4th 1075 (2005), which summarized the common law rule regarding personal liability of corporate agents. However, a full statement of the common law rule includes a key exception overlooked by Elliott's argument: "Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, ***unless they participate in the wrong or authorize or direct that it be done***." (U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal. 3d 586, 595 (1970) (quoted in part

by <u>Reynolds</u>, 36 Cal. 4th at 1087) (emphasis added).) Because Plaintiffs have explicitly alleged that Elliott was directly and personally involved in the purposeful misclassification of Coverall's workers, Plaintiffs have made out a case for holding Elliott personally liable for the working conditions they suffered as a result.

### c)     Common law test

The common law definition of employment is less expansive than the IWC's definition. Under common law, "[t]he essence of the test is the 'control of details'—that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work." (<u>Estrada v. FedEx Ground Package Sys., Inc.</u>, 154 Cal. App. 4th 1, 10 (Cal. Ct. App. 2007) (quoting <u>S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations</u>, 48 Cal. 3d 341, 350-51 (1989)); see also <u>Doe v. Wal-Mart Stores, Inc.</u>, 572 F.3d 677, 683 (9th Cir. 2009) ("The key factor to consider in analyzing whether an entity is an employer is 'the right to control and direct the activities of the person rendering the service, or the manner and method in which the work is performed.' 'A finding of the right to control employment requires . . . a comprehensive and immediate level of day-to-day authority over employment decisions.'" (quoting <u>Serv. Emps. Int'l Union v. County of L.A.</u>, 275 Cal. Rptr. 508, 513 (1990) and <u>Vernon v. California</u>, 116 Cal. Rptr. 3d 121, 132 (2004))).)

As discussed above, Plaintiffs have failed to show that the level of control exercised by the non-Coverall defendants amounted to a "day-to-day authority" over their individual work activities. As a result, Plaintiffs have failed to plead facts sufficient to support a "joint employer" theory with regard to those defendants on their seventh and eighth causes of action.

***

Plaintiffs have pled facts sufficient to permit them to pursue their third, fourth, fifth, and sixth causes of action against the non-Coverall defendants under the theory that Defendants acted as joint "employers" within the meaning of the IWC's wage orders. Therefore, Defendants' motions to dismiss are DENIED on these grounds with regard to these claims. Conversely, because Plaintiffs have failed to demonstrate adequate grounds for pursuing a joint employer theory as to their seventh and eighth causes of action, the court hereby GRANTS

Defendants' motions as to these claims. However, because Plaintiffs have nevertheless successfully pled facts to support an alter ego theory of liability as to Defendants CNA, Allied, and Ares (see supra Part III.A.1), they may nevertheless assert their seventh and eighth causes of action against these Defendants on those grounds. The seventh and eighth causes of action are therefore DISMISSED against Defendant Elliott only.

### 3. Joint Enterprise

All parties with the exception of Defendant Elliott make arguments as to whether Defendants can be considered to have operated a "joint enterprise" such that one defendant would be liable for another's conduct. However, none of the tests for a "joint enterprise" cited by the parties state law applicable to this case. For example, in analyzing this issue, Plaintiffs list the factors required for "single employer" liability from a case dealing with employment discrimination under the ADEA (Doc. No. 97 p.7 (citing Wynn, supra)); Defendants Coverall and CNA rely upon an "integrated enterprise" test from a Title VII and Fair Employment and Housing Act ("FEHA") case (Doc. No. 77 p.6 (citing Huse v. Auburn Honda, No. Civ.S-04-0227DFL/JFM, 2005 WL 1398521, at *3 (E.D. Cal. June 10, 2005))); and Defendants Allied and Ares quote a different case applying the same Title VII/FEHA test (Doc. No. 76 p.5 (citing Maddock v. KB Homes, Inc., 631 F. Supp. 2d 1226, 1238 (C.D. Cal. 2007))).

Because none of the parties have provided any authority for an applicable legal theory that would hold Defendants liable for one another's actions as a joint enterprise under the relevant California state laws, Defendants' motions to dismiss are GRANTED with regard to this aspect of Plaintiffs' action. However, because Plaintiffs have pled facts sufficient to proceed on either a joint employer theory as to certain claims (see supra Part III.A.1) or an alter ego theory (see infra Part. III.A.3) against Defendants CNA, Allied, and Ares, this determination should not affect Plaintiffs' ability to bring any of those causes of action in their TAC with regard to those Defendants.

