Page 1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4    _____

5    SABRINA LAGUNA, et al.,          )

6              Plaintiffs,            )

7         vs.                         ) No. 3:09-CV-02131-JM

8    COVERALL NORTH AMERICA, INC.,    )      (BGS)

9    et al.,                          )

10              Defendants.           )

11   _____)

12

13

14       Deposition of AMRIT SINGH, taken

15       at 3090 Bristol Street, Suite 190,

16       Costa Mesa, California, commencing

17       at 9:25 a.m., Thursday, December 15,

18       2011, before Paulina Balbuena,

19       CSR No. 12898, RPR, CCRR.

20

21

22

23

24

25   PAGES 1 - 166

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFFS:

4         LORENS & ASSOCIATES APLC

5         BY:  L. TRACEE LORENS

6         701 B Street, Suite 1400

7         San Diego, California 92101

8         (619) 239-1233

9         tracee@lorenslaw.com

10

11        CADENA CHURCHILL LLP

12        BY:  RAUL CADENA

13        Attorney at Law

14        701 B Street, Suite 1400

15        San Diego, California 92101
          (619) 546-0888
16        rcadena@cadenachurchill.com

17

18   FOR THE DEFENDANTS COVERALL NORTH AMERICA, CNA HOLDING AND

19   TED ELLIOTT:

20        DLA PIPER LLP

21        BY:  NANCY NGUYEN SIMS

22        2000 Avenue of the Stars, Suite 400

23        North Tower

24        Los Angeles, California 90067-4704
          (310) 595-3008
25        nancy.sims@dlapiper.com

```
1    APPEARANCES (CONTINUED):

2

3    FOR DEFENDANT ALLIED CAPITAL AND ARES CAPITAL CORP.:

4

5         COOLEY LLP

6         BY:  MAZDA K. ANTIA

7         4401 Eastgate Mall

8         San Diego, California 92121

9         (858) 550-6139

10        mantia@cooley.com

11

12

13   FOR THE WITNESS:

14

15        LICHTEN & LISS-RIORDAN, P.C.

16        BY:  SHANNON LISS-RIORDAN

17        100 Cambridge Street, 20th Floor

18        Boston, Massachusetts 02114

19        (617) 994-5800

20        sliss@llrlaw.com

21

22

23

24

25
```

Page 4

1       Thursday, December 15, 2011; Costa Mesa, California

2                      9:25 a.m. - 1:21 p.m.

3                         -- o0o --

4

5           THE REPORTER:  Good morning.  My name is

6    Paulina Balbuena, a court reporter associated with

7    Veritext National Deposition & Litigation Services,

8    whose address is 3090 Bristol Street, Suite 190, Costa

9    Mesa, California.  The date is 12/15/2011.  The time is

10   9:25 a.m., and the deposition of Laguna, et al., vs.

11   Coverall North America et al., is taking place at

12   Veritext.

13           Counsel present on behalf of the Plaintiffs

14   are Tracee Lorens, Lorens & Associates and Raul Cadena,

15   Cadena Churchill; Counsel present on behalf of the

16   Defendants Allied Capital and Ares Capital is Mazda

17   Antia, Cooley LLP; for the witness, Shannon

18   Liss-Riordan, Lichten & Liss-Riordan, P.C.; and then for

19   Defendants Coverall and CNA, Nancy Nguyen Sims, DLA

20   Piper LLP.

21           Please raise your right hand.

22           You do solemnly state the testimony you shall

23   give in this matter shall be the truth, the whole truth,

24   and nothing but the truth so help you God?

25           THE WITNESS:  Yes.

```
 1                    EXAMINATION

 2  BY MS. SIMS:

 3      Q    Mr. Singh, could you please state your name

 4  and spell your last name for the record.

 5      A    My name is Amrit Singh.  Last name is

 6  S-i-n-g-h.

 7      Q    Mr. Singh, my name is Nancy Sims and I

 8  represent the defendants Coverall North America, CNA

 9  Holding and Ted Elliott in this action.  You understand

10  that you have been asked to appear here today for

11  deposition because you objected to the settlement in

12  this case?

13      A    Yes.

14      Q    Have you ever been deposed before, Mr. Singh?

15      A    I'm sorry?

16      Q    Have you ever been deposed before?

17      A    No.

18      Q    Have you ever testified at trial?

19      A    No.

20      Q    Have you ever been a party to a lawsuit?

21      A    Like in a car accident, but not like lawsuit

22  or maybe, like, you know how Bank of America, sometimes

23  they send you forms, stuff like that.

24      Q    So the answer is yes, you have been a party to

25  a lawsuit?
```

1      A     Yes.

2      Q     And one was a car accident, correct?

3      A     Yes.

4      Q     And when was that?

5      A     Two, three years ago.

6      Q     And the Bank of America lawsuit, when was

7   that?

8      A     I think that was recently one about

9   overdrafting.

10     Q     Was this in the last year?

11     A     I'm sorry?

12     Q     Was this in the last year?

13     A     Yes.

14     Q     And tell me about the nature of that lawsuit.

15     A     I think Bank of America was charging people

16  overdrafting fee.  That's all I know.  I don't know more

17  details on that.

18     Q     Were you the plaintiff in that lawsuit?

19     A     No, I was just . . .

20     Q     Were you suing or were you being sued?

21     A     I don't know.  I got a claim form and I filled

22  it in.

23     Q     Okay.  So it was a class action lawsuit?

24     A     I don't know what's the difference between --

25     Q     Okay.  Well, let me ask you:  Was this a

Page 7

1    lawsuit that was pending somewhere and you got a claim

2    form, like you did in this lawsuit, where you filled it

3    out and sent it back or was this a case where you had a

4    lawyer or you yourself filed a lawsuit against Bank of

5    America directly?

6         A    I filled out -- I sent the form.

7         Q    Okay.  So it was a lawsuit where you were a

8    claimant, then.  You weren't actually -- have you ever

9    been to court in that case?

10        A    No.

11        Q    Any other lawsuits that you've been involved

12   in?

13        A    I cannot think of anything else right now.

14        Q    Well, Mr. Singh, please let me go over some

15   guidelines and instructions for the deposition.  You

16   were just placed under oath by the court reporter, and

17   it's the same oath that you would take if you were

18   sitting in a court of law.  Not withstanding the

19   informal surroundings of this conference room, that oath

20   has the same penalties and solemnities as if you were

21   sitting before a judge or a jury.  Do you understand

22   that?

23        A    Yes.

24        Q    The court reporter will be taking everything

25   down verbatim so long as we're, quote, on the record.

1    And everything on the record will be transcribed into a

2    booklet form for your review sometime in the future.

3            You'll have the opportunity to review it and

4    make any changes to ensure that the deposition

5    transcript is as accurate as possible.  But one note of

6    caution, if you make any substantive or material changes

7    to the transcript as opposed to correcting a typo or a

8    misspelling, I or one of the other counsel here may use

9    that information, and to the Court or the jury, we may

10   introduce that evidence to impact their view of your

11   credibility.  Do you understand that?

12       A    Yes.

13       Q    Therefore, it's important for you to give your

14   best testimony here today.  I'm also entitled to your

15   personal knowledge as well as your best recollections,

16   approximations and estimates, but you shouldn't guess or

17   speculate.  Do you understand the difference between a

18   guess or speculation on the one hand and an estimate on

19   the other?

20       A    Yes.

21       Q    If there's any part of my question that you

22   don't understand or that you didn't hear, please ask me

23   to repeat it.  I'll be happy to do so or we can ask the

24   court reporter to read it back.  But if you answer it,

25   then, you know, we'll assume that you heard it correctly

1  and you're answering to the best of your ability.  Do

2  you understand that?

3       A    Yes.

4       Q    Because the court reporter's taking everything

5  down and verbatim, we really need to try to not talk

6  over each other.  And we're doing a very good job of it

7  so far, so I will let you finish your answers if you

8  will please let me finish my questions before you start

9  speaking.

10      A    Okay.

11      Q    Also, because we want a clear record, please

12  avoid shaking your head or nodding.  You know, in normal

13  conversation, we do that.  But we do need you to give a

14  verbal response.  And please avoid any uh-huhs or

15  huh-uhs, because we might be fighting three months down

16  the line about whether that was a yes or a no.

17      A    Okay.

18      Q    If you need to take a break for any reason,

19  let me know.  We will.  This isn't a marathon.  We're

20  happy to let you take a break if you need to at the next

21  reasonable time or, you know, if we have a question

22  pending, we'll ask you to answer that question and then,

23  you know, we can try to take a break at that point if

24  it's a good breaking point.  Okay?

25      A    Okay.

Page 10

1      Q      Are you on any medication today that would

2   prevent your deposition from going forward or would

3   affect your ability to give your best recollections and

4   testimony?

5      A      No.

6      Q      Did you review any documents in preparation

7   for this deposition?

8      A      No.

9      Q      Other than your counsel, did you have any

10  conversations with anybody in preparation for this

11  deposition?

12     A      No.

13     Q      Other than your counsel, did you have any

14  conversations with anybody regarding the deposition,

15  even if it wasn't for the purpose of preparing for the

16  deposition?

17     A      Just with my girlfriend.

18     Q      Okay.  And what did you discuss with her?

19     A      Just that -- where I'm going today, and she

20  wants to know why I'm going.

21     Q      Okay.  Anyone else?

22     A      And my mom.

23     Q      And what did you discuss with her?

24     A      That I won't be home all day today, so she

25  just wanted to know where I'm going.

**REDACTED**

```
1          Q     Anyone else?

2          A     That's it.

3          Q     And I assume at some point you did speak with

4     your counsel regarding this deposition.  I just need a

5     yes-or-no answer.

6          A     Yes.

7          Q     Was anyone else present during those

8     discussions?

9          A     No.

10         Q     Mr. Singh, could you please state your date of

11    birth.

12         A     ███████████████.

13         Q     And for the record, could you please state

14    your address.

15         A     ████████████████████████████████████

16    █████.

17         Q     Is that your home address?

18         A     Yes.

19         Q     And do you have a business address?

20               MS. LISS-RIORDAN:  Let me just ask for the

21    record, under California rules, I assume if this

22    transcript becomes public, that information gets

23    redacted, right?

24               MS. SIMS:  I don't think so unless you ask for

25    it to be redacted, but there would be no reason for this
```

Page 11

Page 12

1    to become public.  You mean in a court filing or some --

2              MS. LISS-RIORDAN:  If in a court filing, I

3    would request that home address information be redacted.

4              MS. SIMS:  That's fine.  We'll stipulate to

5    that.

6              MS. LISS-RIORDAN:  Thank you.

7              MS. SIMS:  Do you guys have any issue with

8    that?  If we should attach the depo to a court filing,

9    to redact his address.

10             MS. LORENS:  No, I don't object.

11             MR. ANTIA:  No.

12   BY MS. SIMS:

13       Q    And I'm sorry.  Your business address, sir?

14       A    I don't have, like, a business address.

15       Q    Okay.  What is your highest level of

16   education, Mr. Singh?

17       A    I attended DeVry for two years.

18       Q    And what years was that?

19       A    AA, Associate's degree, but I never graduated.

20   I quit.

21       Q    What years did you attend DeVry?

22       A    It's been a while.  I'll say five to six years

23   ago.

24       Q    Okay.  And prior to that, were you in high

25   school?

1      A     Yes.

2      Q     Where did you attend high school?

3      A     Upland Option for Youth.

4      Q     Did you graduate from there?

5      A     Yes.

6      Q     What year?

7      A     2001.  I'm not . . .

8      Q     Approximately 2001?

9      A     Yeah.

10     Q     Okay.  Do you have any other -- any technical

11  degrees or licenses or certifications?

12     A     No.

13     Q     Where are you presently employed?

14     A     Frito-Lay.

15     Q     What is your position there?

16     A     I'm a CLT.  It's a central lab technician, QC.

17     Q     Tell me what your duties are.

18     A     I check all the incoming raw materials and

19  also calibrate some of the equipment.

20     Q     How long have you been working there?

21     A     12 years.

22     Q     So from approximately 1999?

23     A     Yes.

24     Q     Prior to that, where were you employed?  Well,

25  I assume you were in school, based on your timing.  So

Page 14

1    was Frito-Lay your first employment?

2         A    Yeah.  I think I did probably some part-time

3    job at a Country Harvest Buffet.

4         Q    What year was that?

5         A    Probably '98.

6         Q    Have you had any other employment since 1998

7    aside from those two that you've mentioned?

8         A    Right now, I own a liquor store with my

9    brother-in-law.

10        Q    What's the name of that liquor store?

11        A    Moon's Market.

12        Q    Where is that located?

13        A    Ontario, California.

14        Q    How long have you owned that market?

15        A    Two years.

16        Q    And you said that that is a business that you

17   are a partner with your brother-in-law?

18        A    Yes.

19        Q    And did the two of you go in and buy it

20   together?

21        A    Yes.

22        Q    And that was in approximately 2009?

23        A    Yes.

24        Q    Two years ago?

25        A    Yes.

1       Q    Mr. Singh, at some point, you were served with
2    a subpoena from our office.  Are you aware that you were
3    previously required to appear for deposition on
4    November 10th?
5       A    Yes.
6       Q    And why did you not appear?
7       A    My attorney was trying to see if I don't have
8    to go.
9       Q    So it was at the advice of counsel that you
10   didn't show up?
11      A    She said she's --
12           MS. LISS-RIORDAN:  Hold on a second.  Just
13   want to instruct you don't testify about anything said
14   between you and me because that's attorney-client
15   privileged.  But you can answer --
16           MS. SIMS:  Yes or no.
17           MS. LISS-RIORDAN:  -- the result of a
18   conversation.  Did you do so on the advice of counsel,
19   you can answer yes or no to that.
20           THE WITNESS:  I'm sorry, what was --
21   BY MS. SIMS:
22      Q    Did you not appear on the advice of counsel?
23      A    Yes.
24      Q    Mr. Singh, when did you first become
25   acquainted with Ms. Liss-Riordan, sitting to your right?

```
1       A     Can you repeat that.

2       Q     Sure.  When did you first meet

3  Ms. Liss-Riordan?

4       A     When I first --

5       Q     Came in contact with her.

6       A     I don't remember exactly the date, but it was

7  probably about a month ago.

8       Q     A month ago.  So we are now December -- what

9  is today, December 15th.  So approximately

10 November 15th?

11      A     Sorry.  I don't know exact date.

12      Q     Okay.  That's okay.

13      A     But roughly about a month ago.

14      Q     So it was before Thanksgiving?

15      A     Yes.

16      Q     Okay.  And how did you come in contact with

17 her?

18      A     My girlfriend told me there's a lawsuit --

19 there's some kind of settlement going on, something

20 going on.  And then she gave me the number -- she got

21 the number from her friend, so she told me to contact

22 Shannon, so I contacted her.

23      Q     What's your girlfriend's name?

24      A     Diana Vizcarra.

25      Q     Can you spell her last name.
```

1        A      V-i-z-c-a-r-r-a.

2        Q      And does Ms. Vizcarra live at your address or

3   does she --

4        A      No, she doesn't.

5        Q      Do you know what her address is?

6        A      I know she lives in -- no, not exactly, but

7   it's Meridian and it's -- that's the name of the street,

8   and it's San Bernardino.  I'm not sure if it's 861

9   North, but it's right there.

10        Q      Do you have a phone number for Ms. Vizcarra?

11        A      I do, but I have -- do you want me to --

12              MS. SIMS:  Yeah, if you wouldn't mind, please.

13              MS. LISS-RIORDAN:  I'm going to object to him

14   putting that on the record.  We can discuss later if you

15   want contact information for her.

16              MS. SIMS:  Well, I think we're entitled to

17   know it and we're happy to -- again, if we file

18   something public, we're happy to strike it off the --

19   you know, redact it so that it's not --

20              MS. LISS-RIORDAN:  Okay.

21              You can only answer what you know.  If you

22   don't know it without having to look it up, you don't

23   have to consult on your phone.

24   BY MS. SIMS:

25        Q      Well, you do have the information with you,

**REDACTED**

```
1    right, sir?  It's on your phone?
2         A    Yes.
3         Q    Okay.  Can we please have the information.
4         A    It's ███████████.
5         Q    Thank you.
6              MS. LORENS:  Was that ████?   ████?
7    BY MS. SIMS:
8         Q    █████████, correct?
9         A    Yes.
10        Q    So I'm sorry, please continue.  You said you
11   got the information about the lawsuit from Ms. Vizcarra?
12        A    Yes.
13        Q    And tell me about the nature of the
14   conversation you had with her.
15        A    She was telling me there's a lawsuit that was
16   going on and they're settling it for $400 only.  If you
17   want to know more information, so contact -- I need
18   some -- I need to contact Shannon or some attorney, so I
19   contact Shannon.  It was just a conversation between us.
20        Q    When did that conversation take place?
21        A    I'd say a month and a half ago.  I think right
22   when I contacted her that -- the same day.
23        Q    So the conversation with Ms. Vizcarra happened
24   the same day that you contacted Ms. Liss-Riordan?
25        A    (Indicating.)
```

Page 18

1      Q    And you indicated that Ms. Vizcarra learned

2  about the lawsuit from a friend?

3      A    Yes.

4      Q    And who is that friend?

5      A    I don't know his name.

6      Q    How is he acquainted with Ms. Vizcarra?

7      A    I guess they work together.  I'm not sure

8  how -- because I -- she's the one who does all the

9  talking usually.  I don't ask her a bunch of questions.

10      Q    Okay.  Fair enough.  How did -- if you have

11  knowledge of it, how did this friend know to tell

12  Ms. Vizcarra about this lawsuit?

13      A    I don't know.  Sorry.

14      Q    All right.  Did she give you any paperwork,

15  Ms. Vizcarra?

16      A    No.

17      Q    So she just told you about the lawsuit and

18  then indicated you should contact a lawyer?

19      A    Yes.

20      Q    And how was it that you decided to contact

21  Mrs. Liss-Riordan?

22      A    She gave me the number.

23      Q    Ms. Vizcarra did?

24      A    Yes.

25      Q    Do you know where Ms. Vizcarra got the phone

1   number for Ms. Liss-Riordan?

2        A    From the friend.

3        Q    What was your intent when you contacted

4   Ms. Liss-Riordan about what you wanted to talk about?

5        A    I just wanted to talk about, like, what's this

6   lawsuit about and, like, what's going on in this because

7   I don't know much about -- I never been in a situation

8   like this, so I just needed some information how this

9   worked.

10       Q    Were you able to reach Ms. Liss-Riordan that

11  day?

12       A    Yes.

13       Q    And you contacted her by phone or by e-mail or

14  some other medium?

15       A    By phone.

16       Q    Was there anyone else on the phone

17  conversation with you two?

18       A    No.

19       Q    And how long did that telephone conversation

20  last?

21       A    Probably 15, 20 minutes.

22       Q    At what point did you retain Ms. Liss-Riordan

23  to be your counsel?

24       A    I'm sorry?

25       Q    When did you hire Ms. Liss-Riordan to be your

1   counsel?

2        A    The date, I don't remember the date.

3        Q    Was it that same day or was it subsequent to

4   that conversation?

5        A    I don't remember if it was the same day or

6   next day, but within those one or two days.

7        Q    What is your compensation agreement with

8   Ms. Liss-Riordan?

9        A    No, I don't -- like how much -- I don't

10  understand what --

11       Q    Meaning, you know, what is the fee

12  arrangement?  Do you pay her hourly or is it some other

13  arrangement?

14       A    (No response.)

15       Q    Let me ask you this:  Are you paying

16  Ms. Liss-Riordan for her services?

17       A    No.

18       Q    Did you sign a written agreement of some sort

19  to retain Ms. Liss-Riordan?

20       A    Like sign some papers with her?

21       Q    Right.  Did you sign any paperwork with -- to

22  say, Ms. Liss-Riordan, you are my attorney.  Here are

23  the terms of our agreement?  Anything like that?

24       A    Yes.

25       Q    Yes, you did?

1      A     Yes.

2      Q     And when was that signed?

3      A     Last month.

4      Q     When was it signed with respect to that first

5  telephone conversation you had with her?

6      A     A day or two after that.

7      Q     Are you being compensated in any way for your

8  participation in this lawsuit by Ms. Liss-Riordan or her

9  law firm?

