UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SABRINA LAGUNA, an individual; CARLOS ACEVEDO, an individual; TERESA SALAS, an individual; and ROES 3-50 on behalf of themselves and in a representative capacity for all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COVERALL NORTH AMERICA, INC., a Delaware corporation; ALLIED CAPITAL CORPORATION, a Maryland corporation; ARES CAPITAL CORPORATION, a Maryland corporation; CNA HOLDING CORPORATION, a Delaware Corporation; TED ELLIOTT, an individual; DOES 5-50 inclusive,<br><br>Defendants. | CASE NO.  3:09-CV-02131-JM (BGS)<br><br>**CLASS ACTION**<br><br>**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING MOTION FOR ATTORNEY'S FEES AND CLASS REPRESENTATIVE ENHANCEMENTS**<br><br>Docket Nos. 254, 255 |

In the fall of 2009, Plaintiffs filed a class action complaint in California state court against Defendants based on purported violations of various state laws relating to class members' Janitorial Franchise Agreements ("JFAs") with Defendant Coverall North America, Inc. ("Coverall"). The parties now move for final approval of a settlement reached in the summer of

2011 and for approval of Plaintiffs' request for attorney's fees and class representative enhancements. For the reasons stated below, the court GRANTS both motions.

## I. BACKGROUND

The facts alleged in Plaintiffs' complaint have been discussed at length in the court's prior orders and need not be repeated here.

On September 12, 2011, the parties moved for preliminary approval of the Class Action Settlement Agreement and Release ("Settlement" or "Agreement"). After a hearing, the court granted preliminary approval. On November 14, 2011, class member Amrit Singh ("Singh" or "Objector") filed an objection to the proposed settlement. Though the objection was filed beyond the date required by the court's preliminary approval order, the court accepted the filing in the interest of determining the issues on the merits. On November 21, the court held a hearing regarding final approval that was attended by all parties and Singh. Subsequent to the hearing, the court sent a letter to the parties and to Singh requesting clarification on two issues. The letter instigated a flurry of responses from the parties and from Singh. After reviewing all of the submissions,[1] the court has determined that final approval is appropriate.

## II. LEGAL STANDARD AND DISCUSSION

The federal rules require a district court's approval in order for any "claims, issues, or defenses of a certified class" to be "settled, voluntarily dismissed, or compromised." Fed. R. Civ. P. 23(e). "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 625 (9th Cir. 1982). However, in making its decision, the court must look at "whether the settlement is fundamentally fair, adequate and reasonable." Id. This includes an examination and balancing of multiple factors, including but not limited to:

---

[1] Several of the documents filed were duplicative and several were not filed in compliance with local rules or the court's instructions. For that reason, the court rejected several documents. The failures to comply notwithstanding, the court has considered all substantive arguments put forth by the parties.

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Id.  Rule 23(e)(1) requires the court to take certain steps to ensure proper administration of the settlement, including "direct[ing] notice in a reasonable manner to all class members who would be bound by the proposal."

**A. Terms of the Settlement Agreement**

The Agreement provides separate benefits for current and former franchisees. Principally, Coverall pledges to assign customer accounts to current franchisees. Settlement ¶ 7.1.  Certain accounts are excepted, and assignments are conditional until franchisees have paid their franchise fees in full.  Coverall represents that the gross billing of all customer accounts in California was $ 20 million in 2010.

Former franchise owners will receive $ 475 each and will receive a $ 750 purchase credit toward a new Coverall franchise.  ¶¶ 7.2-7.3.

The Settlement provides new franchisees with a 30-day right to rescind their JFAs.  If a franchisee rescinds within that period, he or she will be refunded all of the money paid under the JFA except for the $ 75 background investigation.  ¶ 7.4.  Coverall also has agreed to guarantee repurchase of accounts from franchisees according to a specified price formula set forth in the Agreement.  ¶ 7.5.