//

//

### B. Personal Jurisdiction

Coverall, CNA, and Elliott claim that this court lacks personal jurisdiction over both CNA and Elliott because both defendants have virtually no contacts with the State of California. (Doc. No. 77 p.14; Doc. No. 96 p.3.) According to Coverall and CNA, CNA is a holding company with its principal place of business in Florida. (Doc. No. 77 p.16.) The company has no locations, owns no property, and conducts no business in California, and none of its officers or directors reside or are domiciled in California. (Id.) Although Coverall is a wholly owned subsidiary of CNA, Coverall and CNA argue that the mere existence of a parent-subsidiary relationship is insufficient to attribute a subsidiary's "minimum contacts" in a forum state to its parent. (Id.) Similarly, Elliott claims he is a Florida resident who works in Florida, owns no real or tangible personal property in California, and travels to California less than once a year on business. (Doc. No. 96 p.5.) Elliott argues that the fact that Coverall may be subject to the court's jurisdiction does not necessarily imply the same for its non-resident officers. (Id. at p.4.)

Coverall and CNA correctly state the "well-established" principle that "a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes." (Harris Rutsky & Co. Ins. Svcs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1134 (9th Cir. 2003).) However, an exception to that rule exists "where the subsidiary is the parent's alter ego." (Id.) Here, because Plaintiffs have adequately pled facts to support an alter ego theory of liability as to parent company CNA (see supra Part III.A.1), subsidiary Coverall's contacts with California may be imputed to CNA for purposes of establishing personal jurisdiction over CNA.

An analogous concept applies to corporate officers such as Elliott, wherein "the corporate form may be ignored [and the corporation's contacts imputed to an individual] in cases in which the corporation is . . . the alter ego of the individual defendant." (Davis v. Metro Prods., Inc., 885 F.2d 515, 520 (9th Cir. 1989).) However, because the court has found that Plaintiffs have *not* adequately pled an alter ego theory of liability as to Elliott (see supra

Part III.A.1.a), alternative grounds must be provided in order for the court to properly exercise personal jurisdiction over him.

Personal jurisdiction in federal district court is determined according to "the law of the state in which the district court sits":

> Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same. For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least "minimum contacts" with the relevant forum such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."

(Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800-01 (9th Cir. 2004) (quoting Intl. Shoe Co. v. Washington, 326 U.S. 310, 316 (2004)).) Jurisdiction that accords with federal due process may be either general or specific. Under the former, the defendant "must engage in 'continuous and systematic general . . . contacts,' that 'approximate physical presence' in the forum state." (Id. at 801 (quoting (Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984) and Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1086 (9th Cir. 2000)).) Plaintiffs do not attempt to argue that Elliott has had sufficient contacts with the state to justify the exercise of general jurisdiction over Elliott in California. Rather, Plaintiffs claim that Elliott's "specific acts of wrongdoing"—that is, misclassifying Coverall's workers as "franchisees" and "churning" the Coverall cleaning accounts—are sufficient to establish specific jurisdiction over Elliott with regard to these actions. (Doc. No. 99 p.23.)

The Ninth Circuit has established a "three-prong test for analyzing a claim of specific personal jurisdiction":

> (1)    The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2)    the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3)    the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

- 19 -

(Schwarzenegger, 374 F.3d at 802.) The first prong is met by "showing that a defendant *purposefully availed* himself of the privilege of doing business in a forum state"—i.e., through "evidence of the defendant's actions in the forum"—or by "showing that a defendant *purposefully directed* his conduct toward a forum state,"—i.e., through "evidence of the defendant's actions outside the forum state that are directed at the forum." (Id. at 802-03 (emphasis added).) Where "purposeful direction" forms the basis for jurisdiction, an additional three-part "effects" test must be satisfied, which "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." (Id. at 803 (quoting Dole Food Co. v. Watts, 3030 F.3d 1104, 1111 (9th Cir. 2002)).)

Elliott argues that he has no contacts with the state of California that would justify the state's exercise of personal jurisdiction over him. (Doc. No. 96 p.5.) Moreover, what contacts he does have are relatively "infrequent and minor" and did not give rise to any of Plaintiffs' actual claims against him. (Id. at pp. 5-6.) Elliott also argues that it would be "unreasonable and unfair" to subject him to personal jurisdiction in California, because he would then be forced to incur the burden and expense of traveling from Florida in order to defend himself in this action. (Id. at p.6.)