10     A     No.

11     Q     Aside from Ms. Liss-Riordan, did you attempt

12  to make contact with any other attorneys in connection

13  with this lawsuit?

14     A     No.

15     Q     Did you ever make any attempts to contact the

16  plaintiffs' counsel in this lawsuit, here, sitting to my

17  left?

18     A     No.

19     Q     Aside from your discussions with

20  Ms. Liss-Riordan, have you had any communications with

21  anyone regarding your objection to this lawsuit -- to

22  the settlement?  Excuse me.

23     A     Just, like -- just my family.

24     Q     Okay.  And who specifically did you speak

25  with?

1       A       Just my mom and my girlfriend.

2       Q       How many discussions have you had with your

3  mom on the issue?

4       A       Probably just one.

5       Q       And your girlfriend?

6       A       One.  I guess the only time that they want to

7  know what's going on is just like when I went to San

8  Diego.  They were just wondering what's going on.  And

9  then today.  That's about it.

10      Q       Okay.  So it was to share with them where you

11  were going?

12      A       Yeah.

13      Q       Have you talked to them substantively about

14  your objection to the settlement?

15      A       No, they just know that there's some -- that

16  I'm going and there's something going on with Coverall.

17  Not in any details.

18      Q       Have you had any communications with anyone

19  regarding Ms. Liss-Riordan and her firm aside from the

20  one conversation with Ms. Vizcarra that we've already

21  discussed?

22      A       Only thing I know is about, I think, Jan-Pro.

23  That's what you're asking, if I know anything --

24      Q       Go ahead.

25      A       Just about that she's representing people from

1   Jan-Pro.

2        Q     And where'd you learn that?

3        A     From Diane.

4        Q     Aside from -- well, tell me what Diane said

5   about Jan-Pro in that discussion.

6        A     Nothing, she just said, hey, this is the --

7   when she gave me the number, hey, this is the attorney

8   that's representing people from there if you want to

9   contact her.

10       Q     Okay.  So that was in that same conversation

11  we talked about earlier?

12       A     Yeah.

13       Q     Have you had any other discussions with

14  Ms. Vizcarra regarding Ms. Liss-Riordan and her firm

15  aside from that one discussion?

16       A     No.

17       Q     Aside from your mother and that discussion

18  with Ms. Vizcarra, any other discussions with anyone

19  else regarding Ms. Liss-Riordan and her firm?

20       A     No.

21       Q     When did you purchase your Coverall franchise?

22       A     I don't remember exact date.  Probably five

23  years ago.

24       Q     Are you still a Coverall franchisee today?

25       A     No.

Page 25

1     Q    How long did your franchise actively service

2  customer accounts?

3     A    All accounts or just . . .

4     Q    Well, let me ask you this:  When did you stop

5  being a Coverall franchisee?

6     A    Like, if I'm not wrong, two years ago.

7     Q    So you were a franchisee from approximately

8  2006 to 2009?

9     A    I'm not good with the dates, yeah.

10     Q    Sure.  Roughly?

11     A    Roughly.

12     Q    And how long during that time period did you

13  actually service customer accounts?  Was it for those

14  entire three years?

15     A    Well, there's -- you know how there's a

16  package.  First I had like a certain amount of accounts,

17  yes, I -- but at the end, I had just like one or two

18  accounts.  But see, I didn't understand if you were

19  talking about all the accounts I had served was for

20  three years or . . .

21     Q    No, just at any point if you were serving an

22  account, for the purposes of this question, I would say

23  you're an active franchisee.  So would you say for those

24  three years --

25     A    Yes.

1      Q      -- you were servicing accounts?

2      A      Yes.

3      Q      Okay.  How many accounts in total did your

4  franchise service?

5      A      Roughly probably nine, eight to nine.  I'm

6  sorry, eight to ten.

7      Q      Did you provide the cleaning service yourself

8  or did you have others help you?

9      A      I was doing it and then my sister was helping

10  me.

11     Q      So you and your sister were the only two

12  people?

13     A      Yes.

14     Q      What's your sister's name?

15     A      Harvinder Kaur.

16     Q      Could you spell that for the record?

17     A      H-a-r-v-i-n-d-e-r.

18     Q      And her last name?

19     A      K-a-u-r.

20     Q      Were you compensating her in any way for her

21  services?

22     A      Yes.

23     Q      And how were you compensating her?

24     A      I don't know if -- we're just -- depending on

25  how was the check, sometimes we'd split.  Sometime

1    20/60.  It all depended.

2         Q     So it would vary?

3         A     Yeah.

4         Q     But it would be monetary cash compensation?

5         A     Yes.

6         Q     At the time that you were operating your

7    franchise, was that your sole employment?

8         A     No.

9         Q     Okay.  What else were you doing then?

10        A     Frito-Lay.

11        Q     Has Frito-Lay always been a full-time job for

12   you?

13        A     Yes.

14        Q     What hours do you work there?

15        A     Right now, I'm -- I do four tens from 8:00 to

16   6:30, but it's -- throughout Frito-Lay, I had different

17   shifts.  Second shift, third shift.

18        Q     At the time that you were a Coverall

19   franchisee, what kind of shift were you working at

20   Frito-Lay?

21        A     I was working swing shift from 3:00 to 11:00.

22        Q     That's p.m.?

23        A     Yes.

24        Q     Was that Monday through Friday?

25        A     It depended.  Different workweeks.  Sometime

Page 28

1    it'd be Sunday through Thursday.  I never had Monday

2    through Friday in that position.

3         Q    But five days a week?

4         A    Yeah, five days a week.

5         Q    But it would vary by week?

6         A    Yes.

7         Q    During the time you were a Coverall

8    franchisee, what was the highest number of accounts that

9    you would service at one time?

10        A    I would say nine.

11        Q    And what was the lowest number of customer

12   accounts that your franchise serviced at any one time?

13   I think you mentioned at the end that it was one or two

14   accounts?

15        A    Yeah.

16        Q    Now, at the time that you were servicing nine

17   accounts, how many days a week were you working at that

18   time for the franchise?

19        A    Six days.

20        Q    And how many hours a week total would you say?

21        A    Four to six.

22        Q    Four to six hours a day?

23        A    (Indicating.)

24        Q    Four to six hours a day, six days a week, so

25   if my math is right, 24 to 36 hours a week, you would

1    estimate that you worked on the franchise -- or for the

2    franchise?

3        A    Yes.

4        Q    Okay.  Did your schedule, your cleaning

5    schedule vary from week to week or was it set?

6        A    It varies week to week.

7        Q    At the time that you were servicing the lowest

8    number of customer accounts that you had, one to two,

9    how many days a week were you working then for the

10   franchise?

11       A    Two days.

12       Q    How many hours per day would you estimate?

13       A    Probably two to three.

14       Q    Did the schedule vary from week to week or was

15   the schedule set?

16       A    Varies week to week.

17       Q    And these hours that you just gave me, are

18   these hours that you personally worked or hours that

19   between you and your sister, that's how long it took to

20   clean the accounts?

21       A    Actually, my sister put more hours than me.

22   She's the one who was -- like I'd go help her out, but

23   she's putting more hours.

24       Q    And how many hours did your sister work at the

25   time that you were -- that your franchise was servicing

1    nine accounts per week?  Actually, I take that back.

2    How many days a week was she working at that time for

3    the franchise?

4         A    Six days.

5         Q    How many hours per day, if you know?

6         A    Seven to eight.

7         Q    And what is this information based on?  Is

8    this what she told you or you would see her there?

9         A    I'll see her.

10        Q    But you weren't there the entire time, right?

11        A    Well, like, she would go there and then she

12   will take the car and then somebody would give me a ride

13   there, so that's how I know she's already there.  Like

14   we'll share the car.  It would have the equipment in it,

15   so that's kind of how I would know she was there.

16        Q    And when your franchise was servicing one to

17   two accounts, how many days a week was your sister

18   working then?

19        A    Probably just a day sometimes.

20        Q    And how many hours that day?

21        A    Those days we usually go together, so I'd say

22   two to three.

23        Q    Okay.  During the time that you were a

24   Coverall franchisee, were you in school?

25        A    No.

1        Q    When was the last time that your franchise

2    serviced an account, by month and year, if you can give

3    me an estimate?  You said that you stopped servicing

4    accounts in 2009.  Do you remember what month?

5        A    No, I can't remember.

6        Q    Do you remember what that last account was?

7        A    If I'm not wrong, maybe Goodyear.

8        Q    And what was the reason that you stopped

9    servicing that account?

10       A    He wanted a strip and wax done on that account

11   and he was just giving me three -- I believe 300 a month

12   was that account, and the area to do the strip and wax

13   was big, so I couldn't -- I would have to hire somebody

14   and pay like -- the estimate that I got at that time was

15   probably $3,000.

16       Q    And when you say he, this is the

17   representative from Goodyear?

18       A    Yes.

19       Q    Do you remember his name?

20       A    I think Manny.

21       Q    Do you know his last name?

22       A    No.

23       Q    Mr. Singh, have you ever lost any Coverall

24   accounts?

25       A    I lost all of them.

1        Q     So all --

2        A     Nine.

3        Q     -- nine to ten?

4        A     Yeah.

5        Q     Okay.  What was the reason for those losses?

6        A     I don't remember.

7        Q     You don't remember the reason why you lost any

8   of those accounts?

9        A     There's different reasons.  I think only one I

10  could remember is just the alarm went on on that

11  account, and they just -- they didn't want it after.

12       Q     Do you believe that those accounts were lost

13  for good reason?

14       A     No.

15       Q     So you believe some of the losses were

16  unjustified?

17       A     Yes.

18       Q     Explain to me why.

19       A     Like the one I just mentioned to you about the

20  alarm.  The alarm could go on and -- it's not -- it's

21  nothing -- a big situation where they have to cancel the

22  account.

23       Q     But in that case, it was the customer who

24  canceled the account?

25       A     I don't remember the customer.  Only thing I

1    know is Coverall sent me that -- the information that I

2    don't need to no longer --

3         Q    What was the name of that customer?

4         A    I don't remember.

5         Q    So tell me what you do remember.  So with that

6    customer -- was it you or your sister who triggered the

7    alarm?

8         A    I think I did.

9         Q    So you triggered the alarm.  Were police

10   summoned or what happened?

11        A    Yeah.

12        Q    So the police were summoned and then the

13   client was notified?

14        A    Yes.

15        Q    So based on what you're telling me, it sounds

16   like the client was unhappy and then you were informed

17   you had lost the account?

18        A    Yes.

19        Q    And you believe that that was unjustified?

20        A    Yes.

21        Q    Sitting here today, do you have any other

22   recollection regarding any other account that you lost?

23        A    I'm sorry.  I can't think of any.

24        Q    I'm going to mark as Exhibit 1 -- for the

25   record, this is a letter dated May 20th, 2005 to you

Page 34

1  from Coverall.  Why don't you take a moment to read it.

2              (Deposition Exhibit 1 was marked for

3              identification by the court reporter.)

4              MS. LISS-RIORDAN:  I just want to state for

5  the record that we haven't seen any of the documents --

6  we haven't seen any documents.

7              MS. SIMS:  Okay.

8      Q    Mr. Singh, please take a moment to review this

9  document and let me --

10             MS. LISS-RIORDAN:  Do you have a copy for me?

11             MS. SIMS:  Actually, do you mind sharing with

12 him?  I'm actually short on copies.  I'm happy to, by

13 the way, send you a copy for your files of the exhibits.

14     Q    Are you done reviewing the document, sir?

15     A    Yes.

16     Q    Does this refresh your recollection concerning

17 any other lost accounts?

18     A    Now I remember this Leslie Pool.  This is the

19 same issue with strip and wax.  The job was done, but he

20 wanted some more work done with his strip and wax.

21     Q    So this client was dissatisfied with the job

22 that was done on the strip and wax?

23     A    No, it wasn't the job.  He wanted the -- more

24 area needed -- that he think should get done for the

25 strip and wax.

1       Q    Okay.  So the client believed that you should

2  have done something additional that wasn't done?

3       A    Yes.

4       Q    And because he was dissatisfied with that, the

5  client canceled?

6       A    I never talked to a client personally.  Only

7  time I would know that something happened was with

8  letters or I would get a call.  So I never had a

9  conversation with Leslie Pool that, hey, your account is

10  canceled or blah, blah, blah.  I would just receive a

11  letter or phone call from Coverall.  So I don't know.

12       Q    But it was your understanding that the client

13  was unhappy with the fact that they thought some

14  additional work should have been done that wasn't done?

15       A    Yes.

16       Q    Yes?

17       A    Yes.

18       Q    Okay.  And then you were subsequently informed

19  that you were no longer servicing this account?

20       A    Yes.

21       Q    Does that refresh your recollection about any

22  other accounts that you've lost?

23       A    You know, I have to -- if I see something,

24  then it might refresh my memory, but right now, I can't

25  think of one.

1     Q     With this account, Leslie's Swimming Pools,

2   did you think that account loss was unjustified?

3     A     Yes.

4     Q     Okay.  Tell me why.

5     A     Because of the area they want me to clean,

6   it's a big lunchroom, and when I first got that

7   contract, I was not aware of that it's going to be part

8   of strip and wax, the whole entire lunchroom.

9     Q     Now, in this case, you understand that you --

10  you have objected to the settlement in this case,

11  correct?

12    A     Yes.

13    Q     How do you believe that this settlement would

14  have impacted your -- these accounts that you believe

15  that you lost improperly?

16          MS. LISS-RIORDAN:  Objection.

17  BY MS. SIMS:

18    Q     You can answer.

19          MS. LORENS:  I'm sorry, what's the basis for

20  the objection?

21          MS. LISS-RIORDAN:  I wasn't aware that I have

22  to state a basis for the objection.  I'm just objecting.

23          MS. LORENS:  I believe under the code, you

24  need to state the basis, and I'd like to know the basis

25  so I would be able to properly analyze whether or not a

1  motion to compel is necessary.

2          MS. LISS-RIORDAN:  I didn't instruct him not

3  to answer.  I just stated an objection for the record.

4          Can you repeat the question, please, Nancy.

5  BY MS. SIMS:

6      Q   Mr. Singh, how do you believe that this

7  settlement would have impacted these accounts that you

8  believe you lost improperly?

9          MS. LISS-RIORDAN:  My basis for the objection

10  is it's a confusing question and it's assuming that his

11  objection to the settlement is going to somehow directly

12  impact these particular accounts.  But I'm not

13  instructing him not to answer.  He can answer to the

14  best of his ability.

15          MS. SIMS:  Okay.

16          THE WITNESS:  Can you repeat that for me.

17          MS. SIMS:  Can you read the question back,

18  please.

19          (The record was read as follows:

20              "Mr. Singh, how do you believe

21          that this settlement would have

22          impacted these accounts that you

23          believe you lost improperly?")

24          THE WITNESS:  I did not lost these accounts

25  improperly, because what I was told, I did that job.  It

Page 38

1   was the additional job that they wanted that was I'm not

2   aware of.  So that's -- that's why I'm not -- when you

3   make that statement, as improperly, it wasn't . . .

4   BY MS. SIMS:

5        Q    Okay.  I think you're misunderstanding, and

6   let me just clarify.

7        A    Okay.

8        Q    You believe that you lost these accounts

9   improperly, they should not have been taken away from

10  you, right?

11       A    Yes.

12       Q    And my question to you is -- let me just back

13  up.  Have you read the settlement agreement in this

14  case?

15       A    Which one?  The one . . .

16       Q    The settlement agreement in the Laguna case

17  that was signed by all of the parties.

18       A    Not in detail, just -- no.

19       Q    No, you haven't read it?

20       A    No.

21       Q    If you haven't read it, do you have any

22  understanding of the terms of the settlement?

23       A    See, when I see a paper, I don't really

24  understand what they're trying to say.  Only thing I

25  understand is the case going to be settled for some

Page 39

1    $400.  That was understanding, which I think is not fair
2    because all the amount -- or the money that I put in.
3        Q    Okay.  The fact that the case was settled for
4    $400, where did you get that information and
5    understanding?
6        A    I got that claim form.
7        Q    So aside from the settlement term concerning
8    the $400, can you tell me what the other terms of the
9    settlement are?
10       A    If I'm not wrong, I think the other
11   understanding is that current franchise owner will
12   receive some credit.
13       Q    That the current franchise owners will receive
14   a credit?
15       A    Yeah.
16       Q    A credit for what?
17       A    For business.
18       Q    Any other terms of the settlement agreement
19   that you're aware of?
20       A    No.
21       Q    Now, based on your understanding of these
22   settlement terms, do you believe that had the settlement
23   taken place, that it would have had any impact on those
24   accounts that you lost?
25            MS. LISS-RIORDAN:  Objection.  Again, I think

1   the question is confusing.  I'm not instructing him not

2   to answer.  Answer to the best of your ability.

3               THE WITNESS:  Can you please repeat that

4   question.

5   BY MS. SIMS:

6       Q    Let me just -- we'll come back to this

7   question.  What are the reasons why you're objecting to

8   the settlement?

9       A    The reason why I'm objecting is that $400 is

10  not fair for all these franchisee who put money in it,

11  and all they're receiving is 400.

12      Q    Any other reasons?

13      A    No.

14      Q    Okay.  So, again, can you explain to me in

15  more detail -- you've indicated now that the $400 is not

16  fair.  Explain to me why you believe it's not fair.

17      A    Because we -- as a franchise owner, we all

18  paid thousands of dollars to buy this business, and at

19  the end we're just getting $400.

20      Q    What do you think would be fair?

21      A    I don't know what would be fair.

22      Q    Aside from the monetary amount, is there

23  anything else that you would change about the settlement

24  to make the terms acceptable to you?

25      A    Can you please say that --

1      Q     Sure.  Aside from the $400 we've already

2    talked about, is there anything else that you would

3    change about the settlement terms to make you not object

4    to the settlement?

5      A     Another thing that I would like to see is that

6    where a franchise owner is, how far the accounts are,

7    and then if they get to keep their accounts.

8      Q     Okay.  Can you explain that to me a little bit

9    further?

10     A     Like if I have this office, I should be -- I

11   should be the direct person to contact the office

12   manager, whoever's giving me contract.  Coverall should

13   step in if, you know, they need to.

14     Q     So you're saying that it would be more fair if

15   the franchise owners could own the actual accounts

16   themselves?

17     A     Yes.

18     Q     Okay.  Do you understand that that's already a

19   term of the settlement?

20           MS. LISS-RIORDAN:  Objection.

21           MS. LORENS:  And the form of the objection,

22   please?  The basis for the objection.

23           MS. LISS-RIORDAN:  Yeah, I think it's

24   misleading, the question.

25           But go ahead.

Page 42

1  BY MS. SIMS:

2       Q    You can answer.

3       A    I'm sorry, which one?

4            MS. SIMS:  Can you read it back, please.

5            THE WITNESS:  Whenever -- I just need to grab

6  some water, so after this, we could --

7            MS. SIMS:  This is unopened.

8            MS. LISS-RIORDAN:  Yeah, I'd like to get a

9  restroom break when we can.

10           MS. SIMS:  Sure.

11           (The record was read as follows:

12                "Do you understand that that's

13           already a term of the settlement?")

14           THE WITNESS:  Yes, but I don't know how fair

15  that is right now.  I know -- I'm not sure if what's --

16  like, how it's written, I don't know.  I don't know much

17  about that.

18  BY MS. SIMS:

19      Q    I'm sorry.  Explain to me why you think that

20  the term, even though it's already in the settlement

21  agreement, is unfair.

22           MS. LISS-RIORDAN:  Objection; misleading.

23           THE WITNESS:  The reason why I'm saying is

24  because I don't know if -- how they're going to own the

25  account.  There's no explanation on it.  Like if it's

1   just like this offices -- if I own this office, I'm the

2   only one who contact these people or Coverall still

3   contact them, like, I don't know if those terms are

4   written somewhere that from now on, you're the only one

5   can talk to these people or just all we'll be doing is

6   selling you these accounts.  I'm not sure if anything --

7   what they mean by owning an account.

8   BY MS. SIMS:

9        Q    Would you think it would be a fair term to

10  have the customer accounts in, for instance, your name

11  if you were the franchise owner and you, therefore, own

12  the account and any decisions concerning whether you

13  would remain on the account or no longer service the

14  account would be between you and the customer alone,

15  would you believe that to be fair?