The Agreement also provides franchisees with the right to stop servicing an account for nonpayment and reduces the current noncompetition period from eighteen months to twelve months.  ¶¶ 7.6-7.7.  Further, Coverall has promised to replace accounts that are lost as long as the loss of the account is not the fault of the franchisee and the account is lost within the JFA's

1  guarantee period.  Coverall must replace the account within a reasonable amount of time, not to
2  exceed 120 days.  ¶ 7.8.
3       The Agreement also states that Coverall "shall offer Franchise Owners accounts that are
4  located within a reasonable proximity of each other" subject to availability.[2]  ¶ 7.9.  Coverall has
5  also promised to provide training for all new franchisees with training materials in both English
6  and Spanish.  This training will inform franchisees of their ability to incorporate and form
7  partnerships.  ¶ 7.10.
8       Defendants have also agreed to pay the named Plaintiffs a total amount of  $ 15,000.
9  Class counsel has sought, and Defendants have agreed to pay, $ 994,800 in attorney's fees.  ¶¶
10 10-11.
11      As a part of the Settlement, the class will release its claims against Defendants arising out
12 of or related to claims asserted in this case, but will not release claims relating to Coverall's
13 obligations under JFAs with franchisees or the obligations under the Agreement.
14      The court preliminarily approved the Settlement on September 19, 2011.  Shortly
15 thereafter, the claims administrator sent notice to all class members in English and Spanish.
16 Former class members were given until October 24, 2011 to opt out or object, and until
17 November 8, 2011 to submit a claim form.  As of the final approval hearing on November 21,
18 2011, two class members had opted out and one had objected.  Of the former franchisees, 119
19 had submitted claim forms.[3]

---

[2] This provision was modified slightly by the parties in response to the court's letter requesting clarification.  Thus, this order adopts the modified language as paragraph 7.9 of the Settlement Agreement.

[3] There is some conflicting information about the number of former franchisees.  The parties represented to the court that 119 out of 750 former franchisees submitted claim forms, for a response rate of 16%.  This would make the overall recovery rate about 58% since all current franchisees will benefit (Plaintiffs' counsel calculated this at 66%, but that appears to be a mathematical error).   However, the Dournaee Declaration stated that the claim form was mailed to 1494 "Former Franchise Owners."  This was likely a typographical error.  In any case, the total recovery rate is somewhere between 50% and 60%.

**B. Fairness of the Settlement Terms**

Singh strongly objects to the fairness of the Settlement and raised numerous issues at the hearing and in his papers. These concerns are discussed below. However, after considering the Objector's concerns, the court has concluded that, considering the factors listed in Officers for Justice, 688 F.2d 615, the Settlement should be approved. Plaintiffs' case was not weak, but faced several substantial hurdles both to finding liability and obtaining judgment against Defendants. The litigation, while over two years old, was likely to continue for some time given recent Supreme Court decisions on arbitration and class action status. And while the amount offered in settlement may represent less than could have been obtained in some individual cases, assignment of customer accounts and pledges for programmatic changes are significant victories. No governmental entity has weighed in on the matter.[4] Further, Plaintiffs' attorneys have significant experience in this area[5] and have demonstrated skill and diligence throughout the litigation; their representations as to the fairness of the Agreement are not to be taken lightly. Finally, as of the final approval hearing, only two class members had opted out and only one has objected.

Overall, these factors weigh in favor of approval. Plaintiffs' counsel faced significant risks and made a reasonable compromise in order to secure a significant recovery for the entire class.

---

[4] Under 28 U.S.C. § 1715(d), final approval may not be granted until 90 days after federal and state officials are notified. The 90-day window expired in late December. The Objector has repeatedly stated that a Deputy Attorney General of California "is considering taking action in this matter in support of the objection." However, no government entity has made any filing in the case or contacted the court.