Plaintiffs have alleged that Elliott "was intimately involved in the day-to-day decisions at Coverall, which included the decision leading to the misclassification of its employees as independent contractors and the decision to allow 'churning.'" (TAC ¶ 59.) This allegation standing alone appears to be sufficient to permit this court to exercise personal jurisdiction over Elliott.[7] If Elliott did indeed make the decision to miscategorize Coverall's workers as

---

[7] Plaintiffs cite to the deposition testimony of Coverall's former CFO, Steven Cumbow, as support for this claim. (TAC ¶ 59.) However, as Elliott correctly notes, the portions of that testimony provided by Plaintiffs in opposition to Elliott's motion to dismiss do not appear to support Plaintiffs' characterization of Elliott's role in the misclassification and churning decisions. (See Doc. No. 99 Exh. 1.) Although the court is permitted to take this evidence into account without converting a motion to dismiss into a motion for summary judgment (see Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994)), at this stage of the litigation, Plaintiffs should not be required to provide evidence to prove their allegations, particularly as Plaintiffs have stated that they are still conducting discovery on the nature of Elliott's role in the matter.

franchisees instead of employees and to churn the customer accounts, this would constitute an "intentional act" on his part, one that was "expressly aimed" at California—since the intended targets of his decision included Coverall's workers in that state—and that would cause harm to those California workers. Therefore, Plaintiffs' pleading shows that Elliott "purposefully directed his conduct toward" California. In addition, Plaintiffs' claims against Elliott can be said to arise out of that alleged misclassification and churning, as those actions have caused the harms that Plaintiffs claim they have suffered—e.g., unpaid wages and overtime. Finally, requiring Elliott to subject himself to California's jurisdiction appears to be reasonable at this stage. The exercise of personal jurisdiction is only so "unreasonable" as to constitute a due process violation where it "make[s] the litigation 'so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent.'" (Sher v. Johnson, 911 F.2d 1357, 1365 (9th Cir. 1990).) The mere inconvenience of cross-country travel is insufficient to meet this standard. (See id. (finding that "[i]n this era of fax machines and discount air travel," requiring a Florida partnership to defend itself in California is "no more than inconvenience, not a 'severe disadvantage'").)

Therefore, CNA's and Elliott's motions to dismiss for lack of personal jurisdiction are DENIED.

## C.     Causes of Action

### 1.     Rule 9(b) (All Claims)

Defendants Coverall, CNA, and Elliott argue that all of Plaintiffs' claims should be dismissed for failure to satisfy the heightened pleading standard of FED. R. CIV. P. 9(b). (Doc. No. 77 pp. 9-11; Doc. No. 96 pp. 12-15.) Similarly, Defendants Allied and Ares argue that Plaintiffs' claims against them should be dismissed because their joint employer and joint enterprise theories are insufficiently pled under Rule 9(b). (Doc. No. 76 p.6.) Although Plaintiffs do not explicitly allege a fraud cause of action against Defendants, Defendants argue that Rule 9(b)'s requirements must be met because all of Plaintiffs' allegations are based on an allegedly fraudulent course of conduct.

//

### a) Applicable law

The Ninth Circuit has described the application of Rule 9(b) to non-fraud causes of action as follows:

> In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, ***the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim***. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and ***the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)***. . . .
>
> In other cases, however, a plaintiff may choose not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct. In such cases, ***only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements***. . . .
>
> . . .
>
> [In the latter case], an inadequate averment of fraud does not mean that no claim has been stated. ***The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.***

(Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1104-1105 (quoting Lone Star Ladies Inv. Club v. Schlotzky's Inc., 238 F.3d 363, 368 (5th Cir. 2001)) (emphasis added).)

It should be noted at the outset that fraud is not a necessary element of any of Plaintiffs' causes of action. This is the crux of Plaintiffs' argument that Rule 9(b) is simply inapplicable to the instant suit. (Doc. No. 97 p.15.) However, the Ninth Circuit's holding in Vess makes it clear that, even where fraud is not necessary in order to state a claim, where a plaintiff has nevertheless chosen to allege a fraudulent course of conduct as the basis for that claim, Rule 9(b)'s requirements must be met. Therefore, the court must determine as an initial matter which of Plaintiffs' claims, if any, "sound in fraud." Those that do should be analyzed in their entirety under Rule 9(b)'s pleading standard. The remaining claims should be held to Rule 9(b)'s standard only as to any allegations of fraud contained therein; should the fraud allegations be found wanting, the court must strip the fraud allegations from the complaint and then examine whether the remaining allegations state a claim for relief.