16            MS. LISS-RIORDAN:  Objection; that's not in

17  the settlement.

18  BY MS. SIMS:

19       Q    Go ahead.  You can answer.

20       A    Yes.

21       Q    Is there anything else about that term that

22  you believe is unfair as it's currently presented in the

23  settlement agreement?

24       A    I'm not sure how it's presenting, because

25  I'm -- I haven't seen any details on it, so I really

1  can't answer you, like, if it's fair or not.

2          MS. LISS-RIORDAN:  I just want to note for the

3  record that Coverall counsel and plaintiffs' counsel are

4  conferring with each other.

5  BY MS. SIMS:

6      Q    Mr. Singh, have you ever seen a copy of the

7  settlement agreement?

8      A    It's the one that I got in the mail?

9      Q    No, it's not.  It is a document that is

10  approximately 30 pages thick entitled Class Action

11  Settlement Agreement and Release.

12     A    No, I haven't seen it.

13         MS. SIMS:  Do you need to go to the bathroom?

14         MS. LISS-RIORDAN:  Yes.

15         MS. SIMS:  Let's go off the record for five

16  minutes.

17         (Recess.)

18         (Mr. Cadena exited the proceedings.)

19  BY MS. SIMS:

20     Q    Mr. Singh, you understand you're still under

21  oath?

22     A    Yes.

23     Q    Let me go back and ask you just a couple of

24  follow-up questions regarding Ms. Vizcarra.

25         (Mr. Cadena entered the proceedings.)

1   BY MS. SIMS:

2        Q     What does Ms. Vizcarra do for employment?

3        A     Right now?

4        Q     Yes.

5        A     She works for McDonald's.

6        Q     Has Ms. Vizcarra ever worked for Coverall?

7        A     Not that I know of.

8        Q     Has Ms. Vizcarra ever worked for -- you had

9   mentioned before a Jan-Pro.

10       A     I'm not sure if she did or not.

11       Q     Before working at McDonald's, where did

12   Ms. Vizcarra work?

13       A     I don't know.

14       Q     How long have you been dating her?

15       A     Three years.

16       Q     And how long -- has she been working at

17   McDonald's the whole time?

18       A     No.

19       Q     Where was she working before that?

20       A     I don't know.

21       Q     How long has she been working at McDonald's?

22       A     I can't -- I don't remember.  I don't know.

23       Q     Longer than a year?

24       A     I -- I don't know.

25       Q     Okay.  The friend that you had mentioned that

1    Ms. Vizcarra spoke with who gave her Ms. Liss-Riordan's

2    contact information, where does he work?

3         A    I don't know.

4         Q    You had indicated previously, though, that

5    Ms. Vizcarra was talking to a friend I thought you had

6    said at work.  No?

7         A    I'm not sure if they work together, but

8    they -- I thought they worked together.  I'm not sure.

9    I don't know if -- but that's something to do with

10   her -- it's her friend.  I don't know that person.

11        Q    So you think they work together, which means

12   he also works at McDonald's or worked there a month ago?

13        A    I don't want to assume anything, so I don't

14   know.

15        Q    And do you know his name?

16        A    I think she did mention to me, but I can't

17   remember the back of my head.

18        Q    And you never asked her anything about this

19   person who she got the information --

20        A    She told me the name, but I don't remember.

21        Q    Do you know how it was that the friend came to

22   know of the lawsuit involving Coverall?

23        A    No, I don't know.

24        Q    Do you know whether the friend ever worked for

25   Coverall?

Page 47

1        A     I don't know.

2        Q     Do you know whether the friend ever worked for

3    the company you were referring to as Jan-Pro?

4        A     He might.  I don't know.

5        Q     Did you speak with Ms. Vizcarra after you

6    spoke with Ms. Liss-Riordan?

7        A     Yes.

8        Q     And what did you discuss with her?

9        A     Nothing that -- I just talked to her.  That's

10   about it.

11       Q     Did you talk to her about the call with

12   Ms. Liss-Riordan?

13       A     Just that I did got hold of her.

14       Q     You didn't discuss the substance?

15       A     She wants to know, but I was busy.

16       Q     So in the month that has passed, she hasn't

17   been able to get the information out of you?

18       A     No, she just wanted to know what's going on,

19   and I just told her there's a court date in San Diego.

20   That's it.

21       Q     At any point, did you discuss the substance of

22   your communications with Ms. Liss-Riordan with

23   Ms. Vizcarra?

24       A     No.

25       Q     Did you ever speak with the friend that

1    Ms. Vizcarra got the information from?

2        A    No -- no, I did not.

3        Q    Ever have any type of communications with him,

4    either e-mail or written?

5        A    No.

6        Q    You hesitated.

7        A    I just wanted to make sure that I did not get

8    anything from him before I answer yes or no, so . . .

9        Q    And after thinking about it, the answer is

10   still no?

11       A    Yeah.

12       Q    Before we went on break, we were talking about

13   the basis for your objection to the Coverall settlement,

14   and specifically we were talking about the monetary term

15   which you believe is insufficient, but you were unable

16   to tell me what amount you thought would be sufficient.

17           Let's talk about the second term to this

18   agreement, which is that Coverall will agree to

19   repurchase from current and new franchise owners all

20   accounts that are in good standing both financially and

21   operationally.

22           What do you think about this term?

23       A    See, I -- some of these terms I don't

24   understand, so I don't know what -- it's good or not.

25   See, I don't have a background with law, so I don't know

1  if this term is good or not.

2      Q    Okay.  Well, I don't think you need a

3  background with law.  Let's just talk about the term.

4           MS. LISS-RIORDAN:  Objection; he's answered.

5  You're asking him questions that he believes is beyond

6  his knowledge.

7  BY MS. SIMS:

8      Q    Well, let me ask you, sir, I'm asking you

9  factually, not legally at all, Coverall has agreed to

10 repurchase accounts from franchisees.  Is there anything

11 you think is inherently unfair about this term?

12     A    I don't know if it's fair or not.  They're the

13 only one, you know -- I don't know if that's fair or

14 not.

15     Q    So you don't know -- so, then, is it safe to

16 assume you're not specifically objecting to this term of

17 the settlement?

18          MS. LISS-RIORDAN:  Objection; the objection

19 speaks for itself.

20          MS. SIMS:  I don't think that's a term of the

21 objection.

22          But, okay, go ahead.

23          THE WITNESS:  Can you repeat that, please.

24          MS. SIMS:  Sure.  Can you read it back.

25          (The record was read as follows:

1                    "So, then, is it safe to assume

2                you're not specifically objecting to

3                this term of the settlement?")

4            MS. LISS-RIORDAN:  Again, I repeat my

5    objection.  The legal objection has been filed with the

6    Court, noted with the papers.  He submitted his

7    objection in writing through counsel.  There's been an

8    extensive hearing about it.

9            Grilling a layperson who does not have legal

10   training about various terms, I think is beyond the

11   scope of what he reasonably needs to be expected to be

12   able to state.

13           He stated his objection in general layperson's

14   terms to the terms of the settlement.  The objection's

15   been set forth in a great amount of detail through his

16   counsel.  The objection -- I'm sorry, the settlement

17   papers and notice allowed for an objection to be made

18   through counsel, which is what Mr. Singh has done.  So I

19   really object to a whole line of questioning in which a

20   layperson is going to be grilled about various terms

21   which he's already said is beyond his ability to

22   understand and comment on with respect to their legal

23   sufficiency.

24           MS. SIMS:  Counsel --

25           MS. LISS-RIORDAN:  Further -- further -- you

1   wanted me to state the basis for the objection on the

2   record.

3          MS. SIMS:  There's also speaking objections.

4          MS. LORENS:  There's no speaking objections.

5   You should say objection; irrelevant.  Objection; vague.

6   Objection; calls -- seeks to invade the attorney-client

7   privilege.

8          MS. LISS-RIORDAN:  Okay.  Thank you for your

9   advice, but you asked before for the basis for my

10  objection, so that's why I'm further providing it, and I

11  want this to be noted for the record.

12         And a number of the terms as set forth in the

13  objection are things that Coverall already does or

14  already provides, and as set forth in the objection are,

15  therefore, not providing anything new.  Grilling the

16  objector on his detailed understanding of these legal

17  points, I think, serves no basis, but you can go ahead

18  and ask him.  Thank you.

19         MS. SIMS:  Ms. Liss-Riordan, you know, out of

20  respect, I allowed you to put that on the record.  But,

21  again, I would like to note -- and I know you're not a

22  California lawyer -- just to remind you and let you know

23  if you didn't know this before that there are no

24  speaking objections in California.  And while we're fine

25  with you having put that one on the record, on a

Page 52

```
 1   going-forward basis, to the extent that they will
 2   continue and add length to this deposition, we will, if
 3   necessary, seek the costs of that extended length of
 4   deposition and for, you know, the inability, if there is
 5   any, to complete the deposition.
 6              MS. LORENS:  On behalf of the plaintiffs, we
 7   are not in agreement with speaking objections and feel
 8   that they are an attempt to coach the witness.
 9              MS. SIMS:  Right.
10   BY MS. SIMS:
11        Q    Okay.  And I'm sorry, you can repeat the
12   question -- do you have the question in mind or should
13   we have it reread to you?
14        A    Can you please read it back.
15              (The record was read as follows:
16                   "So then is it safe to assume
17              you're not specifically objecting to
18              this term of the settlement?")
19              MS. LISS-RIORDAN:  Objection.
20              THE WITNESS:  I don't think I'd be able to
21   answer this question.
22   BY MS. SIMS:
23        Q    Okay.  Let's go on to the next term, that
24   current and new franchise owners will be able to stop
25   servicing a customer for non-payment at any time they
```

1  see fit.  Do you understand that term?

2          MS. LISS-RIORDAN:  Objection; it's incomplete.

3          THE WITNESS:  Can you repeat that, please.

4          MS. SIMS:  Can you read it back.

5          (The record was read as follows:

6              "Let's go on to the next term,

7          that current and new franchise owners

8          will be able to stop servicing a

9          customer for non-payment at any time

10         they see fit.  Do you understand that

11         term?")

12         THE WITNESS:  No, I don't understand.

13 BY MS. SIMS:

14     Q    Okay.  Well, let me just try to explain it to

15 you without reading from the legal document.  It

16 basically says that a franchisee, if you have a customer

17 that stops paying, that you can choose to stop servicing

18 that account so long as you give notice to Coverall five

19 days before in writing that you're going to stop because

20 the customer's not paying.

21         Do you think there's anything unfair about

22 that term?

23         MS. LISS-RIORDAN:  Objection; it's out of

24 context.

25         THE WITNESS:  I'm -- I don't know how to

1  answer this.

2  BY MS. SIMS:

3      Q    Do you think that that would be unfair if you

4  had a customer who wasn't paying, and Coverall said, at

5  any time you want, you can stop servicing that account,

6  and there's two conditions, that you write to Coverall

7  five days before you're going to stop working on the

8  account and say, hey, I'm going to stop working because

9  this guy's not paying, and you give Coverall the right

10  to take over that customer account and find someone else

11  to service it, would that seem unfair to you?

12          MS. LISS-RIORDAN:  Objection; incomplete and

13  therefore misleading.

14          THE WITNESS:  The only reason this would be

15  unfair, if I lose the account for non-payment, which is

16  not -- you know, as a franchise, I have no control over.

17  BY MS. SIMS:

18      Q    Okay.  Can you explain that?

19      A    Like if I lose that account just because

20  somebody didn't pay and it's not getting replaced, then

21  this is not fair.

22      Q    Okay.  In this case, you would be choosing

23  whether or not you wanted to stop servicing the account,

24  though, so you would have the right to choose.

25      A    Yeah, but if the amount that I'm getting paid

Page 55

1    from that account, that amount's going to get

2    replacement with another account or am I going to end up

3    losing the business.

4         Q    But that has to deal with a separate issue of

5    replacement of the account.  I'm asking you if -- in the

6    settlement agreement, this is one of the terms.  You

7    have the right as a franchisee, you get to choose

8    whether or not you want to stop servicing this account

9    at any time you want, just as long as you tell Coverall

10   that you're going to do it and you let Coverall come in

11   and find someone else, if they want to, to clean that

12   account.

13            MS. LISS-RIORDAN:  Objection; this also

14   doesn't apply to him.

15   BY MS. SIMS:

16        Q    So do you think that would be unfair?

17        A    See, I can't answer that because I'm not a

18   currently franchise owner.

19        Q    Okay.  Well, when you were a franchise owner?

20        A    No.

21        Q    Okay.  Let's go to the next term.  The next

22   term says that Coverall will offer to replace any

23   customer account that a franchise owner loses with one

24   or more customer accounts with equal or greater monthly

25   dollar value within a reasonable time period after the

1  franchise owner loses the account, not to exceed 120

2  days, as long as the customer account was lost through

3  no fault of the franchise owner, including poor service,

4  failure to serve, obnoxious behavior, theft, dishonesty

5  or conduct that otherwise reflects materially and

6  adversely on Coverall; and, two, that the customer

7  account was lost within the applicable guarantee period

8  in the JFA.

9        Do you understand that term or would you like

10  me to summarize it for you?

11      A    Could you please summarize.

12      Q    Basically this term says that Coverall will

13  replace any account that a franchisee loses -- and this

14  is what you were talking about before, and that's why I

15  wanted to make it a separate issue so we could go back

16  to it.  They'll replace any account that a franchisee

17  loses within a reasonable period of time, so long as it

18  wasn't the fault of the franchisee and it was within the

19  guarantee period under the contract that you have with

20  Coverall.

21        Do you believe that this term is unfair?

22        MS. LISS-RIORDAN:  Objection; it doesn't tell

23  the whole story.

24  BY MS. SIMS:

25      Q    You can answer.

1       A    I don't know if it's fair or not.

2       Q    Okay.  You were saying earlier that you

3  thought it would be unfair if you lost an account for

4  non-payment, something that wasn't your fault and that

5  Coverall -- you know, if they didn't replace it, it

6  would be unfair to you.

7            Now, in this term, Coverall is saying, we will

8  replace it if it's not your fault and if it's within the

9  guarantee period.  Does that sound fair to you?

10            MS. LISS-RIORDAN:  Objection; incomplete

11  question.

12            THE WITNESS:  I don't know.  I can't answer

13  that one.  To me, I don't know if it's fair or not.

14            MS. LISS-RIORDAN:  I can explain why I'm

15  objecting to these as being misleading.  But if you'd

16  rather me not --

17            MS. LORENS:  I object to speaking

18  objections --

19            MS. SIMS:  Please --

20            MS. LORENS:  -- and coaching on the record.

21  BY MS. SIMS:

22       Q    So your response, sir, is that you can't

23  answer the question?

24       A    Yes.

25       Q    Because you don't know either way?

Page 58

1        A     Yes.

2        Q     The next term -- and I think you touched on

3   this previously about accounts being close to one

4   another.  The next term says that Coverall will continue

5   to attempt to offer franchise owners accounts that are

6   located within a reasonable distance of each other.

7              Do you understand that term?

8        A     Yes.

9        Q     Okay.  Is there anything that you find to be

10  unfair about that term?

11             MS. LISS-RIORDAN:  Objection.

12             THE WITNESS:  I don't know if it's fair or

13  not, because depending upon where franchise live, I

14  don't know where these accounts going to be, so I can't

15  speak for that.

16  BY MS. SIMS:

17       Q     Okay.  Can you explain to me.  I'm sorry, I'm

18  not understanding your response.

19       A     What I'm saying is let's say I live in Upland

20  and this account is in Fontana, so I don't know if this

21  work for everybody or not, so I can't speak if it's --

22  if you try to find some -- all the offices that's in

23  Fontana area will work for that person or not.

24       Q     Okay.  Well, okay, let's take it back a step,

25  though.  This is about Coverall promising to offer

Page 59

1    franchisees accounts that are located within a

2    reasonable distance of one another.  So if you had an

3    account that was located in Upland and then Coverall

4    offered you an account that was 4 miles away, would you

5    consider that to be a reasonable distance?

6         A    Yes.

7         Q    Okay.  The fact that Coverall was offering you

8    the second account 4 miles away, would you think that

9    that was fair or unfair?

10             MS. LISS-RIORDAN:  Objection; misleading, out

11   of context, confusing to the witness.

12             MS. SIMS:  You can answer.

13             THE WITNESS:  Yes.

14   BY MS. SIMS:

15        Q    Yes, it is fair?

16        A    Yeah.

17             MS. LISS-RIORDAN:  Okay.  I just -- I feel

18   like if you're going to go down this line of

19   questioning, asking him point by point whether various

20   terms are fair doesn't really get us anywhere.

21             The question is whether the settlement adds

22   any value for class members and goes beyond what

23   Coverall already does or purports to do or is required

24   to do.

25             This entire line of questioning is, I think,

1    is improper and irrelevant to the objection, irrelevant

2    to what Mr. Singh himself should be expected to know or

3    articulate.   The legal basis for the objection speaks

4    for itself and is pending with the Court.

5              MS. SIMS:  Okay.  Again, we would like to

6    remind Ms. Liss-Riordan against making speaking

7    objections, as they are improper in California.  And if

8    this continues, we will, if necessary, get Magistrate

9    Judge Walsh on the phone to help us resolve this

10   dispute.

11   BY MS. SIMS:

12       Q    Okay.  Mr. Singh, let's go to the next point,

13   which is that you are a former franchisee, right?

14       A    (Indicating.)

15       Q    One of the terms offered to former franchisees

16   is a 507-dollar credit towards the purchase of a new

17   Coverall franchise.  Do you understand that term?

18       A    Yes.

19       Q    What do you think of this term?  Do you

20   believe that it's fair?

21       A    See, I can't speak for everybody, but for me,

22   I would not put in any money with Coverall.

23       Q    But for folks who are interested in another

24   Coverall franchise, do you think that would be fair?

25       A    I can't speak for anybody else, if they would

1   like it or not.

2        Q    Would it surprise you to hear that there are

3   nearly 40 people who are former franchisees that want to

4   cash in on this coupon and buy a new Coverall franchise?

5        A    Yes, because I think -- I don't know if they

6   understand the whole term that -- how it's going to work

7   out for them.  Probably they just saw that $750 and

8   signed on it.

9        Q    You're just speculating on that, though.  Have

10  you had any discussions with anybody regarding the

11  750-dollar coupon?

12       A    Yes.

13       Q    Who did you speak with?

14       A    I spoke with my attorneys.

15       Q    Have you spoken with any other franchisees

16  regarding the coupon?

17       A    No.

18       Q    Have you spoken with any other franchisees

19  regarding the settlement?

20       A    No.

21       Q    So you believe that this 750-dollar coupon is

22  unfair because you personally are not interested in

23  buying a Coverall franchise?

24       A    Yes.

25       Q    But as to the people who are interested in

1   buying a new franchise, you have no idea whether or not

2   they believe it's fair?

3        A    No.

4        Q    Okay.  I'd like to mark as Exhibit 2 the

5   Notice of Intention to Appear at Final Fairness Hearing

6   and Objection to Class Action Settlement filed on behalf

7   of Mr. Singh in the Southern District Court of

8   California.

9              (Deposition Exhibit 2 was marked for

10             identification by the court reporter.)

11             MS. LISS-RIORDAN:  Nancy, you've multiple

12   copies that you've handed to other attorneys in the

13   room.  Do you have a copy for me?

14             MS. SIMS:  I actually have one copy that

15   plaintiffs are sharing and one copy that Mr. Antia has.

16   I have a copy for you and your client to share.

17             MS. LISS-RIORDAN:  Okay.  If you have more

18   copies that you're going to be using throughout the day,

19   I'd ask at the next break that you make an additional

20   copy for me so I'm able to review it at the same time

21   that my client is able to review it.

22             MS. SIMS:  That's fine.

23             MS. LORENS:  So that Ms. Liss-Riordan doesn't

24   unduly delay the deposition, I will present my copy of

25   Exhibit 2 to her.

1          MS. LISS-RIORDAN:  Thank you.

2   BY MS. SIMS:

3      Q    Mr. Singh, please take a moment to review this

4   document and let me know when you have finished.

5      A    Okay.

6      Q    Are you done, Mr. Singh?

7      A    Yes.

8      Q    I would like to draw your attention to the

9   third paragraph of page 2.