[5] Plaintiffs' attorney Raul Cadena has practiced employment and labor law in San Diego since 1996, and founded his own firm to represent employees eight years ago. Cadena Decl. at 5. Attorney L. Tracee Lorens' law firm, Lorens & Associates, APLC, handles 80% employment class action cases, and Ms. Lorens has acted as lead counsel in numerous class actions over the past ten years. Lorens Decl. at 1.

1. Risk of Proceeding with Litigation

a. Concepcion and Other Coverall Litigation

Plaintiffs expressed concern that after the Supreme Court's decision in AT&T Mobility v. Concepcion, 131 S.Ct. 1740 (2011), the class could have been forced into arbitration. At the very least, the existence of the case would likely cause some delay in the adjudication of this case. Singh uses a footnote to argue that Plaintiffs' concern is misplaced, and that "a number of courts in California have continued to find class action waivers unenforceable even after Concepcion." Obj. at 7, n. 7. While this is true, Singh leaves out the fact that several courts have also come to the opposite conclusion. E.g., Valle v. Lowe's HIW, Inc., 2011 U.S. Dist. LEXIS 93639 at *16 (N.D. Cal. 2011) (holding that Gentry v. Superior Court, 42 Cal. 4th 443 (2007), is no longer good law and citing to two other California district court cases reaching the same conclusion).

This conflicting case law demonstrates Plaintiffs' point: there was no way to be sure whether the class claims would have been forced into individual arbitration. Thus, as with other issues discussed in this order, Plaintiffs were entitled to make some sacrifices due to this uncertainty and the prospect of further delays and expenses.

The same reasoning applies to Singh's argument concerning litigation against Coverall in Massachusetts. Singh explains that the Massachusetts Supreme Judicial Court has ruled that a Coverall franchisee meets the definition of an employee under Massachusetts law. While "Objector's counsel recognize that the law regarding the plaintiffs' misclassification may not be as clear as it is in Massachusetts . . . and the test is more burdensome for plaintiffs [in California]," Singh seems to argue that any apprehension on the part of Plaintiffs is unjustified. However, Singh has provided little support for this contention, instead repeatedly relying on Coverall employees' success or anticipated success in Massachusetts. It is undeniable that by continuing to litigate, Plaintiffs would run some risk based on both California employment law

and other factors described throughout this order. While Plaintiffs and the Objector may disagree about the likelihood of eventual success and recovery, the court finds that Plaintiffs' assessment of the risk was reasonable under the circumstances and the compromises made are acceptable.

b. Financial Health of Defendants

Plaintiffs' concern over Coverall's ability to pay seems to have played a large role in driving the settlement. Singh alleges that while Coverall may not be doing well, Ares Capital (which recently acquired Allied Capital that invested in Coverall) and CNA Holding Corporation (Coverall's parent), both "appear to be in robust financial health." Singh points out that CNA reported almost $ 164 million in revenues in 2010, but fails to also note that the company saw a net loss of $ 1.8 million in 2010, after income of under $ 100,000 in the previous two years. Obj. Ex. 4. Further, Plaintiffs note that Ares reported a loss of $ 7.6 million in its investment in Coverall and now no longer owns Coverall. Singh has not provided evidence sufficient to establish Plaintiffs' concerns about the ability to recover are fabricated.

2. Potential of Individual Recovery

The Objector also constantly raises the point that, given Plaintiffs' concerns with the continuing viability of the class litigation, franchisees could pursue individual claims in court. While individual recovery may have been possible, Singh fails to seriously consider the likelihood of Coverall franchisees hiring attorneys and pursuing these claims on an individual basis.[6] Given Singh's characterization of Coverall franchisees as typically transient individuals incapable of fully understanding the implications of the Settlement, his reliance on the possibility that a significant number of franchisees would instigate individual litigation is unfounded. Further, Singh's argument could only succeed if the opt out provision of the Agreement were

---

[6] Plaintiffs note that only three other cases have been filed against Coverall in California, and none of them involved misclassification claims.

found to be lacking. While some former franchisees may not receive notice or fully understand their rights to opt out, the opt out provision is clear and the parties have engaged in a significant effort to reach class members. Thus, Singh's arguments that rely on the potential recovery of an individual plaintiff taking his claims to trial must be rejected.