//

//

### b) Plaintiffs' claims sounding in fraud

Plaintiffs' claims fall into two broad categories: The first category contains those claims that relate to the false promises allegedly made by Coverall to Plaintiffs as part of Defendants' attempts to induce Plaintiffs to enter into franchise agreements with Coverall. These include Plaintiffs' first cause of action for breach of contract, and second cause of action for misleading advertising. By contrast, the second category consists of those claims arising as a result of Defendants' purported misclassification of Plaintiffs as franchisees rather than employees, as a result of which Plaintiffs were denied certain entitlements. These include Plaintiffs' third through ninth and eleventh causes of action for failure to pay minimum wage and overtime compensation, failure to provide rest and meal periods, failure to reimburse for reasonable business expenses, unlawful deductions from wages, conversion, and theft of labor. The two categories of claims arise out of two distinct courses of action allegedly taken by Defendants, which should be analyzed separately.

With regard to the first category, the claims related to misrepresentations allegedly made by Defendants *prior* to the signing of the franchise agreements do appear to arise out of a "unified course of fraudulent conduct" alleged by Plaintiffs. In the introduction to the TAC, Plaintiffs describe the basis for their suit as follows:

> The above-named Plaintiffs and other similarly situated individuals have been subjected to ***systematic misrepresentations*** . . . in their relations with Defendants as described herein. Defendants purport to sell cleaning "franchises," ***knowing that they lack sufficient business to satisfy their obligations under their franchise agreements***. Individuals purchase these "franchises" for substantial sums of money, ***based on Defendants' misrepresentations*** about the guaranteed amount of monthly income the franchises will provide.

(TAC ¶ 1.) Plaintiffs repeat many of these same allegations in their recitation of the facts, claiming that, "[i]n order to induce workers to sign [] franchise agreements," Defendants "intentionally misrepresent that they have sufficient business to provide the monthly income promised the workers in their agreements," all the while "know[ing] they do not have

sufficient business to satisfy the terms of [those] agreements."[8] (<u>Id.</u> ¶¶ 25-26.) These allegations are fully incorporated for purposes of all claims. (<u>See, e.g.</u>, <u>id.</u> ¶¶ 69, 84.) Plaintiffs further allege that they have suffered damages as a result of these misrepresentations. (<u>Id.</u> ¶¶ 83, 92.) Because Plaintiffs have alleged a unified course of conduct on the part of Defendants that meets all the requirements of fraud, Plaintiffs' breach of contract and misleading advertising claims can be said to be "grounded in fraud." (<u>See</u> <u>In re Daou Sys., Inc.</u>, 411 F.3d 1006, 1028 (9th Cir. 2005) (finding that the plaintiffs' complaint "sound[ed] in fraud" because it "allege[d] myriad misrepresentations made by defendants, of which defendants had full knowledge, which induced plaintiffs' reliance, and which caused plaintiffs damages").)

Conversely, Plaintiffs' second category of claims relating to their misclassification as franchisees does not appear to be grounded in fraud. Although Plaintiffs explicitly state that Defendants "intentionally misclassified [] workers for the purpose of denying them the various benefits to which they are entitled as employees" (TAC ¶ 1), they do not claim that this misclassification was intended to induce Plaintiffs' reliance, or that Plaintiffs' justifiable reliance on that misclassification was the cause of their damages. Therefore, the causes of action falling within this category need not meet the Rule 9(b) pleading standard.

### c) Application of Rule 9(b) standard

Rule 9(b) holds allegations of "fraud or mistake" to a higher standard by requiring the complaining party to "state with particularity" the circumstances surrounding that fraud or mistake. This means that "a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." (<u>In re GlenFed, Inc. Sec. Litig.</u>, 42 F.3d 1541, 1547 n.7 (9th Cir. 1994) (quoting 2 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 9.03 (2d ed. 1994)).)

---

[8] Although Plaintiffs also state at one point that Defendants' misrepresentations may have been merely "negligent[]" (TAC ¶ 25), this allegation is wholly undermined by Plaintiffs' consistent allegations throughout the rest of the TAC that Defendants knowingly and willfully conveyed false information to Plaintiffs about the amount of money Plaintiffs could expect to earn.