10      A    Want me to get it?

11      Q    Yes, please.

12      A    Page 3, you said?

13      Q    Page 2, please.

14      A    Okay.

15      Q    And it states, "Objector Singh intends to call

16   the following witnesses to provide testimony at the

17   final fairness and approval hearing."  No. 1 is you, the

18   second bullet point is your counsel, the third bullet

19   point is Steven Cumbow, former chief financial officer

20   for Coverall North America.

21          Do you know who Mr. Cumbow is, aside from what

22   it says in this paper?

23      A    I'm sorry, have I met him or . . .

24      Q    Do you know who he is?

25      A    Just a CEO for Coverall.

Page 64

1       Q     Do you know what he is expected to testify to?

2             MS. LISS-RIORDAN:  Objection; misstates the

3   document.

4             THE WITNESS:  Just -- yes.

5   BY MS. SIMS:

6       Q     What?

7             MS. LISS-RIORDAN:  I'm sorry, can you repeat

8   the question?  What is he expected to testify to?  He

9   didn't testify.

10            MS. SIMS:  What he is expected to testify to.

11            MS. LISS-RIORDAN:  So that's the text.

12            THE WITNESS:  I'm sorry, can you repeat that

13  question one more time.

14  BY MS. SIMS:

15      Q     Sure.  Can you tell me what Mr. Cumbow is

16  expected to testify to?  He's listed here in your

17  objection; and it was indicated he was going to appear

18  at the hearing and provide testimony.  Do you know what

19  testimony he was expected to provide?

20      A     No.

21      Q     The next bullet point is Mr. Ted Elliott,

22  former chief executive officer for Coverall North

23  America.  Aside from what you see on the paper here, do

24  you know who Mr. Elliott is?

25      A     No.

Page 65

1     Q    Okay.  Do you know what testimony he was

2  expected to provide?

3     A    No.

4     Q    The last bullet point says, "Other witnesses,

5  including other Coverall workers who have performed

6  cleaning work in California."  What other witnesses are

7  referred to here?

8     A    I don't know.

9     Q    It says, "including other Coverall workers."

10  Do you know specifically what Coverall workers you're

11  referencing there?

12     A    No.

13     Q    Do you know any other Coverall franchisees?

14     A    Not personally.  Before when I go pick up a

15  check, probably just know -- just hi, hello, that's all.

16     Q    So you haven't had any communications, then,

17  presumably with any of them in which they've expressed

18  that they are not happy with the settlement?

19     A    No.

20     Q    Is it also safe to assume that you've never

21  had any communications with either Mr. Cumbow or

22  Mr. Elliott?

23     A    No.

24         MS. LORENS:  I'm sorry.  I think we have a

25  double negative there in that response.  Can we clarify?

1             MS. SIMS:  Sure.

2    BY MS. SIMS:

3        Q    Have you ever spoken to either Mr. Elliott or

4    Mr. Cumbow?

5        A    No.

6        Q    Have you had any other type of communications

7    with them, either written or otherwise?

8        A    No.

9        Q    I'd like you to turn to your declaration.  The

10   first paragraph reads, "My name is Amrit Singh.  I

11   bought a Coverall franchise out of the company

12   San Bernardino office around 2005 or 2006 and worked for

13   Coverall performing janitorial cleaning work until 2007

14   or 2008."

15            Does that refresh your recollection as to the

16   time frame that you were a Coverall franchisee?

17       A    I'm not sure, but, yeah, somewhat close to.

18       Q    Prior to signing this declaration, did you do

19   anything to confirm those are the correct dates?

20       A    I did try to look the paperwork, but I

21   couldn't find it.

22       Q    So the dates in here are also an estimation?

23       A    Yes.

24       Q    Okay.  I just noted that they were different

25   from the estimate we got today, so I just wanted to see

1   if it helped you remember.

2          The next sentence says, "I paid for the

3   franchise with an upfront down payment of approximately

4   $5,000 and financed the rest through payments that came

5   out of my monthly pay.  Coverall took many other

6   deductions from my pay as well."

7          What deductions are you referencing there?

8      A   I think there were insurance deductions,

9   loyalty and management fee.  That's what I think.  I'm

10  not sure.  That's what I remember.

11     Q   Paragraph 2 says, "I understand I am a class

12  member in the case listed above.  I object to the

13  settlement, as it does not provide nearly enough relief

14  for individuals who have performed cleaning work for

15  Coverall in California."

16         When you say, "not nearly enough relief," are

17  you referring to the $400?

18     A   Yes.

19     Q   Anything else that you're referring to there?

20     A   You know, what, I don't know.  I'm just

21  referring as just, like, whatever settlement are getting

22  offered, it's not fair.  It's not just the money.

23  There's other things like accounts, like who gonna own

24  the account if you lose it.  There's more detail to it

25  which I don't remember right now.

Page 68

1      Q    Okay.  Well, we talked a little bit earlier,

2  you know, right before the break and right after the

3  break about the various terms.  Is there anything that

4  you would add to those terms that would, in your mind,

5  make the settlement more acceptable to you?

6      A    I can't think of anything right now.

7      Q    Mr. Singh, did you receive a copy of the class

8  notice that was sent to you in connection with this

9  case?

10     A    I can't remember.

11     Q    I'd like to mark as Exhibit 3 a document

12 entitled Legal Notice, which is the class notice.

13          (Deposition Exhibit 3 was marked for

14          identification by the court reporter.)

15 BY MS. SIMS:

16     Q    Mr. Singh, please take a moment to look at

17 this document.  You don't have to read it in full

18 detail, but let me know if you recognize it as something

19 you have seen before.

20     A    Yes.

21     Q    When did you receive the notice?

22     A    I'd say about five, six months ago.  I'm --

23 roughly, or maybe sooner.  I can't remember.

24     Q    But it was before you contacted

25 Ms. Liss-Riordan, correct?

Page 69

1       A     Yes.

2       Q     If I told you it was about the end of

3   September, would that sound -- that that could be the

4   possible timing of when you received this?

5       A     Could be.  I don't remember the dates.

6       Q     Did you review it upon receiving it?

7       A     No.

8       Q     When did you review it?

9       A     I actually just looked at it, and so much to

10  read and so much information, I didn't go through, like,

11  every single page on it.

12      Q     Did you read any portion of it?

13      A     I guess I just read the first one where it

14  says about the settlement, you don't have to do nothing,

15  and 475 benefits included and the credit purchase off a

16  new Coverall franchise, the $750.

17      Q     So you were aware of the settlement prior to

18  that communication that you had with Ms. Vizcarra?

19      A     Yes.

20      Q     Was this the first time that you learned of

21  the settlement is when you received this notice?

22      A     When I read this notice, there was something

23  about this, and there was something else that was

24  saying, like, contact the Court and you might receive

25  another 15,000.  I'm not sure if I read correctly, but

1   it was something in this where it's saying there's

2   like -- like there's going to be another court hearing

3   again and certain people -- or somebody's going to

4   receive 15,000.  I'm not sure if I read it somewhere in

5   here or . . .

6         But there was something else in this which --

7   so what I thought is I might receive more than this.

8       Q    Okay.

9       A    And then this paper was sitting -- I have --

10  somewhere in my closet.

11      Q    Let me just back up.  I want to get the

12  chronology right.  So this arrives to you in the mail,

13  right?

14      A    Yes.

15      Q    And you received it.  Did you look at it right

16  away?

17      A    Probably the next day, because I came home

18  late that day.

19      Q    Okay.  And the next day, you looked at it and

20  you read portions of it, correct?

21      A    (Indicating.)

22      Q    But not the entire thing?

23      A    No.

24      Q    Yes, it's correct that you did not read the

25  entire thing?

1      A    Yes.

2      Q    Okay.  Thank you.  I just want to make sure we

3  have a clear record.

4      A    Yes.

5      Q    At this time, did you formulate an opinion of

6  any sort concerning the settlement?

7      A    Yes.  But what my understanding reading what I

8  read was there's going to be another court date.  And

9  then what I -- my understanding was maybe like another

10  court date and I guess there was a phone line to contact

11  or -- I'm not sure, but there was some other court date

12  that's -- I thought I would -- l would receive 15,000.

13      Q    Did you speak with anyone concerning this

14  notice that you received in the mail, Ms. Vizcarra,

15  anyone else?

16      A    No.

17      Q    Of what you did read in the notice, did you

18  understand it?

19      A    No.

20      Q    Did you understand at least some portion of

21  the notice?

22      A    Yes.

23      Q    Okay.  Let's go through this, and I'd like you

24  to tell me what you did read.  You said you read the

25  first page, correct?

1    A    Yeah.  Do nothing and then -- you know, that

2    part, and then I was just going through and I'm not sure

3    where it does say somewhere here there's going to be

4    another court date.  And then they will decide there

5    who's going to receive that $15,000.

6    Q    So can you tell me what -- so those were the

7    three portions that you read?

8    A    Yeah, yeah.

9    Q    And so you did understand the fact that there

10   had been a settlement?

11   A    Yes.

12   Q    And prior to receiving this, you were aware

13   there was a lawsuit pending against Coverall, correct?

14   A    Yes.

15   Q    As you were reading this, was there any

16   portion of it that you did not understand, or did you

17   just decide -- this is really for my own edification.

18   What I want to know is did you not read this because it

19   looked like it was just too much to read or did you not

20   read this because you thought, oh, I'm trying to read

21   it, but I don't understand it?

22   A    I did start to read, but then I really didn't

23   understand and then I just start going through the pages

24   and see if something -- yeah, it's too many pages for me

25   to really go through.

1      Q     Did you make any efforts to contact anybody to
2  help you understand this document?
3      A     No.
4      Q     Did you see that there is a paragraph in here
5  that provides you with the phone number for the
6  plaintiffs' counsel sitting to my left that you can
7  contact to ask them any questions about the settlement?
8      A     No, I didn't.
9      Q     Look at the last page, Paragraph 17, there's
10 a -- the last subheader.  It says, "How do I get more
11 information?"  Do you understand that sentence?
12     A     Yes.
13     Q     Do you see in the first paragraph there that
14 it provides the phone number for the class counsel as
15 well as their e-mail addresses?
16     A     I did not go through the whole thing, yes, but
17 I can see there is a number there.
18     Q     Okay.  So the fact that you didn't call them
19 or didn't see this was the fact that you chose not to go
20 through the document rather than not being able to
21 understand that their number was listed?
22     A     No, because when you start reading it there's,
23 you know, so many case numbers.  There's so much
24 information that, for me, it's -- I won't understand.
25 So that's why I didn't even bother to go through the

Page 74

1    whole thing.

2         Q     Did you understand that if you objected to the

3    settlement that you have an obligation to appear for

4    deposition?

5         A     I was not aware.

6         Q     Did you understand that you had the right to

7    opt out of the settlement and sue Coverall individually?

8         A     Can you repeat that, please.

9         Q     Sure.  Did you understand that you have the

10   right to opt out of the settlement and exclude yourself

11   from the settlement so you're not a part of the class

12   and then you can sue Coverall directly?

13        A     I -- no, I didn't.  I didn't know that.

14        Q     Since the time that you received this notice

15   and went through it, have you gone back and read it

16   again?

17        A     No.

18        Q     You submitted a claim form in response to this

19   notice, correct?

20        A     Yes.

21        Q     Okay.  I'd like to mark as Exhibit 4 the claim

22   form submitted by Mr. Singh.

23              (Deposition Exhibit 4 was marked for

24              identification by the court reporter.)

25   //

1  BY MS. SIMS:

2       Q    Please take a moment to review this document.

3       A    Yes.

4       Q    Are you done?

5       A    Yes.

6       Q    On page 2, is that your signature?

7       A    Yes.

8       Q    By submitting this claim form, you expected to

9  receive compensation as part of the settlement, right?

10      A    Yes.

11      Q    And you understood enough of the notice to

12  know that you had to send this claim form back, right?

13      A    Right.

14      Q    Why did you submit the claim form if you

15  didn't think that the compensation being offered under

16  the settlement was sufficient?

17      A    'Cause what my understanding reading this

18  notice was is there's going to be additional money I

19  will receive.  My understanding was this plus 15,000.

20      Q    Okay.  Can you tell me -- and we started to

21  talk earlier about what you reviewed in the notice.  Can

22  you flip through it now and tell me what portion you

23  were referring to that led you to believe that you were

24  going to get more money?

25      A    I guess No. 10.

Page 76

1      Q    Concerning will the named plaintiffs receive

2   compensation for their efforts to bring this action?

3      A    Yes.

4      Q    Let's take a look at the claim form that's

5   Exhibit 4.  About two-thirds of the way down in all caps

6   and underlined, it says, "Completing and submitting this

7   form will make you eligible to receive a claims payment

8   of $475 that will be sent directly to you.  You may also

9   claim a 750-dollar credit towards the purchase of a new

10  Coverall franchise."

11          Did you understand that when you read it?

12     A    Again, when I read this notice, my

13  understanding was is this is a claim form and then

14  there's additional money will be received.  That was my

15  understanding.

16     Q    And you're basing that off of Paragraph 10 of

17  the notice?

18     A    Yes.

19     Q    On anything else?

20     A    No.

21     Q    Okay.  When did you send this claim form in --

22  when did you complete the claim form with respect to

23  when you got the notice?  So, in other words, let me

24  rephrase the question.  When you got this notice, did

25  you send the claim form that same day?

1      A      No.

2      Q      Okay.  How long did you wait?

3      A      I don't remember how long.  Probably 10, 15

4   days.

5      Q      Okay.  And you filed your objection in this

6   case, the other document that we showed you earlier, on

7   October 26.  Your claim form here is October 12th.  So

8   there was about 12 days that passed.

9           Now, what happened in those 12 days that made

10  you change your mind in going from submitting a claim

11  form to filing an objection?

12     A      When I talked to Diana, she's the one --

13  because my understanding was I will receive 15, and then

14  she said -- she explained, not in detail, said this is

15  going on, you need to contact somebody, people are only

16  going to receive $400.

17     Q      Did Diane know you had submitted a claim form?

18     A      No.

19     Q      And how did Diane know -- if you know, did she

20  tell you why she came to you with this information?

21     A      Because she knew there's a lawsuit going on

22  with the Coverall.

23     Q      Had you and Diane ever discussed the Coverall

24  lawsuit?

25     A      Like, she knows there's going on, but I don't

1   know if we went into any details what's going on.

2   Because I didn't know.  All I know is I filled out some

3   paperwork and I sent it.

4        Q    And, if you know, how did Diane know about the

5   Coverall lawsuit?

6        A    'Cause I guess probably in a conversation, I

7   probably mentioned it to her, hey, there's a lawsuit

8   going on with the Coverall.

9        Q    What is your understanding of what

10  compensation you will receive, if any, in connection

11  with your objection to the settlement?

12       A    Can you repeat that, please.

13       Q    Sure.  What do you understand that you're

14  going to get in terms of compensation for filing an

15  objection to the settlement?

16       A    I don't know.

17       Q    What do you expect will happen in this lawsuit

18  as a result of your objection?

19       A    My understanding was is if -- my objection

20  will be just -- can you explain that one more time,

21  like . . .

22       Q    Sure.  You objected in this lawsuit, correct?

23       A    Right.

24       Q    Or to the settlement.  What do you expect will

25  happen as a result of the fact that you objected?

Page 79

1       A    Well, my understanding was with this

2   objection, a judge will look at it and evaluate it and

3   see what else need to be -- get done.  To me, this is

4   not fair for all those franchise people who paid so much

5   amount and just receiving $400 out of it.

6       Q    What do you hope will happen as a result of

7   your objection?

8       A    I would hope for good maybe they -- the terms

9   will be changed and people will receive at least what

10  they paid for it.

11      Q    So it is your position that you should get

12  back everything that you paid for your Coverall

13  franchise?

14      A    Yes.

15      Q    And you indicated that before -- how much did

16  you pay?

17      A    5000 was down and then there was a monthly

18  payment.

19      Q    Do you know what the total amount was that you

20  paid?

21      A    I can't remember.

22      Q    Your initial franchise fee, according to your

23  agreement with Coverall, was $19,200.  Does that sound

24  familiar?

25      A    It's been a while.  Maybe.  I don't remember.

Page 80

1        Q    I'd like to mark as Exhibit 5 the cover page

2   to the janitorial franchise agreement between Mr. Singh

3   and Coverall.

4             (Deposition Exhibit 5 was marked for

5             identification by the court reporter.)

6   BY MS. SIMS:

7        Q    Mr. Singh, do you recognize that as your

8   signature at the bottom of the page?

9        A    Yes.

10       Q    And if you look at the top right about a

11  quarter of the way down, it says, "Initial franchise fee

12  $19,200."  Does that refresh your recollection as to the

13  amount that you paid for your franchise?

14       A    Yes.

15       Q    So it is your position that in order to make

16  this settlement fair, you should be receiving back

17  $19,200?

18            MS. LISS-RIORDAN:   Objection.

19            THE WITNESS:   I'm not sure if that's fair or

20  not.

21  BY MS. SIMS:

22       Q    You said earlier, though, that you thought

23  that to be fair, the franchisees need to get back what

24  they paid, and that's the amount that you paid, correct?

25       A    Right.

1          MS. LISS-RIORDAN:  Objection; misstates his

2    testimony.

3    BY MS. SIMS:

4      Q    During the three years that you were a

5    Coverall franchisee, you made money as a result of your

6    work as a franchisee, correct?

7      A    Yes.

8          MS. SIMS:  Let's go off the record.

9          (Recess.)

10   BY MS. SIMS:

11     Q    Mr. Singh, you understand you're still under

12   oath?

13     A    Yes.

14     Q    Okay.  Mr. Singh, I just have a couple more

15   questions for you.  I want to know in what way you

16   believe, if any, that Coverall has wronged you.

17     A    It's just all these accounts are, you know,

18   taken away, and I guess those accounts were resold to

19   other franchises, and that's not fair.  Sometime when I

20   first started was told if you don't want to do a

21   service, just give us a call, we'll have somebody else

22   go there, do it for you.  And that never got done.  This

23   is your office.  Whenever you have meetings with your

24   clients, come in here.  None of that was done.

25          All this money that I spent, and I didn't even

1    get nothing back out of it.

2         Q    Okay.  Well, let's talk about the couple of

3    issues that you've raised.  You said there were accounts

4    that were taken away and accounts that were resold.

5              Now, earlier today we were talking about

6    accounts that you had lost.  The couple that you had

7    mentioned to us today were situations where the customer

8    was unhappy for one reason or another.  One was due to

9    an alarm and one was due to a service issue, correct?

10        A    Not the service issue.  It was too much

11   expectation in what they were paying.  Strip and job --

12   job is at least 3- to $5,000.

13        Q    Right.  So the Coverall -- the customer

14   thought that there was a service that should have been

15   provided that was not, and they were unhappy as a

16   result?

17        A    Yes.

18        Q    Now, you mentioned that accounts were resold.

19   Did you have any accounts of yours that you believe

20   were, quote, taken away and resold?

21        A    Because there's a log that stays in the front

22   desk of our office, and you could see in those logs how

23   many owners are coming in and out of these accounts.

24        Q    Okay.

25        A    So that's how I know is, like, probably my

1    account was one of the same issues, like, being sold to

2    somebody.

3         Q    So you --

4         A    But I personally didn't went back and check if

5    those accounts were sold or not.

6         Q    So you have no personal knowledge.  You're

7    just guessing that you think that's what happened?

8         A    The only reason I know about a couple of the

9    accounts is because when you talk to -- when I go pick

10   up my check, just random, oh, hi, I'm cleaning this

11   account now.  I did not have a conversation with the guy

12   was just talking about, that account.  They were just

13   talking, hey, we have the Leslie Pool.

14             Like, I did not talk to that personal -- like,

15   if you -- let's say two people have a conversation.  I

16   just overheard.

17        Q    So do you believe that Coverall had any role

18   in you losing these accounts?

19        A    Yes.

20        Q    Okay.  What role?  Tell me why.

21        A    Because if -- when they're giving an

22   estimate -- when I was -- I will go into an account and

23   they would explain to me, okay, this is what needs to be

24   done, and what the office want is totally different

25   expectations from them.  Like for that strip and wax

1    job, there's no way somebody could do strip and wax job

2    for $300.  First, I believe it's 18 -- if I'm not

3    wrong -- it's a big office.  I'm not sure -- I'm not

4    sure exactly how much footage was it.