3. Fairness of the Opt Out Provision

Singh also attacks the fairness of the opt out provision in the Settlement, arguing that "it is unrealistic to assume that many Coverall cleaning workers truly understood the significance of the forms that were sent to them and the potential value of the claims they have against Coverall." Obj. at 8. Further, he questions the 30-day opt out period.

While Singh raises valid questions about the opt out process, the court finds it to be fair overall. The notice clearly explained the case and the Settlement obtained by class counsel in both English and Spanish. While the 30-day window is fairly short, Singh fails to provide case law to support his argument. While Ninth Circuit courts have sometimes rejected a 30-day opt out window, some have accepted similar time frames as well. The final determination depends on the specific circumstances of the case. Compare Thieriot v. Celtic Ins. Co., 2011 WL 109636 at *5 (N.D. Cal. 2011) (rejecting 30-day opt out period) with Murillo v. Pacific Gas & Elec. Co, 2010 WL 2889728 at *5 (E.D. Cal. 2010) (approving 33-day window). Here, Plaintiffs' concerns over Defendants' financial health justified the 30-day window.[7]

Finally, Singh's objections about the class' level of understanding do not make the notice unfair. Any class action settlement will contain a total recovery that is lower than the highest potential amount a class member could win through litigation, and Singh has pointed to no

---

[7] Final approval did not come as quickly as Plaintiffs hoped, principally because of Singh's objections. However, this does not negate the original purpose of the short opt out window. Further, Defendants assured the court that they continued to accept claim forms several weeks after the claims period closed. While the short window may have still prevented some class members from opting out, the longer period of claim acceptance alleviates some of the concern that those who considered opting out were not precluded from recovering under the Settlement.

authority mandating that class notice should speculate as to such potential damages in explaining the opt out provision.

4. Claim Window

Singh also maintains that the 45-day claim window for former franchisees is too short. As stated above, the parties assured the court that claims were accepted for at least several weeks beyond the 45-day period. While Singh is likely correct that a significant percentage of the class is comprised of a transient population, he has not suggested how extending the timeframe would solve the problem of locating missing class members. District courts in the Ninth Circuit have often upheld 45-day claim windows. E.g., Moshogiannis v. Security Consultants Group, Inc., 2012 WL 423860 at *6 (N.D. Cal. 2012) (preliminarily approving settlement providing 45 days to submit claim forms); Morales v. Stevco, Inc., 2011 WL 5511767 at *14 (E.D. Cal. 2011) (same). Again, given the circumstances and Defendants' flexibility, the court approves of the claim window.

5. Reversionary Payment and Coupon Settlement

Singh also cites several cases and treatises to criticize the fact that unclaimed funds will revert to Defendants. While this is not a preferable result, Singh gives little weight to the fact that the cash portion of the settlement represents only a portion of the recovery. Defendants' principal concessions are comprised of assigning accounts to current franchisees and pledging to the court that it will curtail its allegedly illegal practices.

Along with the $ 475 to former class members, each class member has the option of redeeming a $ 750 coupon to purchase a new franchise. Singh correctly explains that coupon settlements are viewed with heightened scrutiny because they require class members to continue to do business with the entity that has allegedly previously violated their rights. While it is true that the purported value of the settlement to former class members should be discounted due to the fact that $ 750 of the recovery is in the form of a coupon, Singh essentially ignores the fact

that former class members will recover cash as well.  Given the risk of continuing the litigation and Plaintiffs' concern over Coverall's financial health, the court finds that the $ 475 is an acceptable recovery amount for former franchisees.  The coupon serves as an additional award for those former franchisees who may have had a successful relationship with Coverall or may believe that the programmatic changes and pledge to assign accounts will make a future business relationship viable.  The coupon's existence on top of the cash recovery should not prevent the Settlement's approval.