As discussed above, Plaintiffs' first and second causes of action sound in fraud because they are based on allegations of a unified course of fraudulent conduct—namely, that Defendants knowingly and intentionally misrepresented to Plaintiffs the amount of money they would make if they signed a franchise agreement with Coverall, that Plaintiffs relied on Defendants' misrepresentations in entering into those agreements, and that Plaintiffs suffered damages as a result of that reliance. However, as Defendants Coverall, CNA, and Elliott correctly point out, Plaintiffs have failed to allege details concerning "where Plaintiffs obtained the marketing materials and advertisements [containing the misrepresentations], who provided those materials, who, if anyone, created those marketing materials, [and] when Plaintiffs were subject to the marketing and advertisement." (Doc. No. 77 p.10; Doc. No. 96 p.14.) Plaintiffs' accusations surrounding the circumstances of Defendants' alleged fraud are therefore insufficiently particularized to meet the heightened pleading requirements of Rule 9(b). As a result, Defendants' motions to dismiss are GRANTED with regard to Plaintiffs' first and second claims for breach of contract and misleading advertising.

### 2. Misleading Advertising (Claim No. 2)

Defendants Coverall and CNA argue that Plaintiffs' second cause of action for misleading advertising is also flawed because Plaintiffs do not plead actual reliance on the allegedly false advertisements. (Doc. No. 77 p.12.) Because the court should dismiss Plaintiffs' misleading advertising claim for failure to comply with the requirements of Rule 9(b), it is unnecessary for the court to address this issue at this time.

### 3. Unfair Business Practices (Claim No. 10)

Defendants Coverall, CNA, and Elliott claim that Plaintiffs' claim for unfair business practices fails because it is pled with insufficient particularity and does not allege actual reliance on any alleged misrepresentation. (Doc. No. 77 p.14; Doc. No. 96 p.15.)

Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice" as a form of unfair competition. (CAL. BUS. & PROF. CODE § 17200.) In particular, the definition of an "unlawful" practice "borrows violations of other laws" to establish liability. (Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999); see also

Chabner v. United of Omaha Life Ins. Co., 225 F.3d, 1042, 1048 (9th Cir. 2000).) Thus, if Plaintiffs' TAC succeeds in stating a viable cause of action under any other law, that cause of action can serve as a predicate upon which Plaintiffs may bring a valid § 17200 claim.

To the extent that Plaintiffs' first and second causes of action are pled with insufficient particularity as required by Rule 9(b), as discussed above, Plaintiffs' § 17200 claim is similarly inadequately pled. However, because Plaintiffs' other causes of actions survive this motion to dismiss, Plaintiffs' § 17200 claim also survives. Therefore, the court DENIES Defendants' motions to dismiss with regard to Plaintiffs' tenth cause of action.

### 4. Theft of Labor (Claim No. 11)

Plaintiffs' eleventh cause of action states a claim for theft of labor in violation of CAL. LAB. CODE §§ 216, 553 & 1199 and CAL. PENAL CODE §§ 484 & 532. (TAC ¶¶ 142-143.) However, all of the statutes cited relate to the circumstances under which *criminal* penalties may be imposed on employers for labor condition violations. Plaintiffs have failed to state the source of their authority for bringing a private cause of action against Defendants on these grounds. Therefore, the court hereby *sua sponte* DISMISSES Plaintiffs' eleventh cause of action.

//
//
//
//
//
//
//
//
//
//
//
//

## IV.    CONCLUSION

For the foregoing reasons, the court hereby GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss. Specifically, Plaintiffs' first, second, and eleventh causes of action for breach of contract, misleading advertising, and theft of labor are dismissed as to all Defendants; further, Plaintiffs' seventh and eighth causes of action for failure to reimburse for reasonable business expenses and unlawful deductions from wages are dismissed as to Defendant Elliott only.

Plaintiffs are granted leave to amend as to the first and second causes of action only. Any amended complaint must be filed by **March 7, 2011**. No leave to amend is granted as to the remaining dismissed claims, absent some future showing of good cause.

**IT IS SO ORDERED.**

DATED:  February 14, 2011

_____
Hon. Jeffrey T. Miller
United States District Judge

09-CV-2131-JM (BGS)