5         Q    You have the right, though, before you accept

6    an account to do a walk-through of the account and look

7    at it and consider whether you want to take it, correct?

8         A    Yes.  But --

9         Q    So Coverall --

10             I'm sorry.  Go ahead.

11        A    I'm sorry.  Go ahead.

12        Q    So Coverall --

13             MS. LISS-RIORDAN:  Well, no.  He was starting

14   to say something.

15             MS. SIMS:  Well, he just told me to go ahead.

16   BY MS. SIMS

17        Q    Sir, have you completed your answer or would

18   you like to say something else?

19        A    Only thing I'm saying is, like, you know how

20   when you -- they do show you the account, but then

21   there's a time limit, you know, you already pay your

22   franchise and you want to hurry up and get that account.

23   You don't want to be keep waiting, because sometime

24   it -- you know, it took like two months to get an

25   account.

1       Q    Okay.  Did you ever have an account where you

2    felt that the monetary amount did not -- was not

3    sufficient for the amount of work?

4       A    See, what I was trying to say is, like, when

5    you see an office and when a sales rep go with you or

6    the area guy go with you, he's just telling you this is

7    what needs to be done, and he's just telling you --

8    because I don't have a cleaning background where I could

9    tell him, no, it's going to take this long.  So

10   sometimes you don't even know if it's -- the amount

11   you're getting is right or wrong.

12      Q    Okay.  Well, let me ask you this:  Then, if

13   you had a direct relationship with the client -- and you

14   mentioned this before, that you didn't talk to the

15   customers, for instance, Leslie Pool.  If you had a

16   direct relationship with the customer and you were able

17   to talk all these issues through with them, and if there

18   were service issues they could talk directly with you,

19   and whether or not you stay on the account or whether or

20   not you stop servicing the account was between you and

21   the customer, do you think that would be fair?

22      A    Yes.

23      Q    So if the settlement included a term like

24   that, you would say that the settlement -- that term

25   would be fair?

1            MS. LISS-RIORDAN:  I'm sorry, could you

2    restate that question.

3            MS. SIMS:  Could you read it back, please.

4            (The record was read as follows:

5                "So the settlement included a

6            term like that, you would say that

7            the settlement -- that term would be

8            fair?")

9            MS. LISS-RIORDAN:  Objection; misstates the

10   settlement.

11           THE WITNESS:  I don't know if it's fair or

12   not.

13   BY MS. SIMS:

14       Q    You mentioned there were a couple of things --

15   additional things you thought -- ways in which you

16   thought Coverall wronged you.  One being that you were

17   told you could use the office spaces to meet with your

18   customers, and that didn't happen?

19       A    (Indicating.)

20       Q    Did you ever attempt to use the office space

21   at Coverall to meet with your customers?

22       A    I never have any, like, my customers that I

23   could have, hey, let's have a conference over there what

24   the issues were, because it was all controlled by

25   Coverall.

1      Q    Did you ever attempt to have any

2  communications with --

3      A    I did try --

4      Q    -- the customers?

5      A    -- with Eagle Global.

6      Q    Okay.  Tell me what happened there.

7      A    Well, it was too far for him to go over there.

8      Q    So the customer didn't want to go to

9  Coverall's office because it was too far?

10     A    Yeah, yeah.

11     Q    But Coverall never told you that you couldn't

12 use their facility?

13     A    Well, if you called them, usually there's a

14 receptionist that answer, and there's people going in

15 and out.  Let's say if I know somebody there, a person's

16 already gone.  So there's always -- there's the managers

17 over there or the service guy that who show you account

18 and you try to get hold of him.  Good luck with that.

19     Q    Okay.  I don't think that answers my question,

20 though.  My question was:  Did you ever attempt to use

21 the office space at Coverall?

22     A    Yes.

23     Q    And were you denied that right?

24     A    It's not that I denied, but I couldn't get

25 hold of anybody there to take the customer there.  It's

1   a certain time that customer could go.

2        Q    Okay.  Who did you try to call?

3        A    I think it was -- I forgot his name.  He was

4   my -- the guy who show you your accounts.  I don't know

5   if it's area manager or supervisor, whatever they call

6   them.

7        Q    And you attempted to contact him by phone?

8        A    Phone.

9        Q    And he didn't return your call, or what

10  happened?

11       A    He didn't return my call.

12       Q    Did you ever attempt to call, you mentioned

13  before, the main number and talk to the receptionist?

14  Did you do that?

15       A    He always tells you, hey, he's not in the

16  office, leave a voice mail.

17       Q    Did you ask her about using office space?

18       A    No, because -- but she told me she's new, she

19  don't know.

20       Q    So aside from Eagle Global, who were the other

21  customers that you tried to bring into the Coverall

22  offices for meetings, or was that the only one?

23       A    That's the only -- the guy that I really could

24  really talk to.  Other than that, you usually don't see

25  because you clean offices at night.

Page 89

1       Q     Okay.  And Eagle Global said it was too far,

2   the Coverall offices?

3       A     Well, first it was a date issue and then when

4   we tried to, then I couldn't get hold of them and then

5   he said, you know what, it's too far.

6       Q     The second issue that you mentioned was that

7   if there were special services that you didn't want to

8   do, Coverall said that they could bring someone else in

9   to do it?

10      A     No.  What they were saying is, let's say, you

11  have something planned for Tuesday night.  You just let

12  us know ahead and we'll see if somebody else could go

13  clean the office for you.

14      Q     So if you weren't able to service an account

15  that week, they indicated they would get someone to

16  replace you --

17      A     Yes.

18      Q     -- for that time?

19            Okay.  Did you ever attempt to use this

20  service?

21      A     Yes.

22      Q     Okay.  How many times?

23      A     Two times.

24      Q     What account?

25      A     I think all those accounts.  Like whatever

1    account I would clean -- clean those nights, like

2    Tuesday night, let's say.

3        Q    Okay.  And so tell me what happened when you

4    tried to get help.

5        A    Again, can't even get hold of anybody there.

6    Left the voice mails.

7        Q    And this happened on two occasions?

8        A    Yes, one occasion I did got hold of them and

9    they said they can't find nobody.

10        Q    And how far ahead did you call them?

11        A    Again, I think it was a Tuesday night and I

12    called them about Wednesday, the week before.

13        Q    Okay.  I have no further questions.  I'm going

14    to hand it over to plaintiffs' counsel.

15                          EXAMINATION

16    BY MS. LORENS:

17        Q    Hi.  I'm Tracee Lorens.

18        A    Hi.

19        Q    I'm one of the attorneys for the punitive

20    class, which is a legal term, but it means the franchise

21    owners in California who bought franchises from Coverall

22    during a certain time period.

23        A    Okay.

24        Q    Nice to meet you.

25        A    Nice to meet you.

1      Q    I'm not going to go back through what's called

2   the admonitions about you're under penalty of perjury

3   and all of that, because you understand you're still

4   under penalty of perjury, correct?

5      A    Yes.

6      Q    Okay.  When you started testifying today, I

7   think Ms. Sims had asked you whether you'd ever been

8   involved in another lawsuit, and you talked a little bit

9   about an overdrafting case that had something to do with

10  Bank of America.  Do you remember that?

11     A    Yes.

12     Q    Okay.  And I believe you said that you

13  received a claim form in that case and sent it in to

14  submit your -- to accept your settlement money; is that

15  correct?

16     A    Right.

17     Q    Okay.  How much did they pay you for your

18  claim in that case, if you recall?

19     A    I can't recall.

20     Q    Okay.  Can you give me an estimate, like do

21  you remember if it was more than a thousand dollars or

22  more than $10,000?  Can you give me a range?

23     A    Oh, it was probably 30, 40 bucks.

24     Q    30 or $40.  Okay.  Thank you.  And can you

25  tell me why in that case you felt 30 or $40 was fair,

1   but in this case you're objecting to the settlement?

2        A    Because I usually don't get an overdrafting in

3   my account, and so that's why I thought it was fair for

4   me to receive 30-, $40,000.  Where on this case is I

5   paid a lot of money and all I'm receiving is $400.

6        Q    Okay.  And I think you misspoke.  In B of A,

7   just now you said 30-, $40,000 --

8        A    No.  30, $40.

9        Q    Got it.  Got it.  Let me explore that a little

10  bit with you.  I can tell that you got the notice of the

11  settlement in this case and your claim form, and that

12  you filled out your claim form sometime around

13  October 12th, 2011.  Signed it October 12th, 2011 and

14  sent it back in; is that correct?

15       A    Yes.

16       Q    Okay.  And then I can tell that on

17  October 24th, so about 12 days later, you sent in an

18  objection to the settlement; is that correct?

19       A    Yes.

20       Q    Okay.  And earlier -- and I don't have a copy

21  of the exhibit, so I don't know the exhibit number, but

22  Ms. Sims gave you a copy of your declaration where you

23  objected to the settlement, and you probably still have

24  a copy of it in front of you.  It looks like this

25  (indicating).

1      A     Yes.

2              MS. SIMS:  Exhibit 2.

3              MS. LORENS:  Exhibit 2, for the record.

4      Q     Can you tell me what happened between

5  October 12th when you sent in your claim form and seemed

6  satisfied with the settlement and October 24th when you

7  sent in your objection?

8              MS. LISS-RIORDAN:  Objection; asked and

9  answered.

10             THE WITNESS:  When I filled out that form, my

11  understanding was there's a pending still under review

12  and the people will receive $15,000 in addition to that

13  $400.  That was my understanding.

14  BY MS. LORENS:

15     Q     And who told you that?

16     A     Nothing.  By reading it, this one, right here,

17  legal notice.

18     Q     Okay.  So you thought you were going to get

19  15,000 plus $475, plus if you had wanted to, the

20  750-dollar credit, but you didn't make any claim towards

21  the credit; is that correct?

22     A     Yes.

23     Q     Okay.  When did you find out that you would

24  not receive $15,000, that you would receive 475?

25     A     When I contacted my attorney.

Page 94

1      Q     When you contacted who?

2      A     (No response.)

3      Q     According to the records we have, you have

4  three attorneys.  So when you say, "my attorney," which

5  one of the three attorneys are you referring to?

6      A     Shannon.

7      Q     And what are the names of your other two

8  attorneys?

9      A     I don't know who -- I think Hillary.

10     Q     Okay.  And how many times -- so the first time

11 you found out about the 15,000 not being something that

12 you might get, I think you testified earlier you weren't

13 sure, but you thought it might be partially for you.

14 But the first time you found out that this wasn't

15 something that was for you was when you first talked to

16 Shannon?

17     A     Right.

18     Q     And was that on the same day that you signed

19 this declaration objecting to the settlement

20 (indicating)?

21     A     I don't remember if it was the same day or

22 not.  But I did talk to her, like, probably like two

23 times before I signed that.

24     Q     Okay.  Can you remember when -- you don't have

25 to remember the exact date.  Was it the day before, two

1    days before, earlier the day you signed, do you recall?

2         A    If I'm not mistaken, probably a day or two

3    days before that.

4         Q    A day or two days before --

5         A    Yeah.

6         Q    -- you signed this?

7         A    But, I mean, I'm not sure exactly what date

8    and . . .

9         Q    Okay.  I believe that October 24th was a

10   Monday.  I'm sure someone in this room with all of the

11   smartphones can double-check me on that.  But I believe

12   it was a Monday.

13             Do you recall whether or not you spoke to

14   Shannon on Monday, the 24th, when this was -- when you

15   signed this or whether it might have been over the

16   weekend?

17        A    It wasn't the weekend, maybe Thursday or

18   Friday.

19        Q    The week before?

20        A    Yeah.

21        Q    Okay.  So to reconstruct this, on the 12th you

22   sent in a claim form because you want to claim your

23   settlement, and then about the Thursday or Friday before

24   you object to the settlement, which is the 24th, you

25   talked to Shannon for the first time?

Page 96

1       A     (Indicating.)

2       Q     Correct?

3       A     The 24th?

4       Q     No, the Thursday or Friday before, I believe

5  you said.

6       A     Yes.

7       Q     Okay.  And how long did that conversation

8  last?

9       A     Probably 15, 20 minutes at most.

10       Q     And did Shannon call you on this Thursday or

11  Friday?  And I now do have a calendar.  October 24th was

12  a Monday.  We've got that right.  And the Thursday

13  before was the 20th and the Friday before was the 21st.

14             So the question was --

15       A     No, I called her.

16       Q     You called Shannon, it sounds like, on

17  probably the 20th or 21st?

18       A     Yes.

19       Q     Okay.  How did you get her name and phone

20  number?

21             MS. LISS-RIORDAN:  Objection; this has all

22  been asked before.

23             THE WITNESS:  I got it through Diana, my

24  girlfriend.

25  //

Page 97

1   BY MS. LORENS:

2        Q     Your girlfriend.  And can you tell me about

3   when Diana gave you Shannon's phone number?

4        A     It could be Thursday or Wednesday, but I'm not

5   sure exactly what day, but she gave me a number one of

6   those days.

7        Q     Okay.  And what did Diana tell you when she

8   gave you Shannon's phone number?

9        A     That get on the phone and call her right now.

10       Q     Okay.  Did she tell you why to get on the

11   phone and call her?

12       A     She just told me is, like, just say, hey,

13   contact somebody because I heard that it's just so much

14   amount they're giving everybody and then only few people

15   are receiving 15,000.  Not everybody.

16       Q     Okay.  So Diana says --

17       A     She actually didn't explain exactly.  She

18   said, hey, contact her and then she will explain to you

19   or you will have better understanding of what's going

20   on.

21       Q     Okay.  So Diana says to you maybe on Wednesday

22   the 19th, approximately, you should contact Shannon

23   right away because I heard about this and it isn't

24   enough money, more or less?

25       A     Yeah.

1    Q    Correct me if I got it wrong.

2    A    I'm not sure if she said about the money, but

3    she said, hey, there's a lawsuit's going on,

4    settlement's going.  Hey, here's the number.  Call her.

5    Q    Okay.  And so when Diana tells you you should

6    call Shannon because there's this lawsuit going on, have

7    you at this point put two and two together and

8    understood it's the same lawsuit where you've already

9    submitted your settlement claim form or are you not sure

10   it's even the same lawsuit?

11   A    Actually, I thought it's maybe something

12   different.

13   Q    Okay.  And how does Diana know Shannon?

14   A    She knows through that guy she know, maybe

15   worked with her or somebody.

16   Q    Let me run a name by you.  I don't know if

17   this is the guy, but you keep telling me about this guy

18   and that you didn't know his name.  Could it be Phillip

19   "Beats" (phonetic)?  And I may not be pronouncing the

20   last name appropriately.

21           MS. SIMS:  "Bites" (phonetic).

22   BY MS. LORENS:

23   Q    "Bites," Phillip "Bites."

24   A    No, his name's -- no, that doesn't sound

25   right.  His name is like a common name.

1      Q     Like a John Smith?

2      A     Yeah, or like Tom.

3      Q     Do you think it maybe starts with Tom?

4      A     I --

5      Q     Not sure?

6      A     You know, at my work I go through so many

7  names a day that names and dates are too much for me to

8  remember, but it's a common name.  It's not no Amrit

9  Singh or -- like, you will hear that name pretty much

10 every day.  A common name.

11     Q     Singh's a really common name, too, in India,

12 isn't it?

13     A     Yes.

14     Q     I've had clients before who were farm workers,

15 and they tell me Singh's a very common name in India.

16     A     Yes.

17     Q     Is this person with the common name, would

18 that be like a common name in the United States?

19     A     Yes, yes.

20     Q     So my example was sort of a fair example, but

21 you can't remember the name?

22     A     Yes.

23     Q     Okay.  Was the person Caucasian or were they

24 of another ethnicity?

25     A     I never met that person, so I don't know.

1      Q     You don't know?

2      A     It's just she told me, hey, I have a friend

3   that told me about it.  That there's some going on --

4   something with Coverall.

5      Q     Do you know how Diana's friend knows Shannon?

6      A     She probably explain to me, but I -- I don't

7   remember.

8      Q     Could it be that Shannon represents Diana's

9   friend in this case against Jan-Pro that you mentioned

10  earlier?

11     A     Could be, I'm not sure.

12     Q     Not really sure.  Okay.  So if I understand

13  correctly, you submit your claim on the 12th and you

14  want to get your settlement money if the case is

15  approved by the judge.  And then around the 19th, Diana

16  says you should call Shannon, but you're not really sure

17  if it's about this case.  You just know that you're

18  supposed to call Shannon.

19     A     Yes.

20     Q     Okay.  And that's when, after you talked to

21  Shannon, that you first decide that you want to object

22  because you find out that this 15,000 isn't for you?

23     A     Yes.

24     Q     Okay.  And until you talked to Shannon, you

25  didn't have any objection to the settlement?

1      A    The reason why I didn't have any objection,

2  because I didn't know if I'm going to receive that money

3  or not.  But my understanding is was, like, you're going

4  to receive this.  You have nothing to do -- do nothing,

5  sorry, then you receive the 15,000.

6      Q    Understood.  I just want to figure out what

7  happened between when you filed your claim form and when

8  you filed your objection.  So it sounds like what

9  happened was around the Wednesday, Diana says you ought

10  to call Shannon because Diana talked to someone with a

11  common American name and they were instructing you to

12  get a hold of Shannon?

13      A    Well, they didn't instruct her.  She told me.

14  I don't know if they -- what those two had the

15  conversation, but Diane told me, hey, you should

16  contact, you know, Shannon.

17      Q    Understood.  I apologize.

18      A    No, no, that's fine.

19      Q    Okay.  Now, did Shannon pay your travel

20  expenses to come down to that hearing in San Diego on

21  the 21st?

22      A    No.

23      Q    Okay.  So you paid your own gas?

24      A    Yes.

25      Q    Okay.  And what about the time off that you

1   would have taken off work?

2       A    No, she didn't pay.

3       Q    Okay.  And what about today?  Has she paid you

4   anything for coming here today?

5       A    No.

6       Q    Okay.  And has she agreed to reimburse you for

7   any costs or expenses that might be awarded against you

8   as the appellant -- if you appeal -- let me strike that.

9            Earlier you said that you objected because you

10  thought that the judge would hear your objection and

11  consider it and make some changes to the settlement; is

12  that correct?

13      A    Yes.

14      Q    I'm paraphrasing fairly accurately?

15      A    That's fine.

16      Q    Okay.  If the judge does not make any changes

17  to the settlement, what do you think's going to happen?

18      A    That I'm going to lose that $400 that I'm

19  going to receive.

20      Q    Who told you that?

21      A    I consulted -- my attorney told me that.

22           MS. LISS-RIORDAN:  Objection; don't testify as

23  to anything that was said between you and me, and move

24  to have that stricken.

25  //

1  BY MS. LORENS:

2      Q    Okay.  Do you know what else would happen if

3  the Court approves the settlement and denies your

4  objection?

5      A    No.

6      Q    Do you plan to appeal the Court's decision if

7  the judge says, I don't agree with you, I think it's a

8  fair settlement?

9      A    See, I don't know how this appeal process

10 works, so I don't know if I could even do that, appeal

11 or not.

12     Q    Okay.  If you filed an appeal and the appeal

13 was lost, has Ms. Liss-Riordan told you that she will

14 reimburse you for all of the costs and attorney's fees

15 and expenses that could be awarded against you after

16 that appeal was lost?

17         MS. LISS-RIORDAN:  Objection; misstatement.

18 Asking for communications that are attorney-client

19 privileged and harassing and deterring as well, but I

20 object to that question.

21         MS. LORENS:  Are you instructing him not to

22 answer that question?

23         MS. LISS-RIORDAN:  I'm instructing him not to

24 answer a question that asks for something that was said

25 between him and me, yes.

1              (Instruction not to answer.)

2    BY MS. LORENS:

3        Q    Okay.  Let me ask it in a different way, then.

4             Can you afford to pay somewhere between 25,000

5    and a couple hundred thousand dollars in costs and

6    expenses that could be awarded against you as an

7    objector if you appeal -- if Judge Miller approves the

8    settlement and you appeal his decision?

9             MS. LISS-RIORDAN:  Same objection.  Although

10   the attorney-client privilege aspect of it is not in

11   that question.