6. Lack of Specificity

Generally, Singh takes issue with the lack of specificity in the Settlement and argues that "there really will be no change in the relationship between Coverall and its franchisees in California going forward."  Indeed, it is unclear whether the assignment of all accounts to franchisees will reach the $ 18-20 million Plaintiffs claim, especially because assignments are only conditional until franchises are paid for in full.  However, Singh gives almost no weight to the fact that once franchises are assigned, franchisees will own a valuable business they can choose to sell or continue to operate.  Perhaps more importantly, Singh does not recognize that this court retains jurisdiction to enforce the letter and spirit of this Agreement in order to ensure Coverall abides by its obligations.  It is true Coverall's original JFAs already guaranteed some protections franchisees purportedly did not receive.  That fact notwithstanding, in the future Coverall will face a much stronger threat of swift rebuke should it renege on any of its obligations.

7. Attorney's Fees and Enhancement Payment

Plaintiffs' counsel has requested attorney's fees of $ 994,800.  The Objector asserts that this amount is too much, basing his argument on his own valuation of the Settlement and a comparison of the estimated lodestar amount his attorney may seek in similar litigation against Coverall in Massachusetts.

In California, attorney's fees in this situation are usually calculated using a lodestar analysis. However, sometimes "a lodestar calculation may be enhanced on the basis of a percentage-of-the-benefit analysis." Thayer v. Wells Fargo Bank, N.A., 92 Cal. App. 4th 819, 833 (2001). Plaintiffs' calculation of the lodestar amount here comes to almost $ 3 million—this amount is the result of over 4,500 hours billed by six Plaintiffs' attorneys, a paralegal, and a law clerk. Singh essentially calls this a false representation of the hours and/or rates devoted to this litigation by Plaintiffs' counsel. However, this case has been contentiously litigated for over two years, as this court has observed. Given the length of the litigation and the number of disputes that have been heard in front of this court, there is no reason to believe Plaintiffs' counsel have fabricated the number of hours they have devoted to this litigation.

Plaintiffs do not seek to enhance attorney's fees based on the percentage-of-the-benefit analysis, but do state that their requested fees make up less than five percent of the class' recovery. Obviously the value of the total recovery is disputed. However, even if the cash settlement, the assignment of accounts, and the pledged programmatic changes in the Settlement were worth only about $ 4 million, the requested fee award would fit with normal bounds of class action recovery. See, e.g., Lealao v. Beneficial California, Inc., 82 Cal. App. 4th 19, 36 (2000). Because Singh has made no convincing argument that the fees are inappropriate, the court approves of the $ 994,800 fee award.

Finally, the court approves Plaintiffs' requested enhancement award of $ 10,000 to Sabrina Laguna and $ 2,500 each to Carlos Acevedo and Teresa Salas. Ms. Laguna was deposed three times and played a comparatively large role in the case, and the total class representative enhancement reflects an appropriate portion of the entire Settlement. Further, $ 10,000 is not excessive given the total value of the Agreement. See, e.g. In re Mego Financial Corp. Securities Litigation, 213 F.3d 454 (9th Cir. 2000) (approving of $ 5,000 incentive award to two class representatives out of total $ 1.725 million settlement).

### III. CONCLUSION

While it is possible that litigation may have produced better results for Plaintiffs, the court finds that Settlement is a fair and adequate compromise and will provide class members with a significant recovery. Contrary to the arguments of the Objector, without Plaintiffs' efforts, most class members would have received no compensation. Thus, Plaintiffs' motions for final approval of the settlement and for approval of attorney's fees and class representative enhancements are GRANTED. The court retains continuing jurisdiction over the Settlement and any issues that may arise concerning its implementation, enforcement, construction, or interpretation.

Dated:  February 23, 2012

**Jeffrey T. Miller**
**United States District Judge**