12   BY MS. LORENS:

13       Q    So the question is just could you -- if the

14   judge approves the settlement and Ms. Liss-Riordan says,

15   okay, now, let's appeal, let's appeal this judge, we

16   don't agree with him, and this case goes on another two

17   years through the appellate process and you lose, the

18   Ninth Circuit says, no, we think Judge Miller was right,

19   can you afford to pay the costs and fees that may be

20   awarded following that appeal?

21            MS. LISS-RIORDAN:  I object.  That is so

22   harassing and deterring that it is improper.

23            MS. LORENS:  It actually goes to the issue of

24   whether or not a bond should be ordered by the Court,

25   and that is a discretionary issue and it is an area that

1    is open to discovery.

2            MS. LISS-RIORDAN:  I didn't tell him not to

3    answer.  I stated an objection for the record.  He can

4    answer.

5    BY MS. LORENS:

6        Q    She said you can answer.

7            MS. LISS-RIORDAN:  Could you afford that, is

8    the question.

9            THE WITNESS:  I can't afford like hundreds of

10   thousands, no.

11   BY MS. LORENS:

12       Q    How about 25,000?

13       A    It's a little bit -- it's a lot of amount for

14   me.

15       Q    I understand.  Were you even aware that those

16   types of ramifications could flow from filing an

17   objection and pursuing an appeal in a case like this?

18       A    No.

19       Q    Okay.  Mr. Cadena, who's sitting next to me,

20   and I filed this case about three years ago.  And you

21   don't have to agree with me, nor your attorney, but in

22   our opinion, we worked really hard to get a good

23   settlement for the -- what we call the punitive class,

24   the franchise owners in California who bought franchises

25   from Coverall during the time period covered by this

1    lawsuit.

2           So, of course, I take it a little bit

3    personally that you think that the settlement that we

4    achieved after years and years of hard-fought litigation

5    should be thrown out.

6           So I've sat here today listening to you and

7    listening to some of your complaints about Coverall, and

8    I know in particular that you have talked a lot about

9    the fact that they -- you felt that they would take

10   customer accounts without cause and then sell them to

11   someone else; is that correct?

12       A    Yes.

13       Q    That's correct.

14           Do you understand that as part of this

15   settlement what Mr. Cadena and I were able to accomplish

16   is that Coverall is not going to be able to do that

17   anymore?  The accounts are to be -- if the settlement is

18   approved by the judge, the accounts are to be

19   transferred to the franchise owners under an assignment,

20   and then the franchise owner would have direct contact

21   with the customer.  Do you understand that?

22           MS. LISS-RIORDAN:  Objection; compound,

23   misleading and incomplete statement.

24           But he can answer to the best of his ability

25   what he understands.

1            THE WITNESS:  I don't understand, like, how

2   it's going to be -- like, let's say I'm not a current

3   franchise owner.  I'm not sure how it's going to get

4   done.  So I really can't answer you, like, that it's

5   going to be -- like, they can't, you know, account sold

6   to the franchisee will be their account.

7   BY MS. LORENS:

8        Q    Okay.  When you talked about the Leslie Pool

9   account, you talked about the fact that they pulled that

10  account from you.  Do you believe that had you been able

11  to go talk to the owners of Leslie Pool, you could have

12  worked that out had you been able to talk to them

13  directly and you would have been able to maintain that

14  account?

15       A    Probably.

16       Q    And do you believe it would have been a

17  benefit to you to actually be the person that negotiates

18  directly with the company like the owner of Leslie

19  Pools?

20       A    I can't speak for all the franchise, maybe

21  some people can't communicate it, but for me I think it

22  would have worked out better for me.

23       Q    And I know another one of your concerns with

24  Coverall was that sometimes they'd assign accounts that

25  were too far away, I think you said?

1     A    Yes.

2     Q    So if Coverall were to be forced to assign

3  accounts within, say, 30 miles of the regional

4  offices -- I forget what they -- their field offices?  I

5  forget the terms that they used.

6     A    Okay.

7     Q    Do you think that would be an improvement?

8     A    See, again, I'm not sure if that's good for --

9  if somebody lives in Upland to have an office they found

10 somewhere in San Bernardino, so I don't know if that

11 works better for the franchise owner, because sometimes

12 it depended upon where they live.  So I'm not sure if

13 that's something that would work out for them or not.

14    Q    Well, I understand that you can't speculate

15 about other franchise owners, because you've already

16 testified, I believe, that you haven't talked to any

17 other franchise owners.

18    A    No.

19    Q    Okay.  And so that would be a yes, you have

20 not talked to any other franchise owners, correct?

21    A    Yes.

22    Q    Let's assume hypothetically that most people

23 that buy these franchises buy the franchise from the

24 regional office that's nearest to where they live for

25 the purposes of this question.

1            So it's a hypothetical, but hypothetically

2    speaking, if a franchise owner buys a franchise using

3    the regional office nearest to where they live, where

4    they reside, would it help if Coverall had to give them

5    customer accounts that were within 30 miles of that

6    regional office?

7            MS. LISS-RIORDAN:   Objection.

8            THE WITNESS:   I don't know if that's -- that

9    will help for them or not.

10   BY MS. LORENS:

11        Q    Okay.  How about for you?  How close did you

12   live from your regional office?

13        A    I was far, I was in Upland.  It's about 30, 35

14   miles.

15        Q    So if they gave you customer accounts within

16   30 miles of the regional office, would that have helped

17   your situation back when you were servicing accounts?

18        A    See, instead of region office, what I'm

19   thinking is, like, if I'm in Upland, it should be

20   somewhere around that area.  That would help.

21        Q    Okay.

22        A    If I'm living in Upland, I'm cleaning offices

23   in Upland.

24        Q    And would it help also if the accounts were

25   located close to one another?  So say you're cleaning

1   Leslie Pools one day, and I don't remember your

2   schedule -- I don't think I've ever known your schedule,

3   but say you were cleaning Leslie Pools at 7:00 p.m., to

4   have another account that was fairly close to Leslie

5   Pools as your second account, would that have been

6   helpful?

7       A    Yes.

8       Q    Okay.  So Diana recommends that you call

9   Shannon on probably about Wednesday, the 19th.  And you

10  call on probably about Thursday, the 20th.  How many

11  conversations do you have with Shannon between that day

12  and the Monday that you file your objection?

13      A    I can't remember.  Probably one or two

14  conversations.

15      Q    Okay.  And can you remember how long the

16  conversations lasted?

17      A    Probably 15, 20 minutes.

18      Q    And did you have any conversations with any

19  other attorneys?  I think you mentioned Hillary.

20      A    No.  I met her when she came with her.  No, I

21  didn't have any.

22      Q    Okay.  So there just were two conversations

23  with Shannon prior to sending in your objection?

24      A    Yes.

25      Q    Okay.  And did you write Exhibit 2, which is

1   your objection?  Did you draft this document?

2        A    I typed it.

3        Q    You typed it?  Okay.

4        A    I didn't type it on this paper, but I typed

5   it.  Like, okay, this is what I need.  Like she asked

6   me, hey --

7             MS. LISS-RIORDAN:  Okay.  Don't testify as to

8   anything that was said between us.  You can answer the

9   question, but don't testify about communications between

10  us.  It's privileged.

11  BY MS. LORENS:

12       Q    You can explain how you did it.  She didn't

13  like when you used the word "she asked me," because she

14  was afraid you were going to lead into something she had

15  told you.

16       A    No, she didn't --

17            MS. LISS-RIORDAN:  Because I'm just asserting

18  an attorney-client privilege, which is his right not to

19  testify as to communications between himself and

20  counsel.

21            Go ahead.

22            THE WITNESS:  No, because I didn't remember

23  the dates, so what I was told is you can write

24  approximately.  You don't have to be sure, like, okay --

25            MS. LISS-RIORDAN:  Okay.  Again, don't testify

1    to anything that was said between us.  If you can answer

2    the question without revealing attorney-client

3    communications, you can, but just don't say what I told

4    you or you told me.  You can say what you did.

5         THE WITNESS:  Yes, I did.  Wrote that.

6    BY MS. LORENS:

7         Q    Okay.  It says in here that you bought a

8    Coverall franchise around 2005 or 2006, correct?

9         A    Right.

10        Q    And I think earlier you talked about the fact

11   that you worked this franchise with your sister.

12        A    Yes.

13        Q    And that she actually maybe did a little bit

14   more of the work than you did.

15        A    Yes.

16        Q    Would you consider your sister to be like your

17   partner in this franchise, then?

18        A    Not really, because she was just helping with

19   me.

20        Q    So she was like a worker of yours or was she

21   sort of like a co-owner of the franchise with you?

22             MS. LISS-RIORDAN:  Objection to the extent

23   that calls for a legal conclusion.

24             THE WITNESS:  I don't know.  We never talked

25   about that, stuff like this.  We would just work as a

Page 113

1    family.

2    BY MS. LORENS:

3        Q    Okay.

4        A    Like she helped me and then -- like

5    whatever -- we help each other out all the time, so I --

6    it was not said, okay, this is what you're doing, this

7    is what you're going to get.  It was just . . .

8        Q    But did you feel that she had a say in this

9    business that you bought or did you look at her more

10   like someone that you employed to help you clean as part

11   of this business that you bought?

12           MS. LISS-RIORDAN:  Objection; assumes facts

13   not in evidence.

14           THE WITNESS:  See, I can't really tell you she

15   was working for me because it was like a family thing,

16   and I can't say that she was -- she didn't -- she would

17   just -- I don't -- you know what, I don't know how to

18   explain myself.  It's just in our culture, we don't do

19   that as, okay -- it's just whatever we're getting.  It's

20   not just mine.  It's just a family thing.

21   BY MS. LORENS:

22       Q    So did you look at this franchise, this

23   Coverall franchise as a family business?

24       A    No, what I looked at it is like I would

25   receive 5000.  I hire people to work for me, and I just

1  make probably $2,000 out of it, like, you know, go out

2  there, hire people.

3      Q    So you looked at it as your business, and then

4  the people that helped clean were working for you, but

5  that you were the business owner?

6      A    No, that's what I thought when I wanted to buy

7  it.  Like, okay, that's how the ad would -- be your own

8  boss.  So that's what I thought I was going to be, my

9  own boss.  But I was actually working it.

10     Q    Right.  I understand that.  But we'll go to

11 that in just a minute, the be-your-own-boss topic, but I

12 just want to get a sense of who owned this franchise.

13 Was it you and your sister?  Was it your family or

14 actually just you?

15     A    I owned the franchise.

16     Q    Okay.  And so that would mean your sister was

17 like an employee even though she's a family member?

18          MS. LISS-RIORDAN:   Objection; calls for a

19 legal conclusion.

20 BY MS. LORENS:

21     Q    You can answer.

22     A    She was not -- I can't tell her she was my

23 employee.  She would kill me.

24     Q    Okay.  Well, tell me this, did you give her a

25 paycheck every two weeks or --

1       A     No, it wasn't a paycheck thing.  It was

2    whatever she needs.  Till -- we have a joint account.

3       Q     So the payments that would come from Coverall

4    to pay you on your franchise services would come to a

5    joint account in you and your sister's name?

6       A     Yes.

7       Q     Okay.  And then you and your sister would

8    split up the money, and it sounds like sometimes she got

9    a little bit more than you because she did a little bit

10   more of the work?

11      A     No, it wasn't like that.  It's just whatever

12   she needs, she could take it out.  It's not like you

13   work more, you're going to get more.

14      Q     Is the joint account that the Coverall

15   payments would go to of you and your sister's, is that

16   the same account that you wrote your checks to Coverall

17   out of for purchasing the franchise?

18      A     I don't remember if I gave them a check or --

19   no, I borrowed money from a 401K.

20      Q     Does your sister object to this settlement?

21      A     No, she don't know about it.

22      Q     She doesn't know about it?

23      A     No.

24      Q     Does she know you're objecting?

25      A     Yes.  No, actually, she didn't even talk to me

1    about it.  I didn't talk to her.

2         Q    Okay.  So at least as we sit here today, you

3    don't have any reason to believe that your sister is

4    objecting to this settlement?

5         A    I can't -- you know, if I explain to her,

6    maybe she object, but I don't know.

7         Q    But, as you sit here today, you've told me

8    that you haven't told her about the settlement and that

9    she doesn't know about it.  So as at least as of today,

10   she hasn't expressed an objection to the settlement to

11   you?

12        A    No.

13        Q    Okay.  Is there some reason you didn't tell

14   her about the settlement when the papers came in?

15        A    I guess it's -- I just don't like to talk a

16   lot because once you talk, and then they want to know 20

17   different questions and then I don't even have answers.

18        Q    Right.

19        A    So that's why I probably didn't talk to her.

20        Q    So you probably figured the 475 will hit our

21   joint account, and she gets what she needs to take care

22   of herself, so I don't need to discuss it with her?

23             MS. LISS-RIORDAN:  Objection; misstates his

24   prior testimony.

25   //

1   BY MS. LORENS:

2        Q    You can tell me if I'm wrong.

3        A    No, actually, it didn't even cross my mind

4   about that that she will hit -- my thought is like --

5   like we didn't talk about it.

6        Q    Okay.  But the 475 -- would the 475 have gone

7   into your joint account with your sister?

8        A    Probably.

9        Q    Okay.  Be your own boss.  That's what you

10  thought you were buying, right, when you bought a

11  Coverall franchise was that you were buying a franchise

12  and you were going to be your own boss, correct?

13       A    Yes.

14       Q    Okay.  And listening to you today, it sounds

15  like the biggest problem was that you didn't really own

16  those customer accounts and so you weren't really your

17  own boss, correct?

18            MS. LISS-RIORDAN:  Objection; misstates his

19  testimony.

20            THE WITNESS:  No, it's not just that.  It's

21  just the time and the effort you spend to clean some

22  office, you can't even afford to hire anybody.

23  BY MS. LORENS:

24       Q    No, I'm asking you about the be-your-own-boss

25  thing.  I mean, when you wanted to be your own boss,

1    what did you expect that meant?  Let me ask it that way

2    instead.

3        A    That's what I thought, that I could go hire

4    people, they would clean it for me and then I'll make

5    some money out of it.

6        Q    Okay.  And did you assume you would be able to

7    talk directly to these customers that you were going to

8    be servicing for Coverall?

9        A    Yes.

10       Q    Did you hope that if they had any complaints,

11   before Coverall would pull that account, that you'd be

12   able to talk to that customer and see if you could work

13   things out?

14       A    Yes.

15       Q    Would it have been helpful to you if you had a

16   closer relationship with the customer so that you could

17   get involved in the bidding of the account?

18       A    Yes.

19       Q    So if I represent to you today that those are

20   all things that I was able to accomplish via the

21   settlement, would you still think that the settlement

22   was unfair?

23            MS. LISS-RIORDAN:  Objection; misstates the

24   settlement.

25            THE WITNESS:  Just for that part, if that's --

1    were to happen, no.

2    BY MS. LORENS:

3         Q    It still wouldn't be fair?

4         A    No, because as I said, some people can't

5    communicate with the office manager or something.  I

6    think there should be some kind of training for them.

7         Q    Okay.  So would it be fair if the people that

8    have difficulty communicating -- because I agree with

9    you.  I met a lot of people that spoke Spanish.  Would

10   it be fair if the people that had difficulty

11   communicating were given some additional training so

12   that they understood how to bid an account, for

13   instance?

14        A    Maybe.

15        Q    That would help?

16        A    Maybe.

17        Q    Okay.  Can you give me some other ideas?

18   Because I'm telling you I worked really hard to reach

19   this settlement, and I want it to be really good for all

20   the California franchise owners.  So what else would you

21   like to see to make this settlement more fair?

22        A    And the bidding, when they bid these accounts,

23   they bid too low.

24        Q    Okay.  But if the accounts are assigned to the

25   franchise owner and now they get to talk to the customer

1    directly because they own those customer accounts now,

2    and they get to go in there and bid the accounts and get

3    training if they'd like to, would that solve that

4    problem?

5            MS. LISS-RIORDAN:  Objection; compound, and

6    it's not in the settlement.

7            THE WITNESS:  I don't know if that's -- solve

8    it or not, because there's a lot of other things

9    involved with bidding, you know.  So I don't know if

10   everybody be able to do it or not.

11   BY MS. LORENS:

12       Q    Okay.  But it would certainly help if they

13   were going to get some training on how to bid an

14   account, don't you think?

15       A    Maybe.

16       Q    And do you think it would help if they got

17   some training on how to run a business?

18       A    Maybe.

19       Q    Okay.  Do you think it would help if the

20   training was in English and in Spanish?

21       A    Yeah, maybe, yes.

22       Q    And when you refer to franchise owners -- and

23   I forget the words you used, but that don't understand

24   that well, is it your impression that most of them are

25   Spanish speakers?

1      A     No.

2      Q     Okay.  Can you tell me what you mean by that,

3  then?

4      A     There's a lot of nationalities I seen when I

5  go pick up my check.  It's not just Hispanic.  There's

6  people from all different places were involved in this.

7      Q     Okay.  Can you think of -- can you give me any

8  more advice on what I could do to make this settlement

9  more fair?

10          MS. LISS-RIORDAN:  Objection; and that's not

11  his role here today.

12          MS. LORENS:  Well, he's objected to the

13  settlement because he doesn't think it's fair.

14  BY MS. LORENS:

15      Q     My job is to get the best deal possible for my

16  clients, who are the franchise owners, not Coverall.

17  I'm not Coverall's attorney.  I have gone head to head

18  with Coverall for three years now.

19          So I really want to hear from you because

20  you're the only one that's objected out of a class of

21  1500 people.  I want to hear from you as to what I can

22  do to make this settlement something that you believe is

23  fair and reasonable.

24          MS. LISS-RIORDAN:  Objection; calls for a

25  legal conclusion.

1  BY MS. LORENS:

2      Q    You worked there.  You know what you thought

3  wasn't fair.  Just tell me from your own perspective

4  what you think I could do differently to improve this

5  settlement.

6            MS. LISS-RIORDAN:  Mr. Singh has chosen to

7  speak through his counsel and make an objection through

8  the counsel.  This line of questioning -- well, he

9  either has an answer or doesn't have an answer.  But I

10 think this is calling for a legal conclusion.

11 BY MS. LORENS:

12     Q    You can answer.

13     A    I don't know what to say.  It's hard for me to

14 sit there and tell you right now.

15     Q    Okay.  It sounds like mostly, though, because

16 what we've covered so far, and I've listened to what

17 you've told Ms. Sims, was to be able to deal with the

18 customers directly so Coverall can't take those accounts

19 without you being able to talk to those customers would

20 be important?

21     A    One of the things.

22     Q    Yeah.  And that to have additional training

23 for people would be important?

24     A    Yes.

25     Q    And to have that training in English and

1    Spanish would be helpful?

2        A    Yes.

3        Q    Okay.  Did I forget any of the things that you

4    mentioned that you thought would make this a fair and

5    reasonable settlement?

6        A    I can't --

7        Q    I'm not trying to shorten your list.

8        A    I can't remember everything.

9        Q    Okay.  Ms. Sims talked to you a little bit

10   about opting out of the settlement.  Did you understand

11   that if you wanted to sue Coverall, you didn't think it

12   was enough money, that you could opt out, withdraw

13   yourself from the settlement, hire Shannon and go sue

14   them.  Did you understand that?

15       A    No.

16       Q    Okay.

17            MR. ANTIA:  I couldn't hear that.  Was that a

18   yes or no?  Sorry.

19            THE WITNESS:  No.

20   BY MS. LORENS:

21       Q    But you were in court on the 21st when Shannon

22   argued with the judge and with us about the settlement

23   for the morning and then a couple hours into the

24   afternoon, correct?

25       A    Yes.

Page 124

1       Q    Okay.  And I'll represent to you that that was

2   the 21st of November, okay?

3       A    Okay.

4       Q    So on November 21st, I'm sure you heard me say

5   to the judge towards the end of the hearing, if

6   Mr. Singh's so unhappy with the settlement, maybe he

7   would like to opt out so that he can sue Coverall.  And

8   those weren't my exact words.  I'm paraphrasing what I

9   remember saying.  And I think the judge said something

10  along the lines it seemed like -- it sounded like you

11  were really unhappy with the settlement.  So I think we

12  were all thinking maybe you would like to opt out and

13  sue Coverall and not be bound by the settlement.

14          So I'm going to ask you today, would you like

15  to be able to do that?

16      A    I have to consult my attorney on that.

17      Q    But I want to know what you want to do.  I

18  don't want to know what your attorney wants to do.  I'm

19  pretty sure I know what your attorney wants to do.  I

20  want to know what you'd like to do.

21          In other words, it's sort of like there's two

22  options in a case like this, you can take the money or

23  you can opt out and sue the company on your own, your

24  own lawsuit, or there's a third option, I guess, you

25  could opt out and not sue the company and do nothing.

1            And I'm just curious because I could tell you

2    didn't know you had the right to opt out and sue the

3    company, would you like to do that?  Would you prefer to

4    opt out and sue Coverall via Ms. Liss-Riordan or would

5    you rather stay in and collect your settlement monies if

6    the Court approves the settlement?

7            MS. LISS-RIORDAN:  Objection; not a complete

8    statement.

9    BY MS. LORENS:

10       Q    You can answer.

11           MS. LISS-RIORDAN:  The options are maintaining

12   his objection on behalf of a class or opting out of the

13   settlement, pursuing his own individual claims.  You can

14   ask him if he has --

15           MS. LORENS:  Shannon, I'm not taking your

16   deposition.  You're testifying.

17           MS. LISS-RIORDAN:  You're mis- --

18           MS. LORENS:  Do you have an objection?

19           THE REPORTER:  One at a time.

20           MS. LORENS:  Do you have an objection?

21           MS. LISS-RIORDAN:  Yes.

22           MS. LORENS:  State the objection.

23           MS. LISS-RIORDAN:  I'm objecting to the

24   incomplete and misleading and mischaracterization of his

25   options so as to request an answer that's based on

1    incomplete, misleading premises.

2    BY MS. LORENS:

3         Q    Okay.  Do you remember the question anymore?

4         A    Something about opt out.

5         Q    Yeah.  I want to know what you, Amrit Singh,

6    wants to do, now that you know you have these choices.

7    Would you like to opt out, reject this settlement and

8    have Shannon sue Coverall on your behalf?  Or would you

9    rather go forward with the claim that you filed on the

10   12th and get paid through the settlement if Judge Miller

11   approves this settlement?

12        A    I would go with the objection.

13        Q    You would go with the objection.

14        A    Yes.

15        Q    So you want to stay in but object to the

16   settlement.  You do not want to opt out?

17        A    No.

18        Q    No.  Okay.  So would you like to be able to

19   opt out?

20        A    I'm sorry.

21        Q    Maybe I misunderstood you.  You're saying no,

22   you'd like --

23        A    No, I will go with the objection; not with the

24   opt out.

25        Q    So you want to stay in and object to the

 1   settlement, correct?

 2        A    Yes.

 3        Q    And you do not want to opt out?

 4        A    Yes.

 5        Q    And you do understand now that if Judge Miller

 6   approves the settlement that the next step your attorney

 7   is likely to take is to file an appeal, correct?

 8        A    I'm not sure.

 9        Q    Okay.  Do you understand that if your attorney

10   does file an appeal, then this case will go on for

11   another 18 months to two years?

12        A    I don't know how this legal process works, so

13   I don't know if -- what's going to happen.

14        Q    Okay.  And if your attorney files an appeal

15   and it drags on for another 18 months to two years, do

16   you understand that the whole rest of the class who

17   didn't object will have their payments held up?  Do you

18   understand that?

19        A    Yes.

20        Q    Okay.  And do you understand that if the

21   appeal is not successful, that you can be held liable

22   for costs and fees and expenses related to that appeal?

23             MS. LISS-RIORDAN:  Same objection as before.

24   You're trying to harass and deter this objector.

25             But go ahead and answer if you have an answer.

1             THE WITNESS:  No, I didn't know that.

2     BY MS. LORENS:

3        Q     Okay.  So knowing that, I just want to make

4     sure that -- because it feels funny to me.  And you're

5     looking at me like you understand.  On the one hand,

6     I've got someone objecting who's filed a claim that says

7     pay me, and on the other hand, I have that same person

8     saying, I object because I don't like this settlement.

9     So we're offering you this option of if you don't like

10    it, you can opt out and you can still sue Coverall.

11            MS. LISS-RIORDAN:  I'm going to object.  This

12    is going over questioning you've already asked.  This is

13    harassing, intimidating, and it's repeating a question

14    you've already asked.  You've asked it; he's answered

15    it.  He says that he wants to stay in the class and

16    object to the settlement.  If you have another question

17    to put to him, please put it.

18            MS. LORENS:  His response to my last question

19    was that he didn't understand that, so I just want to

20    make sure that he understands what his options are.

21            Can you read my last question back.

22            (The record was read as follows:

23                "Okay.  So knowing that, I just

24            want to make sure that -- because it

25            feels funny to me.  And you're

1            looking at me like you understand.

2            On the one hand, I've got someone

3            objecting who's filed a claim that

4            says pay me, and on the other hand, I

5            have that same person saying, I

6            object because I don't like this

7            settlement.  So we're offering you

8            this option of if you don't like it,

9            you can opt out and you can still sue

10           Coverall.")

11 BY MS. LORENS:

12    Q   I just want to make sure you've had an

13 opportunity to understand your various options.  So

14 knowing what you know about the costs of an appeal and

15 all of that stuff now, do you still want to file a claim

16 and pursue an objection or would you rather reconsider

17 your objection?

18    A   I'll go ahead and pursue with my objection.

19    Q   Okay.  And has your attorney advised you of

20 the fact that she's been sanctioned in relation to her

21 requests that you not have to show up for this

22 deposition?

23    A   Yes.

24    Q   Okay.  I think I'm done, but let me review my

25 notes.

Page 130

1      A      Okay.

2      Q      Do you know whether or not Shannon represents

3   Diana in a lawsuit?

4      A      I don't know.

5      Q      Okay.  And I think I asked this, but I forget

6   whether I did or not, so I apologize if I have.  Is

7   Diana involved in any janitorial franchise lawsuits in

8   California like against Jani-King or Jan-Pro or . . .

9      A      I'm not sure.  If she -- I don't know.  I

10  never discuss anything with her, or she never told me

11  anything.

12     Q      Do you know if she's ever worked for Jani-King

13  or Jan-Pro?

14     A      I don't know.

15     Q      Okay.  Do you know that your attorney was an

16  attorney for a class of Jani-King franchise owners in

17  California?

18            MS. LISS-RIORDAN:  Objection.

19            THE WITNESS:  Yes.

20  BY MS. LORENS:

21     Q      Okay.  And do you know that in that case, the

22  punitive class got nothing because class certification

23  was denied?

24            MS. LISS-RIORDAN:  Objection.

25            THE WITNESS:  Yes.

1    BY MS. LORENS:

2         Q    Do you know whether or not the gentleman with

3    the common American name that you can't remember is

4    represented by Shannon?

5         A    I don't know.

6         Q    Okay.  Do you know whether or not he's

7    involved in a case against Jani-King?

8         A    I don't know.

9         Q    Do you know if he's involved in a case against

10   Jan-Pro?

11        A    I don't know.

12        Q    Do you know how he came to know Shannon?

13        A    No.

14        Q    Do you have any idea how Diana came to know

15   Shannon?

16        A    Through that guy.

17        Q    Through that guy?

18        A    Yeah.

19        Q    Okay.  Do you know if Shannon's ever talked to

20   Diana?

21        A    No, she hadn't talked to her -- no.

22        Q    As far as you know?

23        A    Yeah.

24        Q    Do you have a computer?

25        A    Yes.

1      Q    Okay.  I know when there were some questions

2   being asked about whether there had been any e-mails or

3   written communications with this person whose name you

4   can't remember, you hesitated.  And I think you said

5   something like you just wanted to make sure that there

6   hadn't been any communications, correct?

7      A    Yes.

8      Q    Are you sure you don't have any written

9   communications about calling Shannon or about your

10  objection?

11     A    No.

12     Q    Okay.  Do you have any written communications

13  about this case against Coverall in California with

14  anyone?

15     A    I can't remember.

16     Q    Okay.  I'd like to ask that you retain your

17  computer; in other words, don't delete information on

18  it.  We call it don't spoliate evidence.

19     A    Okay.

20     Q    So please retain any computer information,

21  written information, any documentation in your

22  possession that has anything to do with this case.

23     A    Okay.

24     Q    Okay?  So that would be communications with

25  other people, that would be communications with your

1    mom, with your sister, with Shannon, anything that has

2    to do with this case.

3         A    Okay.

4         Q    Okay.  And you didn't -- you decided to object

5    after you talked to Shannon and she told you you

6    wouldn't get the 15,000 that you'd seen -- that you

7    thought you had seen in the paperwork, correct?

8         A    Right.

9              MS. LISS-RIORDAN:  Again, I object to any

10   attorney-client privileged communications being

11   testified about.

12             MS. LORENS:  I'm just getting into the timing

13   of when he changed his mind.

14             MS. LISS-RIORDAN:  That's not an objection.

15             MS. LORENS:  Nothing further for me.

16             MR. CADENA:  (Indicating.)

17             MR. ANTIA:  I have a few questions, but I need

18   to take a quick break.

19             (Recess.)

20                        EXAMINATION

21   BY MR. ANTIA:

22        Q    Mr. Singh, my name is Mazda Antia.  I

23   represent a company called Ares Capital Corporation and

24   a company called Allied Capital Corporation.  Have you

25   heard of those companies before today?

1        A     No.

2        Q     Did you ever hear of those companies while you

3   were working for Coverall?

4        A     No.

5        Q     Now, you said you provided Diane -- is that

6   her name, your girlfriend's name?

7        A     Right.

8        Q     -- with the notice which is marked as

9   Exhibit 3 to the settlement, is that correct, you gave

10   her a copy of it to read?

11        A     No.

12        Q     No?

13        A     No.

14        Q     You just talked to her about what's contained

15   in the notice?

16        A     I didn't even go into detail.  I'm just

17   saying, hey, somebody's suing -- that some attorneys are

18   suing Coverall.  That was back probably two, three years

19   ago.  But she just know that I just received some

20   paperwork for settlement.  There's no details that

21   she -- I'm positive or I'm not sure that I talked about,

22   hey, we're receiving this much money or anything.

23        Q     Did you say you knew there was a lawsuit going

24   on two or three years ago?

25        A     No, no.

1      Q    Two or three months ago, did you mean?

2      A    She knows -- I talked to her about it first --

3  I told her, hey, when I filed paperwork, like, she knew

4  about it, that I'm suing -- or, like, there's a lawsuit

5  going on with Coverall.

6      Q    Okay.

7      A    Like, she didn't know details or date or

8  nothing.  She just -- she just knew about it.

9      Q    Why do you think she found you a lawyer to

10 talk to about this settlement?

11     A    Probably because probably she just wanted me

12 to consult somebody, you know, just to make sure, you

13 know, whatever I'm doing is right.

14     Q    Did you ask her to find you a lawyer?

15     A    No.

16     Q    Did you talk to her about how much money you

17 might receive from the settlement?

18     A    I can't remember that.

19     Q    I mean, do you recall telling her that you

20 might get this 15,000 plus $475?

21     A    I don't remember.

22     Q    Have you ever talked to her about how much

23 money you might obtain from the settlement?

24     A    No.

25     Q    Have you ever talked to her about how much

1   money you would like to get in a perfect world from

2   Coverall based on your previous experience with them?

3        A    No.

4        Q    Did you ever speak to her -- Diane -- is it

5   Diana or Diane?  Sorry.

6        A    Diana.

7        Q    Did you ever speak to Diana after you spoke

8   with Shannon about how much money you might receive from

9   the settlement?

10       A    No, I just told her that I did call her.

11       Q    That you did call her?

12       A    Yes.

13       Q    And she didn't ask --

14       A    She did ask, but I didn't bother to answer

15   her.

16       Q    And did you ever -- did she ask if it was more

17   than 15,000 that you'd be getting from the settlement?

18       A    No, she was just saying, so what's going to

19   happen.  I said I don't know what's going to happen yet.

20       Q    Now, you said you had conversations with

21   Shannon --

22            MR. CADENA:  I apologize for calling you

23   Shannon, but that's how he's been referring to you

24   today.

25   BY MR. CADENA

1      Q      -- on the phone.  Do you know if there were

2  any other participants in those two phone conversations

3  with Shannon?

4      A      No.

5      Q      It was just yourself and Shannon?

6      A      Yes.

7      Q      No one else with Shannon?

8      A      No.

9      Q      And do you recall if Diana spoke to her friend

10 and told her friend that you had made contact with

11 Shannon?

12     A      I don't know.

13     Q      And do you understand that there have been

14 filings made with the Court on your behalf?

15     A      I'm sorry?

16     Q      Do you understand that as part of your

17 objection, there have been papers, pleadings we call in

18 the legal term, filed with the Court on your behalf?

19     A      Like the objection, you're talking about?

20     Q      That's one example.  Correct.  I think it's

21 Exhibit No. 2 (indicating).  Do you understand that

22 there have been pleadings, which is what we call

23 something that's been filed with the Court?

24     A      Yes.

25     Q      Do you understand that those documents and

1   documents like those have been filed on your behalf with

2   the Court?

3        A    See, I'm confused now.  You're talking about

4   this objective (sic) or are you talking about other

5   papers?

6        Q    What papers do you understand have been filed

7   with the Court on your behalf since the filing of

8   Exhibit 2?  Do you have Exhibit 2 in front of you?

9        A    Yes.  See, I'm not good with these papers.  I

10  know I've -- there's a few was filed.  That's all.

11       Q    Let me ask you this:  Did you review any of

12  the papers that were filed on your behalf prior to the

13  time they were filed with the Court?

14       A    Yes.

15       Q    Okay.  Do you recall what documents those

16  were?

17       A    I don't know.  It was about 20-some page

18  documents.

19       Q    And you read that before it was filed with the

20  Court?

21       A    I didn't go through each page, just -- I just

22  knew there were papers that were filed.  I didn't go

23  through everything.

24       Q    And my question is a little different.  I

25  apologize if it's confusing.  My question is:  Did you

1    read that 20-page document before it was filed with the

2    Court or after it was filed with the Court?

3        A    Before.

4        Q    How did you read it before?  Did someone send

5    it to you?

6        A    Yes.

7        Q    Who sent it to you?

8        A    See, I'm not sure which paper you're talking

9    about.  Are you talking about the appeal paper?

10       Q    I'm referring to the fact that -- let me back

11   up.  You understand you've objected to the settlement,

12   right?

13       A    Yeah, that's all I know.  I don't know which

14   paper.

15       Q    Do you understand that your lawyer has filed

16   papers with the Court on your behalf articulating the

17   reasons why you feel the objection is unfair?  Do you

18   understand that?

19       A    Yes.

20       Q    Okay.  Have you read any of those papers?

21       A    No.

22       Q    Okay.

23       A    Not, like, page to page.  All I know is just

24   there's papers filed.

25       Q    Now, it's true you've deferred to your

1   lawyer's judgment on objecting to the settlement; is

2   that correct?

3       A    Yes.

4       Q    Is there anything you disagree with in regards

5   to the stance your lawyer has taken?

6       A    No.

7       Q    Now, you said earlier today, I think when

8   Ms. Sims was asking you questions, that it was your

9   understanding that if the judge approved the settlement

10  that you would lose your right to the $475 that's part

11  of the settlement here.  Do you recall stating that

12  earlier today?

13      A    I think I said that.

14      Q    Okay.  And I'm not trying to mislead you.  We

15  can pull it from the transcript.  But my question is:

16  Have you ever questioned that decision?  The decision

17  being that by objecting, you might lose your rights to

18  certain monies.  Have you ever questioned that decision

19  that you made by objecting to the settlement?

20          MS. LISS-RIORDAN:  Objection.

21  BY MR. ANTIA:

22      Q    You can answer.

23          MS. LISS-RIORDAN:  Objection; misleading.

24          THE WITNESS:  I don't -- I can't recall if I

25  did or not.

1   BY MR. ANTIA:

2       Q    Have you ever had thoughts in your own head or

3   contemplated whether you should be getting more money as

4   a part of this settlement?

5       A    More money than what -- like, which amount are

6   you talking about?  I didn't understand amount.

7       Q    Which amount do you think I'm talking about?

8       A    I thought you were talking about this -- the

9   $475.

10      Q    Okay.  And have you ever thought that you

11  deserved more money than that?

12      A    Yes.

13      Q    And you understand, though, that if the

14  settlement is approved, you would not be getting -- or

15  you would be getting at the most $475?  Do you

16  understand that?

17      A    Yes.

18      Q    And have you ever questioned whether you

19  should exclude yourself from the settlement in order to

20  try to gain more money from Coverall or some other

21  party?

22      A    No.

23      Q    And have you talked to Diana -- other than

24  your attorneys, let me just state that up front, have

25  you talked to anyone else about this case other than

1    Shannon or Hillary?

2         A    Not in a detail, but they just know there's an

3    appeal going on.

4         Q    And have you talked to any of your friends

5    regarding your options on this settlement and this

6    objection that you're in the midst of?

7         A    No.

8         Q    Have you sought out other attorneys to talk to

9    to discuss the issues involved in this case?

10        A    No.

11        Q    Have you asked anyone for names of other

12   attorneys to talk to so you could get other ideas

13   regarding this case?

14        A    No.

15        Q    Now, if Judge Miller does not approve the

16   settlement, do you plan to sue Coverall regarding the

17   claims that you've articulated earlier today?

18        A    You -- can you just -- can you repeat that one

19   more time.

20             MR. ANTIA:  Madam Court Reporter, can you

21   repeat the question.

22             (The record was read as follows:

23                  "Now, if Judge Miller does not

24             approve the settlement, do you plan

25             to sue Coverall regarding the claims

1            that you've articulated earlier

2            today?")

3            THE WITNESS:  I don't know.  I've got to talk

4    to somebody before I do.

5    BY MR. ANTIA:

6        Q    And have you considered that option?

7        A    No.

8        Q    And did you sign a retainer agreement with

9    your lawyers regarding the representation of you in this

10   case?

11       A    What's . . .

12       Q    Sure.  Did you sign any contract with Shannon

13   or Shannon's law firm in order for them to represent you

14   in this case?

15       A    I think I did sign some paper.

16       Q    You did.  Okay.  And did you review that

17   contract before you signed it?

18       A    No.

19       Q    Did you discuss that contract -- other than

20   with your lawyers, did you discuss that contract with

21   anyone?

22       A    No.

23       Q    Did you talk to Diana about it?

24       A    No.

25       Q    Has Diana ever met Shannon or Hillary?

1     A    Not to me.  I don't know if they met before.

2  I don't know.

3     Q    Has Diana ever mentioned that she knows

4  Shannon or Hillary or anyone that works in Shannon or

5  Hillary's law firm?

6     A    Not to me.

7          MR. ANTIA:  Okay.  That's all the questions I

8  have.  Thank you, Mr. Singh.

9          THE WITNESS:  Thank you.

10         MS. LORENS:  I have just one last question

11  following up on what Mr. Antia asked.

12                   FURTHER EXAMINATION

13  BY MS. LORENS:

14     Q    Did you ever sign what's called a conflict

15  waiver?  A form that says, I'm waiving any conflicts

16  that you, my attorney, Ms. Liss-Riordan, may have with

17  me?

18     A    I don't remember.

19     Q    You don't remember.

20          Has anyone ever mentioned to you -- strike

21  that.

22          MS. LISS-RIORDAN:  I thought you had one more

23  question.  I think you're going beyond the scope of what

24  Mr. Antia asked.

25  //

1    BY MS. LORENS:

2        Q    Has anyone from Ms. Liss-Riordan's office

3    disclosed to you that they may have --

4             MS. LISS-RIORDAN:  Objection.

5    BY MS. LORENS:

6        Q    -- a conflict of interest with you because

7    they also represent a class of Coverall franchisees in

8    Massachusetts?

9             MS. LISS-RIORDAN:  Objection; again, you're

10   asking for attorney-client communication.

11   BY MS. LORENS:

12       Q    I don't want to know any -- I just want a

13   yes-or-no answer whether or not this has been disclosed

14   to you.  Has anyone disclosed to you that there may be a

15   conflict of interest between you and the class of

16   franchise owners that Ms. Liss-Riordan represents in

17   Massachusetts?

18            MS. LISS-RIORDAN:  And objection because it

19   assumes a fact that's not in evidence.

20            THE WITNESS:  I don't remember.

21   BY MS. LORENS:

22       Q    You don't remember.  Okay.  Were you ever

23   given a document to sign that had the word "conflict" in

24   it as you were hiring Ms. Liss-Riordan?

25       A    I don't remember.

1      Q    Were you ever told to go confer with an

2   independent attorney, that means an attorney other than

3   Ms. Liss-Riordan or her firm, about a potential

4   conflict?

5      A    No.

6      Q    Are you aware of the fact that at any time,

7   you can seek independent counsel to get a second opinion

8   about your rights as they relate to this case and your

9   objection?

10     A    I'm sorry.  I didn't --

11          MS. LISS-RIORDAN:  Counsel, I'm going to

12   continue to object on the harassing and deterring nature

13   of the questions, but go ahead and ask them.

14   BY MS. LORENS:

15     Q    Are you aware that at any time, today,

16   tomorrow, next week, a year from now, you have the right

17   to speak with another attorney to inquire about your

18   options in this case?

19          MS. LISS-RIORDAN:  I also think it's improper

20   to inform a represented party at a deposition that he

21   should seek other legal counsel.  He can answer, but

22   this is just an improper line of questioning.

23          MS. LORENS:  Well, my understanding of the law

24   is that if you have a potential conflict, you've got to

25   disclose it and advise the client to seek independent

1   counsel in evaluating that conflict and whether to waive

2   it.

3              MS. LISS-RIORDAN:  I'm not going to get into a

4   legal fight with you on the record, Tracee.  Just ask

5   him a question.  I'm stating my objection.

6   BY MS. LORENS:

7       Q    Are you aware that you have the right to speak

8   with an independent attorney, if you'd like, regarding

9   this case?

10      A    Yes.

11      Q    Okay.

12             MS. LORENS:  Nothing further.

13             MS. LISS-RIORDAN:  I'm going to ask a few

14  questions, but let's take a break first.

15             (Recess.)

16             (Mr. Cadena exited the proceedings.)

17                          EXAMINATION

18  BY MS. LISS-RIORDAN:

19      Q    Mr. Singh, I've got a few questions for you.

20  You've been asked a lot today about your relationship

21  with Coverall and you talked a bit about losing customer

22  accounts.  Can you just tell me generally what issues

23  you have with Coverall?

24             MR. ANTIA:  Objection; asked and answered.

25             THE WITNESS:  There's multiple issues, like if

1    I lose account, I won't even know about it till I get a

2    letter.  Never get to talk to the manager, whoever owns

3    that building, what's going on with it.  It's just

4    overall, it wasn't working out with them.

5    BY MS. LISS-RIORDAN:

6        Q    Okay.  Just from a more general level, you

7    paid, I think the testimony was, more than $19,000 to

8    Coverall.  How do you feel about having paid that money

9    to Coverall?

10       A    That that was a lot of money for what I was

11   doing.  It looks like I was just paying to get a job.  I

12   was just a worker there.

13       Q    And did you get the kind of money you were

14   expecting to get from Coverall in exchange for having

15   paid $19,000 --

16       A    No.

17       Q    -- which you took out of your 401K, a lot of?

18       A    No, it was not even close.

19       Q    Can you tell me generally what kind of pay you

20   did get from the job you did for Coverall?

21       A    If you calculate everything, probably minimum

22   wages.

23       Q    Okay.  Now, the settlement -- you understand

24   the settlement provides that certain people who worked

25   for Coverall could get $475, right?

1       A    Yes.

2       Q    Okay.  And you understand that that is only

3   available to the former workers, not the current -- not

4   the people that are currently working for Coverall,

5   right?

6       A    Right.

7       Q    Well, first of all, what do you think about

8   that?  Do you have any thoughts about that?

9       A     It's not fair for the current franchise owner

10  not to receive money, just a credit, and it's not fair

11  for the franchise owner -- former franchise owner to

12  just receive money and just $400, where they spent

13  thousands of dollars to buy this franchise.

14      Q    And do you understand that under the

15  settlement, the only people who get the $475 are the

16  people who send in a claim form?

17      A    Yes.

18      Q    And do you understand that only somewhere over

19  100 -- 119 people sent in that claim form to get the

20  $475?

21      A    Yes.

22           MR. ANTIA:  Objection; lacks foundation.

23  BY MS. LISS-RIORDAN:

24      Q    So my question for you is:  If I represent to

25  you that what Coverall would be paying out in the

Page 150

1    settlement is approximately $55,000 for a class of 1500

2    workers, do you have any thoughts on that?

3              MR. ANTIA:  Objection; misstates the record,

4    lacks foundation and misstates the settlement.

5              MS. LORENS:  I agree with those objections and

6    object on behalf of the plaintiffs as well.

7              MS. SIMS:  I concur.

8              THE WITNESS:  Can you please repeat that.

9    BY MS. LISS-RIORDAN:

10        Q    Sure.  If I represent to you that if the

11   settlement were approved, people who worked for Coverall

12   would get somewhere around a total of $55,000, do you

13   have any feelings about that?

14             MR. ANTIA:  Same objection.

15             MS. LORENS:  Concur.

16             MS. SIMS:  I concur as well.

17             THE WITNESS:  I don't think it's fair for all

18   those people who spent thousand of dollars and just

19   receiving $400, especially for those that didn't get

20   those forms.

21   BY MS. LISS-RIORDAN:

22        Q    All right.  Mr. Singh, you testified today you

23   have a couple of years of college education, right?

24        A    Yes.

25        Q    And when you read the notice that was sent to

1    class members, your understanding of it was that if you

2    sent the form in, you would get $15,000 plus $475,

3    right?

4         A    Yes.

5         Q    Do you have any thoughts about whether most or

6    any of the Coverall workers out there who got this form,

7    what they might have understood from it?

8              MR. ANTIA:   Objection.

9              MS. SIMS:   Objection; lacks foundation, calls

10   for speculation.

11             THE WITNESS:   Same thing probably what I

12   thought, that you're going to receive this money and

13   then later on you're going to receive that 15,000.

14   BY MS. LISS-RIORDAN:

15        Q    And do you think that if more Coverall workers

16   actually understood that if the settlement is approved,

17   all they're going to get if they're a former worker and

18   if they met the deadline of putting the claim in, all

19   they would get is $475, do you think if more people

20   really understood that, they would think that was a fair

21   settlement?

22             MS. SIMS:   Objection; lacks foundation, calls

23   for speculation.

24             MS. LORENS:   Concur.

25             THE WITNESS:   Can you please repeat that.

1    BY MS. LISS-RIORDAN:

2        Q     Sure.   The people who do work for Coverall --

3    I mean, you have a couple years of education, right?

4        A     Yes.

5        Q     Do you understand that there are a lot of

6    Coverall workers that don't have higher education?

7                 MS. SIMS:  Objection.  I'm sorry.  Go ahead.

8                 MS. LORENS:  Objection; calls for speculation,

9    lacks foundation.

10                THE WITNESS:  Yes.

11   BY MS. LISS-RIORDAN:

12       Q     Okay.   And so my question is:  Do you think

13   that if the Coverall workers who received Exhibit 3,

14   this class notice, in the mail really understood that if

15   this settlement is approved, they, if they were former

16   Coverall workers, would be eligible to receive $475 if,

17   and only if, they got a claim form submitted in time and

18   that there would be no other money paid to any other

19   Coverall workers, do you think if they really truly

20   understood that, people would agree that that was fair?

21                MS. SIMS:  Objection; lacks foundation, calls

22   for speculation.

23                THE WITNESS:  No.

24   BY MS. LISS-RIORDAN:

25       Q     And, now, I think you were asked questions by

1   a couple or several of the lawyers here today about

2   various terms in the settlement agreement regarding

3   so-called ownership of accounts.  These were terms that

4   were discussed with you regarding what these attorneys

5   stated were changes that would be made for current

6   workers with respect to how much interaction they might

7   have with cleaning accounts.  Do you remember that --

8        A    Yes.

9        Q    -- discussion?

10            Okay.  And, first of all, you understand that

11  those provisions of the settlement only apply to the

12  current workers, not the former workers, obviously,

13  right?

14       A    Right.

15       Q    Okay.  And do you understand that those

16  terms -- that the so-called assigning of accounts would

17  only, under the terms of the settlement, apply to

18  workers who had paid off their franchise fees and paid

19  off any additional business fees with respect to those

20  accounts?

21            MR. ANTIA:  Objection; lacks foundation.  He's

22  already testified he hasn't even reviewed the settlement

23  agreement.

24            MS. LORENS:  Calls for speculation.

25            MS. SIMS:  I concur.

1          THE WITNESS:  Can you please repeat it.

2   BY MS. LISS-RIORDAN:

3      Q    Okay.  So if I represent to you -- okay.  I

4   know you've said you haven't read every term of this

5   notice or the legal papers.  But do you understand that

6   these terms regarding the so-called assignment of

7   accounts only applies to the Coverall workers who have

8   paid off their franchise fee in full and have paid off

9   any additional business fees as related to the accounts?

10  Do you understand that this assignment of accounts would

11  only happen after all of those amounts are paid off?

12          MS. LORENS:  Same objection.

13          MS. SIMS:  Same.

14          THE WITNESS:  No, because I don't think that's

15  fair for them because they might lose an account before

16  they paid these off, so they don't own the account.

17  BY MS. LISS-RIORDAN:

18      Q    Okay.  So, in other words, if there were some

19  protections that could occur and be of some benefit

20  after the payments are paid off, those benefits would

21  not go to the people who hadn't yet paid off their

22  accounts, right?

23          MS. SIMS:  Objection; leading.

24          THE WITNESS:  Yes.

25  //

1  BY MS. LISS-RIORDAN:

2       Q      Okay.  And do you think that's fair for them?

3       A      No.

4       Q      Okay.  Because one of the concerns I think I

5  heard you talk about earlier is that accounts seem to be

6  passed on from one franchisee to another, right?

7       A      Yes.

8       Q      And you talked about how there was some log in

9  the office where you saw that -- something about

10 accounts got handed from one franchisee to another,

11 right?

12             MS. SIMS:  Objection; misstates prior

13 testimony.

14             THE WITNESS:  Yes.

15 BY MS. LISS-RIORDAN:

16      Q      Okay.  So is it your understanding that the

17 settlement agreement would prevent that from ever

18 happening again?

19             MR. ANTIA:  Same objection.

20             MS. SIMS:  Objection; lacks foundation, calls

21 for speculation.

22             THE WITNESS:  I don't know.  I can't answer

23 that because I haven't seen nothing yet.  So if that

24 were to happen, that would be good for the current, but

25 not the previous people who already lost all their

Page 156

1   accounts.

2   BY MS. LISS-RIORDAN:

3       Q     Right.  And if those changes that we talked

4   about regarding the so-called assignment of accounts

5   only applies to the people who already paid off their

6   accounts, all the people who haven't yet paid all their

7   accounts would still be vulnerable to the turning of

8   accounts that we're talking about, right?

9       A     I don't think that's fair.

10      Q     So you don't think that's fair to all those

11  people who haven't paid off their accounts yet, right?

12      A     Right.

13            MS. SIMS:  Objection; leading.

14  BY MS. LISS-RIORDAN:

15      Q     Another term of the settlement is that the

16  attorneys who were representing the punitive class in

17  this case, that's Ms. Lorens or her co-counsel who was

18  sitting here today, would be paid nearly a million

19  dollars in attorneys' fees.  If I represented to you

20  that under the settlement, Coverall workers would

21  receive approximately $55,000 and Ms. Lorens and her

22  co-counsel would receive close to a million dollars, do

23  you think that's fair?

24      A     No.

25            MS. LORENS:  Objection.

1           THE WITNESS:  No.

2           MS. LISS-RIORDAN:  Okay.  I have no further

3  questions.

4           MS. LORENS:  I have a couple.  Do you want me

5  to go first?

6           MR. ANTIA:  Sure.

7           MS. LORENS:  Because you guys might have some,

8  too.

9                    FURTHER EXAMINATION

10  BY MS. LORENS:

11      Q    I just want to make sure I heard you

12  correctly.  Earlier I think you told us you hadn't read

13  the settlement agreement; is that correct?

14      A    (Indicating.)

15      Q    That was the 20-some page document that

16  Ms. Sims was talking to you about.

17      A    I probably didn't went through everything, no.

18      Q    Have you ever seen the settlement agreement?

19      A    (No response.)

20      Q    Let me ask it differently.  Have you ever seen

21  any documents relating to this case that aren't included

22  in the exhibits that are sitting in front of you?  Have

23  you seen anything besides that?

24      A    I can't remember.

25      Q    All right.  Have you ever seen a document that

1    looks like this (indicating)?  And I'm now referring to

2    the class action settlement agreement and release, which

3    was Exhibit D to the motion for preliminary approval, I

4    believe.

5         A    I don't remember seeing that.

6         Q    Okay.  So earlier today, you testified that

7    you'd never seen this before.  Is it your testimony that

8    you've never seen it or that you don't remember seeing

9    it?

10        A    I think I -- I don't remember seeing it.

11        Q    Okay.  Do you have any idea of what is

12   contained in this document?

13        A    I don't remember.

14        Q    Can you tell me anything at all that you

15   remember in this document, even if it's just one thing?

16        A    No, I don't remember.

17        Q    Are you sure you've even seen it before?

18             MS. LISS-RIORDAN:  Asked and answered;

19   objection.

20             MS. LORENS:  Well, the problem is we've gotten

21   two answers.

22   BY MS. LORENS

23        Q    So I just want to make sure we've got a clear

24   record here.  And you know you're under oath.  So even

25   though this is an informal setting, this is very

Page 159

1    serious.  It's like testifying in court.

2           Do you know for sure whether or not you've

3    ever seen this document before?

4    A    I can't say for sure I've seen it or not.

5    Q    Okay.  And I believe you also testified

6    earlier that you haven't ever talked to any other of the

7    franchise owners about this case.

8    A    No.

9    Q    And you haven't talked to any other franchise

10   owners about the proposed settlement in this case?

11   A    No.

12   Q    Okay.  So then when you tell your attorney how

13   the other class members might feel about this

14   settlement, you're just guessing, aren't you?

15   A    Yes, I'm just --

16   Q    You're just --

17          MS. LISS-RIORDAN:  Let him finish.

18   BY MS. LORENS:

19   Q    I'm sorry.  I did not mean to cut you off.

20   Please finish.

21   A    That's okay.  I'm just saying is what I feel

22   they all thought.

23   Q    Right.  So you're speculating, you're guessing

24   what you think they might feel?

25   A    Yes.

1      Q     And then when you started, you said your

2   issues with the settlement were that you would lose an

3   account and you won't know until you get the letter.

4   Would that be a letter from Coverall telling you you've

5   lost an account that you were referring to?

6      A     Yeah, a letter or a phone call.

7      Q     Okay.  So when you said that, you meant they

8   could take your account and you wouldn't even know they

9   took your account until they sent you a letter or made a

10  phone call, correct?

11     A     Yes.

12     Q     Okay.  And that your other issue with the

13  settlement was that you never got to talk to the manager

14  of the building --

15     A     Yes.

16     Q     -- correct?

17     A     Yes.

18     Q     And so if I was able to get Coverall to agree

19  that you can't lose an account without the actual owner

20  of the building being the person that terminates your

21  services, that would be an improvement, right?  Did that

22  make sense?  I can rephrase that.

23     A     Yes, but I don't know if the current owner

24  would -- you know, how they feel about that.

25     Q     Right.  My question is this:  So if we change

1   the system so that now it's not Coverall that takes an

2   account, that the only way you can lose an account is,

3   say, you're working for Leslie Pools and, say, the

4   owner's name was Joe, and Joe said to you, I'm not happy

5   with your services, I'm firing you.  If that was the

6   only way an account could be pulled, that would be

7   better than the way it used to be, right?

8        A    Right.

9        Q    Okay.  And that would also mean that you'd get

10   to talk directly to -- and I'm just guessing that the

11   owner of Leslie Pool's name is Joe, that's just an

12   example, but let's use Joe for our example.  That would

13   also mean that you would have the right to talk directly

14   to Joe and discuss any issues he had with the services,

15   correct?

16       A    Right.

17       Q    Okay.  And that would be a lot better than the

18   way it was when you were a Coverall franchisee, right?

19       A    Yes.

20            MS. LORENS:  Okay.  Nothing further.

21            MS. SIMS:  Mazda, do you have anything?

22            MR. ANTIA:  Do you have anything?

23            MS. SIMS:  No.

24            MR. ANTIA:  I'm fine.

25            MS. SIMS:  We're done.

1           THE REPORTER:  This completes the deposition.

2    The time is 1:21.

3           Did you need a copy?

4           MS. LORENS:  I don't think I need a copy.

5           THE REPORTER:  Do you need a copy of the

6    transcript?

7           MR. ANTIA:  Yes.

8           MS. LISS-RIORDAN:  Yes, I'd like a copy,

9    please.

10          MS. SIMS:  We do need a rough.

11          THE REPORTER:  Does anybody else need a rough?

12          MR. ANTIA:  If she's getting a copy, I don't

13   need a copy.

14          THE REPORTER:  So you don't need a copy, then?

15          MR. ANTIA:  No, I'm good.  Thank you.

16    (The deposition of AMRIT SINGH was concluded at this

17                      point.)

18          (TIME NOTED: 1:21 P.M.)

19

20

21

22

23

24

25

1                DEPOSITION OFFICER'S CERTIFICATE

2

3   STATE OF CALIFORNIA            )

4                                 )   ss.

5   COUNTY OF ORANGE              )

6

7        I, PAULINA BALBUENA, hereby certify:

8        I am a duly qualified Certified Shorthand Reporter

9   in the State of California, holder of Certificate Number

10  CSR 12898 issued by the Court Reporters Board of

11  California and which is in full force and effect.  (Fed.

12  R. Civ. P. 28(a)).

13       I am authorized to administer oaths or

14  affirmations pursuant to California Code of Civil

15  Procedure, Section 2093(b), and prior to being examined,

16  the deponent was first duly sworn by me.  (Fed. R. Civ.

17  P. 28(a), 30(f)(1).

18       I am not a relative or employee or attorney

19  counsel of any of the parties, nor am I a relative or

20  employee of such attorney or counsel, nor am I

21  financially interested in this action.  (Fed. R. Civ.

22  28).

23       I am the deposition officer that stenographically

24  recorded the testimony in the foregoing deposition and

25  the foregoing transcript is a true record of the

1 testimony given by the witness. (Fed. R. Civ. P.

2 30(f)(1)).

3        Before completion of the deposition, a review of

4 the transcript [ ] was [X] was not requested. If

5 requested, any changes made by the deponent (and provided

6 to the reporter) during the period allowed, are appended

7 hereto. (Fed. R. Civ. P. 30(e)).

8

9 Dated: December 19, 2011

10

11

12

13    _____

14        PAULINA BALBUENA, CSR No. 12898, RPR, CCRR

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3    THURSDAY, DECEMBER 15, 2011

4

5    WITNESS                              EXAMINATION

6

7    AMRIT SINGH

8        BY MS. SIMS                                5

9        BY MS. LORENS                   90, 144, 157

10       BY MR. ANTIA                             133

11       BY MS. LISS-RIORDAN                       147

12

13

14                INSTRUCTION NOT TO ANSWER

15                   Page       Line

16                    104          1

17

18                 INFORMATION REQUESTED

19                      (NONE)

20

21

22

23

24

25

Page 166

```
 1                    DEPOSITION EXHIBITS

 2                       AMRIT SINGH

 3   NUMBER                DESCRIPTION                    PAGE

 4

 5   Exhibit 1      Letter dated May 20, 2005 from        34

 6                  Coverall to Amrit Singh; 1 page

 7   Exhibit 2      Notice of Intention to Appear at      62

 8                  Final Fairness Hearing and

 9                  Objection to Class Action

10                  Settlement; 6 pages

11   Exhibit 3      Legal Notice; 14 pages                68

12   Exhibit 4      Claim Form; 2 pages                   74

13   Exhibit 5      Cover page to the janitorial          80

14                  franchise agreement between Mr.

15                  Singh and Coverall; 1 page

16

17

18

19

20

21

22

23

24

25
```